## UNITED STATES COURT OF INTERNATIONAL TRADE

*Before*: The Honorable Jane A. Restani

| | |
|---|---|
| **RESOLUTE FP CANADA INC.,** | |
| **Plaintiff,** | |
| **v.** | |
| **UNITED STATES,** | **Court No. 23-00095** |
| **Defendant,** | |
| **and** | **PUBLIC DOCUMENT** |
| **COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS, et al.,** | |
| **Defendant-Intervenors.** | |

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD BY PLAINTIFF RESOLUTE

Elliot J. Feldman
Michael S. Snarr
Ronald J. Baumgarten
Tung A. Nguyen

**Baker Hostetler LLP**
1050 Connecticut Ave., NW
Suite 1100
Washington, D.C.  20036

Counsel for Resolute FP Canada Inc.

Dated:  November 6, 2023

# TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................... 1

II.   RULE 56.2 STATEMENT ......................................................................... 4

    A.  THE ADMINISTRATIVE DETERMINATION UNDER REVIEW ......................... 4

    B.  ISSUES OF LAW AND REASONS FOR CONTESTING ADMINISTRATIVE
       DETERMINATION ................................................................................ 4

III.  STATEMENT OF FACTS ......................................................................... 5

IV.   SUMMARY OF ARGUMENT .................................................................. 10

V.    STANDARD OF REVIEW ....................................................................... 12

VI.   ARGUMENT............................................................................................ 15

    A.  THE FLAWS IN COMMERCE'S DUMPING CALCULATIONS: AN OVERVIEW
       OF THE DPM AND COHEN'S *d* TEST ........................................... 15

    B.  THE SUNSET REVIEW STATUTE PROVIDES FOR A COMPANY-SPECIFIC
       DETERMINATION AND REVOCATION OF AN ORDER ............................... 18

      1.  Commerce Failed To Make A Resolute-Specific Determination As To The
         Likelihood Of The Continuation Or Recurrence Of Dumping .................. 18

      2.  Commerce Acted Arbitrarily In Denying Resolute  Company-Specific
         Relief............................................................................................ 21

    C.  THE FINAL RESULTS IN THIS REVIEW ARE ARBITRARY, CAPRICIOUS
       AND OTHERWISE NOT IN ACCORDANCE WITH LAW ............................... 24

      1.  Commerce Failed To Examine Resolute's Lawful Rate And Arbitrarily
         Rejected Resolute's "Good Cause" Showing Under 19 U.S.C. §
         1675a(c)(2) .................................................................................. 25

         a.  Resolute Demonstrated Defects In Commerce's DPM....................... 27

             (1)  Changes In Jurisprudence........................................................ 28

             (2)  Statistical Scholarship On The Record ....................................... 34

             (3)  Additional Factors.................................................................... 35

         b.  Commerce Failed To Articulate And Apply The Correct Standard ..... 37

             (1)  Commerce Should Have Reached A No Likelihood Finding By
                 Considering The Only Lawful Dumping Margin On The Record In
                 The Review .................................................................................. 37

             (2)  Commerce's Insufficient Explanation And Erroneous Application
                 Of 19 U.S.C. § 1675a(c)(2) Are Arbitrary And Capricious .......... 38

             (3)  Commerce's Disregard For Key Record Evidence (Hedges'
                 Report) Is Arbitrary And Capricious............................................ 41

2.   Commerce Never Addressed Resolute's Claim Of "Extraordinary Circumstances" And Should Have Reported To The Commission A Zero Margin As To Resolute ........................................................................... 43

VII.   CONCLUSION ...................................................................................................... 46

## TABLE OF AUTHORITIES

**Cases**

*AG der Dillinger Huttenwerke v. United States*,
193 F. Supp. 2d 1339 (Ct. Int'l Trade 2002) ............................................................ 25, 44

*Allegheny Ludlum Corp. v. United States*, 367 F. 3d 1339 (Fed. Cir. 2004) .................. 35

*Butte Cnty. V. Hogen,* 613 F. 3d 190 (D.C. Cir. 2010) ................................................... 42

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
467 U.S. 837 (1984) ........................................................................................ 13, 14, 22

*Government of Uzbekistan v. United States*, 25 Ct. Int'l Trade 1084 (2001) ................. 44

*Guangzhou Jangho Curtain Wall Sys. Eng'g Co. v. United States,*
181 F. Supp. 3d 1265 (Ct. Int'l Trade 2016) ........................................................... 12, 40

*Jilin Forest Indus. Jinq1ao Flooring Grp. Co. v. United States*,
617 F. Supp. 3d 1343  (Ct. Int'l Trade 2023) ................................................................. 40

*Kisor v. Wilkie,* 139 S. Ct. 2400 (2019) .................................................................... 13, 14

*Koyo Seiko Co., Ltd. v. United States,* 36 F. 3d 1565 (Fed. Cir. 1994) ................... 14, 22

*Marmen Inc. v. United States*, 545 F. Supp. 3d 1305 (Ct. Int'l Trade 2021) ...... 10, 29, 31

*Marmen Inc. v. United States*,
627 F. Supp. 3d 1312 (Ct. Int'l Trade Mar. 20, 2023) .................................................... 30

*Mid Continent Steel & Wire Inc. v. United States*,
31 F. 4th 1367 (Fed. Cir. 2022) .................................................................................passim

*Mid Continent Steel & Wire, Inc. v. United States*,
628 F. Supp. 3d 1316 (Ct. Int'l Trade 2023) ........................................................... 30, 42

*Mid Continent Steel & Wire, Inc. v. United States*,
940 F. 3d 662 (Fed. Cir. 2019) ......................................................................... 10, 30, 41

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ....................................................................................... 12, 40, 46

*Murray v. Schooner Charming Betsy*, 6 U.S. 64 (1804) ................................................ 35

*Neenah Foundry Co. v. United States*, 25 C.I.T. 287 (Apr. 2, 2001) ............................ 12

*NEXTEEL Co., Ltd. v. United States*,
2023 WL 3017973 (Ct. Int'l Trade Apr. 19, 2023) ................................................... 29, 42

*NEXTEEL Co., Ltd. v. United States,* 28 F. 4th 1226 (Fed. Cir. 2022) ............. 10, 29, 31

*SeAH Steel Corp. v. United States,*
539 F. Supp. 3d 1341 (Ct. Int'l Trade 2021) ............................................. 10, 29, 31, 32

*Seneca Foods Corp. v. United States,* 2023 Ct. Int'l Trade LEXIS 154 (2023) ....... 42, 46

*Shijiazhuang Goodman Trading Co. v. United States,*
172 F. Supp. 3d 1363 (Ct. Int'l Trade 2016) ..................................................... 13, 40, 46

*Stupp Corp. v. United States,* 5 F. 4th 1341 (Fed. Cir. 2021)........................ 9, 28, 31, 42

*Stupp Corp. v. United States*, 619 F. Supp. 3d 1314 (Ct. Int'l Trade 2023).................. 30

*Techsnabexport v. United States*, 515 F. Supp. 2d 1363 (Ct. Int'l Trade 2007) ........... 26

*Timex V.I., Inc. v. United States,* 157 F. 3d 879 (Fed. Cir. 1998) ............................ 13

*United Steel & Fasteners, Inc. v. United States*, 947 F. 3d 794 (Fed. Cir. 2020) ......... 14

*Zhejiang Mach. Imp. & Exp. Corp. v. United States*,
471 F. Supp. 3d 1313 (Ct. Int'l Trade 2020) .................................................................. 14

## Statutory Provisions

19 U.S.C. § 1516a(b)(1)(B)(ii) ................................................................... 12, 13

19 U.S.C. § 1673d(c)(B)(i)(I)-(II) ...................................................................... 18

19 U.S.C. § 1675(c)(1) ............................................................................... 4, 24

19 U.S.C. § 1675(c)(4) ..................................................................................... 19

19 U.S.C. § 1675(c)(4)(B) ................................................................................ 19

19 U.S.C. § 1675(d) .......................................................................................... 22

19 U.S.C. § 1675(d)(1) ............................................................................... 22, 23

19 U.S.C. § 1675(d)(2) ..................................................................... 4, 19, 22, 24

19 U.S.C. § 1675a(c)(1) .............................................................................passim

19 U.S.C. § 1675a(c)(1)(A) ......................................................................... 24, 37

19 U.S.C. § 1675a(c)(2) .............................................................................passim

19 U.S.C. § 1675a(c)(3) .............................................................................passim

19 U.S.C. § 1677f-1(c)(1) ................................................................................. 18

19 U.S.C. § 1677f-1(d)(1)(B) ............................................................................ 15

28 U.S.C. § 1581(c)............................................................................................. 4

## Regulatory Provisions

19 C.F.R. § 351.222(b)...................................................................................... 23

19 C.F.R. § 351.222(f)....................................................................................... 23

19 C.F.R. § 351.218(d)(2) ................................................................................. 19

19 C.F.R. § 351.218(d)(3)(iv)(A) ................................................................. 39

19 C.F.R. § 351.218(e)(1)(ii)(C)(2) ............................................................... 8

19 C.F.R. § 351.222 ..................................................................................... 22

19 C.F.R. § 351.222(a) ................................................................................. 23

19 C.F.R. § 351.222(i) ............................................................................ 22, 23

19 C.F.R. § 351.309(c)(1)(iii) ........................................................................ 8

**Administrative Decisions**

*Certain Softwood Lumber Products from Canada: Amended
Final Results of Antidumping Duty Administrative Review in Part; 2021*,
88 Fed. Reg. 61,511 (Dep't Commerce Sept. 7, 2023) ................................... 6

*Certain Softwood Lumber Products From Canada: Final Affirmative Determination
of Sales at Less Than Fair Value and Affirmative Final Determination of Critical
Circumstances*, 82 Fed. Reg. 51,806 (Dep't Commerce Nov. 8, 2017) ........... 5

*Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty
Administrative Review and Final Determination of No Shipments; 2020*, 87 Fed. Reg.
48,465 (Dep't Commerce Aug. 9, 2022) ......................................................... 6

*Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty
Administrative Review and Final Determination of No Shipments; 2021*, 88 Fed. Reg.
50,106 (Dep't Commerce Aug. 1, 2023) ......................................................... 6

*Certain Softwood Lumber Products from Canada: Final Results of Antidumping Duty
Administrative Review; 2017–2018*, 85 Fed. Reg. 76,519 (Dep't Commerce Nov. 30,
2020) ............................................................................................................ 5

*Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty
Administrative Review; 2019*, 86 Fed. Reg. 68,471 (Dep't Commerce Dec. 2, 2021) ..... 6

*Continuation of Countervailing and Antidumping Duty Orders on Oil Country Tubular
Goods From Argentina, Italy, Japan, Korea and Mexico, and Partial Revocation of
Those Orders From Argentina and Mexico With Respect to Drill Pipe*, 66 Fed. Reg.
38,630 (Dep't Commerce July 25, 2001) ...................................................... 22

*Light-Walled Welded Rectangular Carbon Steel Tubing From Taiwan: Final Results of
the Expedited Sunset Review of the Antidumping Duty Order*, 87 Fed. Reg. 64,437
(Dep't Commerce Oct. 25, 2022) ................................................................. 20

*Steel Concrete Reinforcing Bar From the Republic of Turkey, Taiwan, and Japan; Final
Results of First Expedited Sunset Reviews of the Antidumping Duty Orders*, 87 Fed.
Reg. 60,120 (Dep't Commerce Oct. 4, 2022) ................................................ 21

## Other Authorities

Appellate Body Report, *United States - Anti-Dumping and
Countervailing Measures on Large Residential Washers From Korea*,
WT/DS464/AB/R (adopted Sep. 26, 2016) .................................................................... 35

Appellate Body Report, *United States – Continued Existence and Application
of Zeroing Methodology*, WT/DS350/AB/R (adopted Feb. 19, 2009) ........................... 36

Appellate Body Report*, United States – Final Anti-Dumping Measures on Stainless
Steel from Mexico*, WT/DS344/AB/R (adopted May 20, 2008) ..................................... 36

Appellate Body Report, *United States – Measures Relating to Zeroing and Sunset
Reviews*, WT/DS322/AB/R (adopted Jan. 23, 2007) ..................................................... 36

Decision of the Panel on First Remand Determination, *Pure Magnesium
from Canada*, USA-CDA-00-1904-06 (Oct. 15, 2002) ................................................... 27

Decision of the Panel on Second Remand Determination, *Pure Magnesium from
Canada*, USA-CDA-00-1904-06 (Apr. 28, 2003) ........................................................... 27

*Modification to Regulation Concerning the Revocation of Antidumping and
Countervailing Duty Orders*; 77 Fed. Reg. 29,875 (Dep't Commerce May 21, 2012).... 23

Panel Decision, *Softwood Lumber from Canada: Final Affirmative Determination of
Sales at Less Than Fair Value and Affirmative Final Determination of Critical
Circumstances*, NAFTA No. USA-CDA-2017-1904-03 (Oct. 5, 2023) ...................... 7, 32

*Policies Regarding the Conduct of Five-year ("Sunset") Reviews of
Antidumping and Countervailing Duty Orders; Policy Bulletin*,
63 Fed. Reg. 18,871 (Dep't Commerce Apr. 16, 1998) ................................................. 20

*Proposed Modification to Regulation Concerning the Revocation
of Antidumping and Countervailing Duty Orders*;
76 Fed. Reg. 15,233 (Dep't Commerce Mar. 21, 2011) ................................................. 23

*Softwood Lumber Products From Canada; Notice of Commission
Determination To Conduct Full Five-Year Reviews*,
88 Fed. Reg. 16,458 (Int'l Trade Comm'n Mar. 17, 2023) ................................................. 3

Uruguay Round Agreements Act, Statement of Administrative Action,
H.R. Doc. 103-316, Vol. 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4200 ..... passim

I.    **INTRODUCTION**

Plaintiff Resolute FP Canada Inc. ("Resolute" or "Plaintiff") hereby submits the following Memorandum in accordance with Rule 56.2(c) of the Rules of the United States Court of International Trade.

The Department of Commerce ("Commerce") did not find Resolute to be dumping softwood lumber from Canada into the U.S. market when it applied its preferred Average-to-Average ("A-A") methodology in the original investigation.  Had Commerce stopped there, as it should have, Resolute would not have been subject to the antidumping ("AD") order, would not be requesting a sunset review five years later, nor appealing the result of that sunset review now to this Court.

Commerce should have stopped because it did not and could not justify, as the law required, abandoning its preferred methodology for an "exceptional" alternative.  Instead, it deployed a methodology to prove "targeted" dumping that has been discredited by experts and questioned severely in this Court and in the U.S. Court of Appeals for the Federal Circuit ("CAFC").  The targeted "finding" was for the natural seasonal price differences characteristic of a seasonal commodity.  The prices were not different in the same season for Canada and the United States.  They were different, as should have been expected, in different seasons in the United States.

As part of the sunset review inquiry, Commerce must examine the dumping rates assigned to the respondents that were published in the underlying investigations and reviews.  The record itself demonstrates that but for the failed differential pricing methodology ("DPM"), Resolute had a zero, A-A margin.  Commerce also had "good cause" under the statute to consider "other factors," that is, recent judicial precedent

and statistical expertise that have upended Commerce's methodological choices, rendering them unreasonable and hence unlawful.

Commerce has indicated that it does not revoke antidumping orders for individual companies in sunset reviews, but there is nothing in the statute that dictates this practice, nor is there any binding precedent supporting it.  There is no apparent reason why a company that has been examined individually in an antidumping investigation cannot see the order revoked in a sunset review.  Here the injustice of denying company-specific consideration is acute because the company should not have been subject to the order for the last five years.  The dumping finding in the investigation was the result of a methodology unlawfully applied.

This case may be one of first impression.  Commerce does not appear to have revoked an order in part with respect to a specific company, nor do there appear to be precedents for companies seeking revocation of an order in a sunset review where Commerce has asserted the companies were found to be dumping in the investigation. Yet the logic of antidumping investigations and reviews calls for company-specific inquiry and calculation, the statute does not prohibit a company-specific revocation, and Commerce has invoked the statute as authority for partial revocation of an order based on the determination of an ITC sunset review.  There also are no apparent precedents for companies to be subject to an antidumping order for five years based on a discredited agency methodology.

Commerce should have reported to the U.S. International Trade Commission ("Commission") a zero dumping margin with respect to Resolute.  The record already contains the necessary and lawful published rate for Resolute.

Commerce's Sunset Review determination relies on the false premise that Resolute was dumping at the time of the original investigation and, therefore, will resume or continue to dump Canadian softwood lumber in the United States. Commerce's final determination that Resolute was dumping has been appealed to a NAFTA Panel that has remanded the determination to Commerce with respect to the application of Commerce's DPM.

Commerce's use of the DPM, including the Cohen's *d* test, has been questioned and remanded by the CAFC in other dumping cases.  The NAFTA Panel, following those decisions, remanded Commerce's application of the DPM to Resolute so that Commerce can address those decisions and the judicial concerns about inappropriate application of the statistical methodologies in the DPM.

Resolute's dumping margin without application of the DPM was zero.  Commerce applied the DPM and its technique of "zeroing" to find a dumping margin slightly above *de minimis*.  This appeal challenges Commerce's Sunset Review determination that rests on the flawed assumptions, discredited in several appeals, about Commerce's application of the DPM.  Notwithstanding that, in the final determination, Resolute would not have been found dumping but for the unlawful application of the DPM and zeroing, Commerce concluded in its expedited sunset review, without authority, that the order could not be revoked as to any single interested party where other interested parties have acceded to the order's continuation.[1]

---

[1] Other parties subject to the same antidumping order, including Resolute, elected to challenge the order's continuation in a full sunset review at the Commission.  *See Softwood Lumber Products From Canada; Notice of Commission Determination To Conduct Full Five-Year Reviews*, 88 Fed. Reg. 16,458 (Int'l Trade Comm'n Mar. 17, 2023).

## II.    RULE 56.2 STATEMENT

### A.    THE ADMINISTRATIVE DETERMINATION UNDER REVIEW

Pursuant to 28 U.S.C. § 1581(c), Resolute challenges Commerce's Final Results of the Expedited First Sunset Review of Antidumping Duty Order on softwood lumber from Canada. *See Certain Softwood Lumber Products from Canada: Final Results of the Expedited First Sunset Review of the Antidumping Duty Order*, 88 Fed. Reg. 20,479 (Dep't Commerce Apr. 6, 2023), P.R. 46 ("Final Results") and accompanying Issues and Decision Memorandum (Mar. 31, 2023), P.R. 45 ("IDM").

### B.    ISSUES OF LAW AND REASONS FOR CONTESTING ADMINISTRATIVE DETERMINATION

Resolute brings this challenge to resolve the following issues:

1.    Whether Resolute is entitled to (a) a company-specific determination in the AD sunset review and (b) a company-specific revocation of the AD order on softwood lumber under 19 U.S.C. § 1675(d)(2).

2.    Whether Commerce's findings under 19 U.S.C. § 1675(c)(1) and § 1675a(c)(1), that there is a likelihood of continuation or recurrence of dumping with respect to Resolute, were arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

3.    Whether Commerce's failure to apply the "good cause" exception at 19 U.S.C. § 1675a(c)(2) and reach a negative likelihood determination as to Resolute based on other relevant factors, including but not limited to, expert statistical evidence and binding CAFC precedent, was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

    4.    Whether Commerce's failure to find "extraordinary circumstances" and report a zero margin to the Commission under 19 U.S.C. § 1675a(c)(3) as to Resolute was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

## III.    STATEMENT OF FACTS

This case originates with the AD proceedings in *Softwood Lumber from Canada*, Case No. A-122-857.  Resolute was a mandatory respondent in the investigation and first administrative review, where it received AD rates of 3.20% and 1.15%, respectively. *See Certain Softwood Lumber Products From Canada: Final Affirmative Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, 82 Fed. Reg. 51,806 (Dep't Commerce Nov. 8, 2017) and accompanying IDM (Nov. 1, 2017) ("Inv. IDM"); *Certain Softwood Lumber Products from Canada: Final Results of Antidumping Duty Administrative Review; 2017–2018*, 85 Fed. Reg. 76,519 (Dep't Commerce Nov. 30, 2020) and accompanying IDM (Nov. 23, 2020) ("AR1 IDM").

The record here shows that, but for Commerce's use of its DPM in the investigation, Resolute's margin would have been zero and Resolute would have been excluded from the AD order.  *See Antidumping Duty Investigation of Certain Softwood Lumber Products from Canada: Analysis of Data Submitted by Resolute FP Canada, Inc. for the Final Determination*, at 7 (Nov. 1, 2017), P.R. 28, C.R. 1 ("Resolute's Final AD Calc Memo INV") (Exh. 1 to Resolute's Substantive Response to the Notice of Initiation, Jan. 5, 2023 ("Resolute's Sub. Resp.")).  The DPM also inflated Resolute's individual margin above *de minimis* in the first administrative review.  *See Analysis for the Final Results of the Antidumping Duty Administrative Review of Certain Softwood*

*Lumber Products from Canada: Resolute FP Canada Inc.*, at 3-4 (Nov. 23, 2020), P.R. 28, C.R. 1 ("Resolute's AD Final Analysis Memo AR1") (Exh. 2 to Resolute's Sub. Resp.).

Resolute requested and was denied mandatory or voluntary respondent status in the second administrative review and was assigned the non-examined companies' rate of 11.59%.  *See Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty Administrative Review; 2019*, 86 Fed. Reg. 68,471 (Dep't Commerce Dec. 2, 2021) and accompanying IDM (Nov. 23, 2021) ("AR2 IDM").  The impact of the DPM on the mandatory respondents' rate distorted the calculation of the non-examined companies' rate.  *See* Resolute's Case Br. at 40-41, P.R. 36.

Resolute was not selected as a mandatory nor voluntary respondent in the third and fourth administrative reviews but participated in those proceedings and received a non-selected companies' rate inflated by Commerce's use of the DPM.  *See Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020*, 87 Fed. Reg. 48,465 (Dep't Commerce Aug. 9, 2022) and accompanying IDM (Aug. 3, 2022) ("AR3 IDM"); C*ertain Softwood Lumber Products From Canada: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2021*, 88 Fed. Reg. 50,106 (Dep't Commerce Aug. 1, 2023) and accompanying IDM (July 26, 2023) ("AR4 IDM"); *Certain Softwood Lumber Products from Canada: Amended Final Results of Antidumping Duty Administrative Review in Part; 2021*, 88 Fed. Reg. 61,511 (Dep't Commerce Sept. 7, 2023); Resolute's Case Br. at 40-41, P.R. 36.  Resolute received the non-examined companies' rate of 4.76% in the third administrative review and

6.26% in the fourth administrative review.[2]  The Final Determination from the investigation and the Final Results of all administrative reviews of the AD Order are on appeal or remand.  *See Resolute FP Canada Inc. et al. v. United States,* Ct. No. 23-0026 (AR4) (complaint filed, Nov. 1, 2023); *Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020*, USMCA No. USA-CDA-2022-10.12-02 (awaiting briefing); *Certain Softwood Lumber Products from Canada: Final Results of Antidumping Duty Administrative Review*; *2019*, USMCA No. USA-CDA-2021-10.12-04 (briefing complete, awaiting Panel); *Softwood Lumber from Canada, Final Results of the Antidumping Duty Administrative Review; 2017–2018*, USMCA No. USA-CDA-2020-10.12-02 (briefing complete, awaiting Panel); *Softwood Lumber from Canada: Final Affirmative Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, NAFTA No. USA-CDA-2017-1904-03 (on remand to Commerce).[3]

The Notice of Initiation of the First Sunset Review of the Antidumping Duty Order on Softwood Lumber from Canada, Case No. A-122-857, was published in the Federal Register on December 1, 2022.  *See Initiation of Five-Year (Sunset) Reviews*, 87 Fed. Reg. 73,757-58 (Dep't Commerce Dec. 1, 2022), P.R. 20.  Resolute timely submitted a Substantive Response on January 5, 2023, P.R. 28-29, C.R. 1-2.

---

[2] The AR4 Final Results were issued after both the conclusion of the Sunset Review and the filing of the Complaint in this case.

[3] After the Plaintiffs' Complaint, but prior to the briefing in this proceeding, the NAFTA Panel reviewing the Final Results of the AD investigation in *Softwood Lumber from Canada* issued its Final Decision on Oct. 5, 2023.

Commerce, on January 25, 2023, informed the Commission that it had not received adequate substantive responses from respondent interested parties in A-122-857 and, hence, would conduct an expedited sunset review of the antidumping duty order on softwood lumber from Canada consistent with 19 C.F.R. § 351.218(e)(1)(ii)(C)(2).  *See* Letter from Commerce to Commission re: Sunset Reviews Initiated Dec. 1, 2022, Jan. 25, 2023, at 1, P.R. 31.

On January 26, 2023, Resolute requested that Commerce establish a briefing schedule for the expedited sunset review pursuant to 19 C.F.R. § 351.309(c)(1)(iii). *See* Letter from Baker Hostetler to Commerce, Jan. 26, 2023, at 2, P.R. 32.[4]

Resolute, even before Commerce established a schedule, filed a case brief on March 3, 2023, P.R. 36, asking that Commerce find that, as to Resolute, there is no likelihood of continuation or recurrence of dumping were the AD order to be revoked as to Resolute.  Resolute explained that its AD margin would have been zero but for the DPM that was the subject of remands on appeals.  Resolute asked Commerce to find that (i) recent precedents at the Federal Circuit since the investigation, including judicial use of substantial expert literature in the field of statistical analysis, have established that Commerce's DPM, including the Cohen's *d* test, for determining Resolute as dumping subject merchandise, is defective and its application unreasonable;  (ii) because of the application of the DPM and zeroing in the AD investigation, Resolute was found unlawfully to be selling subject merchandise for less than fair value; (iii) the AD order should not have been imposed on Resolute; (iv) Resolute has demonstrated "good cause" for Commerce

---

[4] Commerce finally established a briefing schedule on March 8, 2023.  *See* Memorandum to File: Certain Softwood Lumber Products from Canada, First Expedited Sunset Review; Briefing Schedule, Mar. 8, 2023, P.R. 39.

to consider other relevant factors in this sunset review under 19 U.S.C. § 1675a(c)(2), including recent jurisprudence and a new report on the record by an expert in statistics; (v) there is no likelihood that Resolute would continue or resume dumping upon revocation of the order as to Resolute; (vi) "extraordinary circumstances" apply for reporting to the Commission that a zero margin is likely to prevail upon revocation of the AD order as to Resolute; and (vii) therefore, Commerce should revoke the AD order on softwood lumber as to Resolute. *See* Resolute's Case Br. at 7-48.

The Coalition did not file a case brief.  Sierra Pacific ("SP") filed case briefs on March 13, 2023*,* SP Case Br., P.R. 40.  Rebuttal briefs were filed by Resolute, P.R. 42, the Coalition, P.R. 41, and SP, P.R. 43, on March 17, 2023.

Commerce issued the Final Results on April 6, 2023.  Commerce "determined that revocation of the Order would be likely to lead to the continuation or recurrence of dumping."  Final Results, 88 Fed. Reg. at 20,480, P.R. 46.  Commerce found that "the magnitude of the weighted-average dumping margin likely to prevail is up to 7.28 percent."  *Id.*  Commerce rejected Resolute's arguments that "good cause" existed to consider other relevant factors as part of the likelihood inquiry.  *See* IDM at 18, P.R. 45. Commerce did not pronounce on whether Resolute would continue or resume dumping.

Commerce, in the Final Results, ignored record evidence, including an expert statistical report on the Cohen's *d* test, *see* Report by Prof. Larry Hedges ("Hedges' Report"), P.R. 28, C.R. 1 (Exh. 9 to Resolute's Sub. Resp.), and discounted the substantial body of jurisprudence questioning Commerce's departure from the statistical literature when running the Cohen's *d* test.  *See, e.g., Stupp Corp. v. United States,* 5 F. 4th 1341 (Fed. Cir. 2021); *Mid Continent Steel & Wire Inc. v. United States*, 31 F. 4th 1367 (Fed. Cir. 2022) ("*Mid Continent II*"); *Mid Continent Steel & Wire, Inc. v. United*

9

*States*, 940 F. 3d 662 (Fed. Cir. 2019) ("*Mid Continent I*"); *see also NEXTEEL Co., Ltd. v. United States,* 28 F. 4th 1226 (Fed. Cir. 2022); *Marmen Inc. v. United States*, 545 F. Supp. 3d 1305 (Ct. Int'l Trade 2021); *SeAH Steel Corp. v. United States,* 539 F. Supp. 3d 1341 (Ct. Int'l Trade 2021). Commerce never addressed Resolute's showing of "extraordinary circumstances" that justified reporting to the Commission a zero dumping margin in the event that the AD order was revoked as to Resolute.

Resolute filed a Summons and Complaint with this Court on May 8, 2023.  The Coalition and Sierra Pacific filed separate motions to intervene, which the Court granted on May 17 and June 7, 2023, respectively. The Parties filed a Joint Status Report with this Court on July 12, 2023, and the Court issued a Scheduling Order on July 13, 2023. This Motion and accompanying Memorandum are timely filed under the Court's Scheduling Order.

## IV.    SUMMARY OF ARGUMENT

Commerce did not find Resolute dumping when it applied its preferred A-A methodology in the original investigation.  It found dumping only when it applied, supposedly as an exception, an alternative, A-T methodology with zeroing.  Since then, this Court and the CAFC have found the same A-T methodology Commerce used for Resolute and in other cases to be defective because it relied on a defective "differential pricing methodology."

In the Sunset Review appealed here, Commerce found it likely that dumping would continue or resume if the antidumping order were revoked, notwithstanding the defects in Commerce's original findings.  Commerce made no finding for Resolute alone

but should not have found Resolute to have been dumping and, therefore, could not reasonably have found a likelihood of continuing or resumed dumping as to Resolute.

Commerce refused to consider, in the Sunset Review, company-specific revocation of the antidumping order for Resolute.  Because other examined companies did not request a sunset review, Commerce judged the submissions inadequate for a full review.  In an expedited sunset review, Commerce did not consider any circumstances specific to Resolute, refused to revoke the order for one company, and reported to the Commission a dumping margin calculated for all companies instead of the rate applicable to Resolute.

Changes in jurisprudence between the time of the original investigation and the expedited Sunset Review require new consideration of the basis for Commerce finding Resolute to have been dumping in the original investigation.  Commerce should have applied the law in the Sunset Review requested by Resolute as it stood at the time of the Sunset Review, not as it had been at the time of the original investigation. Commerce should have confirmed its original finding of no dumping according to the preferred A-A methodology and revoked the order as to Resolute.

This Court should remand for Commerce to calculate again Resolute's dumping margin according to the A-A methodology; find no targeted dumping where the record shows fair comparisons of prices in Canada and the United States; find no likelihood of a continuation or resumption of dumping by Resolute because there was no dumping to continue or resume; report a zero margin for Resolute to the Commission; and revoke the order as to Resolute.  The Court should find no lawful basis for denying Resolute a company-specific revocation of the order.

## V.   STANDARD OF REVIEW

This Court reviews the Final Results of the First Sunset Review under 19 U.S.C.

§ 1516a(b)(1)(B)(ii), asking whether Commerce's decision is "arbitrary, capricious, an

abuse of discretion and otherwise not in accordance with law."  *See also Neenah*

*Foundry Co. v. United States*, 25 C.I.T. 287, 290 (Apr. 2, 2001).  The Supreme Court in

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)

elaborated on the arbitrary and capricious standard, noting that, although the "scope of

review. . . is narrow,"

> . . . the agency must examine the relevant data and articulate a
> satisfactory explanation for its action including a "rational connection
> between the facts found and the choice made." (quoting *Burlington Truck*
> *Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

The Supreme Court explained, "we must 'consider whether the decision was

based on a consideration of the relevant factors and whether there has been a clear

error of judgment.'" *Id.* (quoting *Bowman Transportation, Inc. v. Arkansas-Best Freight*

*System, Inc.,* 419 U.S. 281, 285 (1974); *Citizens to Preserve Overton Park v. Volpe,*

401 U.S. 402, 416 (1971)).  The Supreme Court provided a few examples that would

justify a finding that an agency had acted arbitrarily and capriciously, including "when

the agency has relied on factors which Congress has not intended it to consider, entirely

failed to consider an important aspect of the problem, {or} offered an explanation for its

decision that runs counter to the evidence before the agency. . . ." *Id.; see also*

*Guangzhou Jangho Curtain Wall Sys. Eng'g Co. v. United States,* 181 F. Supp. 3d

1265, 1278 (Ct. Int'l Trade 2016) ("By not addressing this argument, Commerce has

'entirely failed to consider an important aspect of the problem.'") (citation omitted);

*Shijiazhuang Goodman Trading Co. v. United States,* 172 F. Supp. 3d 1363, 1380 (Ct.

Int'l Trade 2016) ("The court concludes that the Department's decision . . . was arbitrary and capricious, and therefore contrary to law, because Commerce failed to address the merits of the question before it.").

This Court also asks whether the Final Results were "otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(ii).  Under this standard of review, the Court must apply the two-step analysis articulated in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984) ("*Chevron*") when examining whether Commerce's interpretation of the statute is in accordance with law. *See also Timex V.I., Inc. v. United States,* 157 F. 3d 879, 881 (Fed. Cir. 1998). According to *Chevron*, when Congress has spoken unambiguously, the issue has been resolved and there is no deference owed to the agency. *See Chevron,* 467 U.S. at 843-44.

An agency, under *Chevron*'s first step*,* must accept the plain language of a statute.  An agency may fill gaps in the statute through its own statutory interpretation only when a statute is "silent or ambiguous." *Id.* at 843.  And even when an agency has authority to interpret the law, *Chevron* requires deference to the agency's interpretation only when there is a "genuine ambiguity" (or congressional silence) in the statute. Thus, in undertaking *Chevron* "Step One," "before concluding that a {statute} is genuinely ambiguous," the Court "must exhaust all the 'traditional tools' of construction"—"text, structure, history, and purpose." *Id.*  The Court must give primary weight to "the statute's text, giving it its plain meaning." *Timex,* 157 F. 3d at 882. Deference is proper "only when {the} legal toolkit is empty and the interpretive question has no single right answer." *Kisor v. Wilkie,* 139 S. Ct. 2400, 2415 (2019).

Should the Court be unable to discern Congress's intent with respect to the statutory provisions at issue, it must proceed to *Chevron* "Step Two." In undertaking that inquiry, the Court is to defer to a "reasonable" agency interpretation. *Koyo Seiko Co., Ltd. v. United States,* 36 F. 3d 1565, 1573 (Fed. Cir. 1994). However, the reasonableness standard requires that "the agency's reading … must come within the zone of ambiguity the court has identified after employing all the court's interpretive tools." *Kisor*, 139 S. Ct. at 2415–16.

In *Kisor v. Wilkie*, the Supreme Court clarified, elaborated, and expanded on the extent to which agency interpretations of regulations are entitled to judicial deference. A reviewing court, *Kisor* teaches, must "exhaust all 'traditional tools' of construction" when deciding on whether a regulation is truly ambiguous. *Kisor*, 139 S. Ct. at 2415 (citing *Chevron U.S.A. Inc.,* 467 U.S. at 843 n. 9). The Court delivered agencies a stern warning: "{T}he agency's reading must fall 'within the bounds of reasonable interpretation.' And let there be no mistake: That is a requirement an agency can fail." *Id*. at 2416 (internal citations omitted).

The CAFC and this Court already have applied *Kisor* to strike down Commerce's interpretation of its regulations as not in accordance with law. *See, e.g., United Steel & Fasteners, Inc. v. United States*, 947 F. 3d 794, 800-801 (Fed. Cir. 2020); *Zhejiang Mach. Imp. & Exp. Corp. v. United States*, 471 F. Supp. 3d 1313, 1332-33 (Ct. Int'l Trade 2020). Similarly, in this appeal, the Court should remain mindful of *Kisor* when deciding Commerce's discretion to interpret its own regulations.

14

## VI.    ARGUMENT

### A.    THE FLAWS IN COMMERCE'S DUMPING CALCULATIONS: AN OVERVIEW OF THE DPM AND COHEN'S *d* TEST

This Sunset Review, at its core, concerns the unlawfulness of a methodology Commerce has employed throughout the life of the AD order on *Softwood Lumber from Canada*, and which this Court and the CAFC have questioned as unreasonable. Without the DPM, and its foundational Cohen's *d* test in particular, Commerce never would have found dumping as to Resolute, and could not have imposed the AD order on Resolute, a named mandatory respondent in the investigation and first administrative review.  *See* Resolute's Final AD Calc Memo INV, at 1 (Exh. 1 to Resolute's Sub. Resp.), P.R. 28, C.R. 1.  Nor could Commerce continue the order in the sunset review where Resolute never properly was found to be dumping.  Methodological flaws have tainted Resolute's margin and justify Resolute's exclusion from the order through this Sunset Review.

Normally, Commerce is supposed to deploy the "preferred" A-A price comparison method when undertaking an AD investigation.  However, Commerce may resort to the "exception" of the average-to-transaction ("A-T") price comparison method to find "targeted" dumping, although only after satisfying certain statutory prerequisites. *See* 19 U.S.C. § 1677f-1(d)(1)(B).  Commerce is required to find "a pattern of export prices that differ significantly among customers, regions, or periods of time" and "explain{} why such differences cannot be taken into account" using the preferred A-A methodology. *Id*. Commerce formulated the two-stage DPM to decide whether those criteria are satisfied, which would then permit the Department to use the A-T method.  *See* Figure 1, *infra.*

15

To find patterns of significant price differences in the first stage of the DPM, Commerce uses two tests.  The first is the "Cohen's *d* test" – a statistical tool known for measuring differences in non-trade remedy settings – which Commerce uses to find alleged "significant" price differences among customers, regions, *or* time periods.  The Federal Circuit has called this test the "foundation" of the DPM.  *See Mid Continent II*, 31 F. 4th at 1381 ("But here Commerce embraced the Cohen's *d* statistics measure and relied on the literature for that measure in making its statutory significance assessment -- and that embrace extends beyond the first step and is the foundation of the remaining steps.")  Commerce's departure from the underlying statistical assumptions of that test, and the failure to use the appropriate denominator when calculating the Cohen's *d* coefficient, render the test unreasonable as a proxy for determining significant price differences.  *See* Part VI.C.1.a(1), *infra*.  The DPM is contaminated from the start.

Commerce calls its second test the "ratio test."  It purports to determine whether "patterns" exist among those significant price differences supposedly found through application of the Cohen's *d* test. The ratio test, as designed, fails to differentiate among the categories of alleged price differences – customer, region, and time period – and produces aggregated and nonsensical results that Commerce calls a "pattern."  The ratio test produces anything but a pattern.  *See* Part VI.C.1.a (3), *infra.*

---

**Differential Pricing Methodology ("DPM")**
**Figure 1**

*Stage 1*: Look for "patterns" of significant price differences.

    a) Cohen's *d* test to find "significant" price differences among customers, regions, or periods of time.
    b) Ratio test to determine "patterns" among significant price differences.

*Stage 2*: Conduct "meaningful difference" test to determine whether a "pattern of significant price differences" permits use of the A-T method to calculate a dumping margin (with zeroing) over the preferred A-A method.

---

For the second stage of the DPM, Commerce developed the "meaningful difference" test, attempting to explain why such patterns of differences cannot be taken into account using the preferred A-A method. When Commerce purports to find such a pattern, it resorts to the A-T method and zeroing. Commerce leans entirely on quantitative measurements, which do not take into account qualitative factors like seasonality, which explain the price differences in this case.[5] There can be no "fair comparison" of home country and U.S. prices by disregarding those factors. *See* Part VI.C.1.a (3), *infra*.

---

[5] Resolute made this argument in the Sunset Review. *See* Resolute Case Br. at 35, P.R. 36; Resolute's Sub. Resp. at 8, P.R. 28. Evidence on the record before Commerce demonstrated that the A-T methodology is not needed because in the case of a seasonal commodity like softwood lumber, the A-A methodology is able to account for a pattern of significant price differences. *See* Resolute's AR2 Case Br. at 22-24 (Exh. 12 to Resolute's Sub. Resp.), P.R. 29, C.R. 2; Resolute's AR3 Case Br. at 8-10 (Exh. 13 to Resolute's Sub. Resp.); P.R. 29, C.R. 2.

**B.     THE SUNSET REVIEW STATUTE PROVIDES FOR A COMPANY-SPECIFIC DETERMINATION AND REVOCATION OF AN ORDER**

1.     Commerce Failed To Make A Resolute-Specific Determination As To The Likelihood Of The Continuation Or Recurrence Of Dumping

Resolute asked Commerce to make a determination that revocation of the AD order on softwood lumber from Canada would not likely lead to a recurrence or continuation of dumping as to Resolute.  *See* Resolute's Case Br. at 41-42, P.R. 36.  As Resolute demonstrated, it was never dumping and, therefore, could not continue to do so, leaving one remedy – the revocation of the order as to Resolute.  In the Final Results, however, Commerce never addressed Resolute's arguments on a company-specific determination and revocation and resorted to an order-wide determination (and continuation of the order).  *See* IDM at 21-22, P.R. 45.  Commerce's decision to disregard Resolute's company-specific claims was arbitrary and capricious and otherwise not in accordance with law.

The Tariff Act generally establishes a company-specific approach to dumping.  Commerce's practice prior to the Uruguay Round Agreements Act was to select all foreign producers or exporters and to calculate a margin for each of them.  *See* Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. 103-316, Vol. 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4200 ("URAA SAA").   This default was incorporated into the statute, which sets out the "general" rule of calculating individual dumping margins for all "known" foreign exporters/producers.  *See* 19 U.S.C. § 1677f-1(c)(1).  Under 19 U.S.C. § 1673d(c)(B)(i)(I)-(II), Commerce is to set rates for individually investigated companies and resorts to an all others' rate when it must use sampling due to a large number of respondents.

Nothing in the statutory provisions concerning five-year reviews changes the individual examination of mandatory dumping respondents.  The Tariff Act at 19 U.S.C. § 1675(d)(2) provides in relevant part:

> In the case of a review conducted under subsection (c), the administering authority shall revoke a countervailing duty order or an antidumping duty order or finding, or terminate a suspended investigation, unless—
>
> (A) the administering authority makes a determination that dumping or a countervailable subsidy, as the case may be, would be likely to continue or recur, and
>
> (B) the Commission makes a determination that material injury would be likely to continue or recur as described in section 1675a(a) of this title.[6]

Other statutory provisions, and Commerce's own regulations and practice pertaining to sunset reviews, confirm that the company-specific approach is not abandoned uniquely for sunset reviews.  An individual respondent may waive participation in a five-year review, but it then must formally admit that it dumped.  *See* 19 U.S.C. § 1675(c)(4); 19 C.F.R. § 351.218(d)(2).  The statute explains what this admission means:

> B) Effect of waiver
>
> In a review in which an interested party waives its participation pursuant to this paragraph, the administering authority shall conclude that revocation of the order or termination of the investigation would be likely to lead to continuation or recurrence of dumping or a countervailable subsidy (as the case may be) **with respect to that interested party**.  19 U.S.C. § 1675(c)(4)(B) (emphasis added).

---

[6] *See also* 19 C.F.R. § 351.222(i)(1)(ii).  Commerce claims that the legislative history shows an intent to make sunset reviews uniquely applicable to all mandatory respondents collectively, not individually, but the statute contains no language to indicate a departure from the statutory antidumping scheme.

The statute itself, thus, explicitly mandates a company-specific likelihood determination in the case of an interested party's non-participation, as there is nothing in law or logic that would authorize one interested party to make a concession of continued dumping on behalf of a different interested party.  No party can waive the rights of another party.

Commerce, in interpreting 19 U.S.C. § 1675a(c)(3), also provides the Commission with the rate likely to prevail for each of the respondents in the event of revocation of the order.  The Department's *Sunset Review Policy Bulletin,* issued in 1998, announced:

> Specifically, the Department normally will provide the company-specific margin from the investigation for each company regardless of whether the margin was calculated using a company's own information or based on best information available or facts available. Furthermore, in light of the legislative history discussed above, for companies not specifically investigated or for companies that did not begin shipping until after the order was issued, the Department normally will provide a margin based on the all others rate from the investigation. In addition, the Department normally will provide to the Commission a list of companies excluded from the order based on zero or *de minimis* margins, if any, or subsequently revoked from the order, if any. *Policies Regarding the Conduct of Five-year ("Sunset") Reviews of Antidumping and Countervailing Duty Orders; Policy Bulletin*, 63 Fed. Reg. 18,871, 18,873 (Dep't Commerce Apr. 16, 1998).

Commerce's longstanding policy, then, is to report company-specific margins to the Commission, including for companies with zero or *de minimis* rates. *See, e.g., Light-Walled Welded Rectangular Carbon Steel Tubing From Taiwan: Final Results of the Expedited Sunset Review of the Antidumping Duty Order*, 87 Fed. Reg. 64,437 (Dep't Commerce Oct. 25, 2022) and accompanying IDM (Oct. 20, 2022) at 3, 9-10; *Steel Concrete Reinforcing Bar From the Republic of Turkey, Taiwan, and Japan; Final Results of First Expedited Sunset Reviews of the Antidumping Duty Orders*, 87 Fed.

Reg. 60,120 (Dep't Commerce Oct. 4, 2022) and accompanying IDM (Sep. 28, 2022) at 4, 10.  There would be no reason to report more than one company and the different rates if continuation were determined entirely by the existence of a dumping margin, for a single company, just barely above *de minimis*.

Commerce should make a company-specific finding in the case of a respondent, such as Resolute, who participates fully in the sunset review and demonstrates no likelihood of the continuation or recurrence of dumping as to itself.

Commerce had the authority to make a company-specific likelihood determination, and the record already contains Resolute's correct margin, showing that Resolute was not dumping at the time of the investigation. *See* Resolute's Final AD Calc Memo INV, at 3 (Exh. 1 to Resolute's Sub. Resp.), P.R. 28, C.R. 1; *see also* Resolute's Case Br. at 44, P.R. 36.  Commerce should have recognized the inherent unreasonableness in concluding that a company never dumping could continue or resume dumping.  The statute was not intended to produce such an absurd and illogical result.

2.  Commerce Acted Arbitrarily In Denying Resolute Company-Specific Relief

Resolute sought revocation of the AD Order on a company-specific basis.  *See* Resolute's Case Br. at 45-47, P.R. 36; Resolute's Rebuttal Br. at 7-9, P.R. 42.  This remedy should follow directly from a no likelihood finding as to Resolute in the AD sunset review.  Commerce provided no direct response to the merits of Resolute's legal argument, however, asserting that "we disagree with Resolute's argument that Commerce should revoke the Order with respect to Resolute because the margins. . . would have been zero or *de minimis* had Commerce not used its 'flawed'" DPM and zeroing.  IDM at 9, P.R. 45.

Commerce retains the authority to revoke on a company-specific basis.  The
Tariff Act generally provides for revocation in AD/CVD cases at 19 U.S.C. § 1675(d).
Under § 1675(d)(1), Commerce "may revoke, **in whole or in part**, a countervailing duty
order or an antidumping duty order" as a result of an administrative review or a changed
circumstances review (emphasis added).  As noted previously, in sunset reviews,
Commerce "shall **revoke** . . . an antidumping duty order" unless Commerce finds that
there is a likelihood of continuation or recurrence of dumping (and the Commission finds
a likelihood as to continuation or recurrence of material injury).  19 U.S.C. § 1675(d)(2)
(emphasis added).  Commerce, in at least once instance, has invoked § 1675(d)(2) and
19 C.F.R. § 351.222 as giving it the authority to perform a "partial revocation" of an
order.  Following a Commision sunset review of *Oil Country Tubular Goods*, Commerce
stated: "pursuant to section 751(d)(2) of the Act and 19 CFR 351.222(i)(2)(i), the
Department is revoking, in part, the antidumping duty orders on OCTG from Argentina
and Mexico with respect to drill pipe."[7] The Commission had found drill pipe was a
separate like product and made a negative likelihood of injury determination as to drill
pipe from Argentina and Mexico.  Commerce altered the scope of the orders for
Argentina and Mexico to remove drill pipe.[8]

An agency may fill gaps in the statute through its own interpretation only when
the statutory language is "silent or ambiguous," *Chevron*, 467 U.S. at 843, and even
then, the determination must be "reasonable."  *Koyo Seiko Co., Ltd.,* 36 F. 3d at 1573.

---

[7]  *Continuation of Countervailing and Antidumping Duty Orders on Oil Country Tubular
Goods From Argentina, Italy, Japan, Korea and Mexico, and Partial Revocation of
Those Orders From Argentina and Mexico With Respect to Drill Pipe*, 66 Fed. Reg.
38,630 (Dep't Commerce July 25, 2001).

[8] *See id*. at 38,631 n. 7.

The term "revoke" is described in § 1675(d)(1) as being "in whole or in part."  The same term in (d)(2) should be construed in similar manner, as confirmed by Commerce's own reasonable interpretation of that term in the *OCTG* case.[9]

Commerce's regulations provide additional interpretive insights.  They define "revocation" as "a term of art that refers to the end of an antidumping or countervailing proceeding in which an order has been issued."  19 C.F.R. § 351.222(a).  The revocation provision applicable to sunset reviews, *see* 19 C.F.R. § 351.222(i), describes the "circumstances under which the Secretary will revoke an order."  A prior version of the regulation allowed for Commerce to "partially revoke an order with respect to an individual exporter or producer" within the context of an administrative review, if the importer could demonstrate three consecutive years of no dumping.  *Proposed Modification to Regulation Concerning the Revocation of Antidumping and Countervailing Duty Orders*; 76 Fed. Reg. 15,233 (Dep't Commerce Mar. 21, 2011); 19 C.F.R. §§ 351.222(b) & (f) (2011).  That regulation was amended in 2012 to eliminate the partial revocation option in administrative reviews; the changed circumstances provisions, allowing for partial revocation, were maintained.  *See Modification to Regulation Concerning the Revocation of Antidumping and Countervailing Duty Orders*, 77 Fed. Reg. 29,875 (Dep't Commerce May 21, 2012).  Commerce has not amended the general definition of "revocation."

---

[9] Commerce invoked the SAA to say that Commerce (and the Commission) will make sunset review determinations "on an order-wide" basis, URAA SAA, 1994 U.S.C.C.A.N. at 4205, but interpreting that language too broadly would have prohibited the partial revocation in the *OCTG* case and any others where the Commerce finds separate like products subject to the same order and makes different sunset review determinations as to those products.  The statute itself does not prohibit partial revocation as to separate like products nor distinct companies.

Based on the regulatory history, revocation has been treated broadly as applying to all review proceedings.  Commerce has used its discretion to establish the types of revocation.  Such an interpretation appears reasonable and not inconsistent with the statute.  In this instance, Commerce's exercise of the discretion afforded under 19 U.S.C. § 1675(d)(2) was arbitrary and capricious.  Commerce never made a finding on Resolute's legal claims as to company-specific revocation, a key element of Resolute's Complaint and requested relief.  *See* Resolute Complaint at ¶ 23; Prayer for Judgment and Relief ¶ 3(ii).  And even had Commerce agreed with Resolute's interpretation, the failure to exercise discretion here and proceed to a company-specific revocation, where there was never dumping and no likelihood of continued or recurring dumping with respect to Resolute, represents arbitrary, capricious, and unlawful decision making.

**C.**     **THE FINAL RESULTS IN THIS REVIEW ARE ARBITRARY, CAPRICIOUS AND OTHERWISE NOT IN ACCORDANCE WITH LAW**

Commerce, in an expedited sunset review, is required to "determine whether revocation of an antidumping duty order . . . would be likely to lead to continuation or recurrence of sales of the subject merchandise at less than fair value."  19 U.S.C. § 1675a(c)(1); 19 U.S.C. § 1675(c)(1).  The statute directs Commerce to consider: "(A) the weighted average dumping margins determined in the investigation and subsequent reviews, and (B) the volume of imports of the subject merchandise for the period before and the period after the issuance of the antidumping duty order or acceptance of the suspension agreement."  *Id*. § 1675a(c)(1)(A) & (B).

Sunset reviews are more than rote, box-checking exercises for maintaining orders while nominally claiming consistency with WTO AD Agreement obligations.  *See*

24

WTO AD Agreement, Art. 11.3.  Commerce's interpretation unlawfully empowers one party to waive the rights of another and all parties to depend on one another for even partial revocation of the order.

The law requires more from Commerce.  Regardless of whether a review is expedited or full, this Court has emphasized that Commerce "must conduct meaningful sunset reviews."  *AG der Dillinger Huttenwerke v. United States*, 193 F. Supp. 2d 1339, 1363 (Ct. Int'l Trade 2002).  Commerce "must comply with the statute and explain its decisions;" it "cannot erect barriers simply to avoid considering complicated problems." *Id.*

The Final Results in this expedited sunset review are arbitrary and capricious, and not in accordance with law.  Citing recent CAFC jurisprudence and expert evidence on the record, Resolute demonstrated that it was not dumping the subject merchandise and should never have been subject to the AD order in the first instance.  *See* Resolute's Case Br. at 39-42, P.R. 36.  There could be no likelihood of resumed or continued dumping as to Resolute.

1.   Commerce Failed To Examine Resolute's Lawful Rate And Arbitrarily Rejected Resolute's "Good Cause" Showing Under 19 U.S.C. § 1675a(c)(2)

Resolute's lawful, A-A dumping margin was already on the record in the Sunset Review.  Commerce, bound to apply the law as it now stands, should have abandoned reliance on the A-T rate, which was calculated using the unlawful DPM.  Examining instead Resolute's proper and normally preferred A-A margin from the investigation, Commerce would have found that Resolute was never dumping and, hence, there was no likelihood Resolute would continue or resume dumping after revocation of the order.

Commerce also had a compelling reason to go beyond the default considerations in 19 U.S.C. § 1675a(c)(1) (*i.e.*, the dumping margins determined in the investigation and reviews and the volume of imports before and after issuance of the order).  The sunset review statute provides that, "If good cause is shown, the administering authority shall also consider such other price, cost, market, or economic factors as it deems relevant." 19 U.S.C. § 1675a(c)(2).  A "good cause" showing is the means by which Commerce is made to examine factors outside those enumerated at 19 U.S.C. § 1675a(c)(1).  The "list of {other} factors is illustrative."   URAA SAA, 1994 U.S.C.C.A.N. at 4214. Commerce is to "analyze such information on a case-by-case basis."  *Id.*

The courts have found that the inquiry as to "good cause" affords Commerce considerable discretion in reaching a determination on the use of other relevant factors under 19 U.S.C. § 1675a(c)(2), but does not free Commerce to ignore such factors. *See, e.g., Techsnabexport v. United States*, 515 F. Supp. 2d 1363, 1370 (Ct. Int'l Trade 2007) ("{O}n remand, Commerce must necessarily examine economic and political changes that have occurred since the preliminary determination. . .  and determine whether these changes affect the reevaluation of the likelihood of continued or recurring dumping.").[10]

Commerce must give "full consideration" to "other factors" alleged by the respondent once "good cause" is found.  Decision of the Panel on First Remand

---

[10] A NAFTA Panel has interpreted specifically the "good cause" provision.  *See, e.g.,* Decision of the Panel on First Remand Determination, *Pure Magnesium from Canada*, USA-CDA-00-1904-06 (Oct. 15, 2002) at 6 ("Given the importance of 'other factors' in determining the significance of zero margins, it seems clear that an allegation of a consistent history of zero dumping margins is sufficient good cause as a matter of law.").

Determination, *Pure Magnesium from Canada*, USA-CDA-00-1904-06 (Oct. 15, 2002) at 6.

Commerce is to avoid "a formalistic approach" based on a rigid interpretation of the SAA,

which is "out of place in an administrative proceeding."  *Id.*  As an "objective fact-finder,"

the Department must undertake a thorough analysis of the record evidence and refrain

from making conclusory findings.  Decision of the Panel on Second Remand

Determination, *Pure Magnesium from Canada*, USA-CDA-00-1904-06 (Apr. 28, 2003) at 6**.**

a.    <u>Resolute Demonstrated Defects In Commerce's DPM</u>

Resolute explained to Commerce that the question presented in this review was

which margin to use as to Resolute when making a sunset determination.  *See*

Resolute's Case Br. at 38.  Normally, Commerce would examine the dumping rates on

the record in all segments and apply the general rules that it has established based on

the SAA. *See* URAA SAA, 1994 U.S.C.C.A.N. at 4213-14.  As Resolute explained, the

correct margin was on the record and all that remained was for Commerce to conform

to the law and consider that zero margin.  *See* Resolute's Case Br. at 13-37, 44, P.R.

36.

Resolute also provided Commerce with the legal justification for relying on the

published A-A rate by asking Commerce to find that Resolute had made a showing of

"good cause" to examine other relevant factors under 19 U.S.C. § 1675a(c)(2).  *See*

Resolute's Case Br. at 38-42, P.R. 36.  Here, changes in jurisprudence on the DPM,

backed by significant expert statistical authority, provided the requisite "good cause" for

Commerce to consider "other factors" (beyond Resolute's "official" margins in the

investigation and administrative reviews in *Softwood Lumber from Canada*).  Those

factors, which demonstrated the manifest errors in application of the Cohen's *d* test,

showed that Resolute was not dumping at the time the AD order was imposed and, hence, was not likely to continue or resume dumping in the event of revocation of the order.

(1)    Changes In Jurisprudence

Resolute argued that the fundamental transformation of jurisprudence on the DPM since the investigation was one basis for "good cause," which would require Commerce to consider other relevant factors as part of the sunset review analysis.  *See* Resolute's Case Br. at 13-24, P.R. 36.  The CAFC has raised serious concerns with Commerce's use of the Cohen *d* test, including whether Commerce has met the underlying data assumptions for the test's proper application.  The CAFC also has vacated the use of a simple, rather than weighted, average standard deviation to calculate the pooled standard deviation in the Cohen's *d* test.  These decisions, now on remand or back before the courts,[11] underscore the unreasonableness of Commerce's application of the DPM.

*Stupp Corp.,* 5 F. 4th 1341 involved a challenge to Commerce's use of the DPM, including the Cohen's *d* test, to determine dumping margins in the underlying investigation.  The respondents argued that the test and comparison groups in the Cohen's *d* test failed to meet three fundamental statistical assumptions: normal

---

[11] Resolute has joined the Government of Canada's ("GOC") *amicus curiae* briefs in the CAFC appeals of *Marmen and Stupp.  See* Brief of GOC *et al.* as *Amici Curiae* in Support of Plaintiffs-Appellants and Urging Reversal, *Marmen Inc. v. United States*, Case No. 2023-1877, July 17, 2023 (corrected version); Motion for Leave to File Brief of *Amici Curiae* GOC *et al.* in Support of Defendant-Appellant and Urging Reversal, *Stupp Corp. v. United States,* Case No. 2023-1663, Aug. 1, 2023 (brief attached).

distribution, sufficient size, and roughly equal variance. The CAFC recognized this

critical defect in the Department's application of the Cohen's *d* test:

> We agree that there are significant concerns relating to Commerce's application of the Cohen's *d* test in this case and, more generally, in adjudications in which the data groups being compared are small, are not normally distributed, and have disparate variances. Our concerns raise questions about the reasonableness of Commerce's use of the Cohen's *d* test in less-than-fair-value adjudications, warranting further supporting explanation from the Department. *Id.* at 1357.

Other judges have followed *Stupp*'s lead and scrutinized Commerce's application

of the Cohen's *d* test.  *See NEXTEEL Co., Ltd.*, 28 F. 4th at 1239 (vacating the CIT

decision on appeal and remanding "to reconsider in view of *Stupp*"); *Marmen Inc.*, 545

F. Supp. 3d at 1320 (holding that "the evidence before the Court calls into question

whether the data Commerce used in its differential pricing analysis violated the

assumptions of normality and roughly equal variances associated with the Cohen's *d*

test"); *SeAH Steel Corp.*, 539 F. Supp. 3d at 1351 ("In accordance with the CAFC's

decision in *Stupp*, this Court concludes that use of a population, instead of a sample,

does not negate the assumptions inherent to the Cohen's *d* test.").  In each case, the

courts remanded to Commerce due to the deficiencies in the DPM identified in *Stupp*.

This Court recently issued another decision in *NEXTEEL*, criticizing Commerce's failure

to adhere to statistical fundamentals and remanding to Commerce "for reconsideration

of the academic literature cited in the Final IDM."  *NEXTEEL Co., Ltd. v. United States*,

2023 WL 3017973, at *10 (Ct. Int'l Trade Apr. 19, 2023) ("*NEXTEEL CIT Remand*").[12]

---

[12] Commerce relied on this Court's 2019 *NEXTEEL* decision to justify the use of the Cohen's *d* test as reasonable. *See* IDM at 11 n. 61, P.R. 45 (citing *NEXTEEL Co., Ltd.*, 392 F. Supp. 3d at 1294-97).  The CAFC reversed this decision in 2022, *see NEXTEEL Co., Ltd.,* 28 F. 4th at 1239, and this Court has now remanded Commerce's redetermination for the same defects.  In two other decisions, this Court upheld

Federal courts are also questioning another element of Commerce's use of the Cohen's *d* test.  When calculating the denominator of the Cohen's *d* coefficient, Commerce uses a simple average of the standard deviations of the test and control groups.  Recent appeals at the CAFC have challenged Commerce's use of a simple, rather than weighted average, standard deviation.  In two decisions over the last few years, the CAFC rejected Commerce's explanation, strongly rebuked Commerce, and vacated and remanded for further development. *See Mid Continent I*, 940 F. 3d at 674-75 ("On the record before us, we cannot conclude that Commerce's methodology was a reasonable exercise of its agency discretion in light of the statutory constraints and policies."); *Mid Continent II*, 31 F. 4th at 1381 ("We must remand for further proceedings before Commerce in light of the identified deficiencies—as we did in this matter in 2019 regarding the simple-averaging choice and as we did in *Stupp* regarding other aspects of Commerce's use of Cohen's *d*.  Commerce must either provide an adequate explanation for its choice of simple averaging or make a different choice, such as use of weighted averaging or use of the standard deviation for the entire population.").[13]

Commerce, in the Sunset Review, downplayed the importance of the recent case law (including binding precedent), mainly offering a defense against arguments

---

Commerce's redetermination on the Cohen's *d* test.  These decisions are now on appeal to the CAFC.  *See Stupp Corp. v. United States*, 619 F. Supp. 3d 1314 (Ct. Int'l Trade 2023) ("*Stupp II*"), *appeal docketed* No. 2023-1663 (Mar. 27, 2023); *Marmen Inc. v. United States*, 627 F. Supp. 3d 1312 (Ct. Int'l Trade Mar. 20, 2023), *appeal docketed* No. 2023-1877 (May 11, 2023).

[13] This Court recently remanded Commerce's redetermination on the issue of simple averaging and issued a firm rebuke: "If Commerce continues to rely on the academic literature to support its methodology, it must further explain why its choice of the simple average is reasonable in light of this inconsistency." *Mid Continent Steel & Wire, Inc. v. United States*, 628 F. Supp. 3d 1316, 1323 (Ct. Int'l Trade 2023) ("*Mid Continent CIT Remand*").

Resolute never made, *see, e.g.,* IDM at 10, P.R. 45 (application of A-T to all sales in meaningful difference test); *id.* at 11 (applicability of Administrative Procedure Act); *id.* at 12 (ratio test cut offs), or failed to address those it did. *See* Resolute's Case Br. at Part I.B.3 (WTO jurisprudence on DPM and zeroing), P.R. 36.

Commerce argued in the IDM, in defense of its use of the Cohen's *d* test, that "the CAFC's concerns in *Stupp* and *Mid Continent* were specific to the facts of those particular cases."  IDM at 16, P.R. 45.  The issue here, however, is the law, not the peculiar facts of any particular case.  The differences from one case to another in sales data and subject merchandise are irrelevant.  The court in *Stupp* and *Mid Continent* found Commerce's application of its Cohen's *d* test unreasonable when the requisite assumptions of the test were not respected.  The numbers put into the Cohen's *d* test formulas may vary from case to case but the criteria for judging the reasonableness of the formula's application do not change.

The CAFC has recognized that challenges to the Cohen's *d* test involve questions of statutory interpretation, *see Stupp Corp.*, 5 F. 4th at 1352, and, hence, are subject to the reasonableness standard. *See id.* at 1353; *Mid Continent II*, 31 F. 4th at 1376.   Other authorities confirm that the choice of Commerce's methodologies, including the Cohen's *d* test, is an issue of statutory interpretation, regardless of underlying facts.  *See NEXTEEL Co., Ltd.,* 28 F. 4th 1226 at 1238-39; *Marmen Inc.,* 545 F. Supp. 3d at 1319-20; *SeAH*, 539 F. Supp. 3d at 1350-51.  Likewise, the NAFTA Panel in the appeal of the underlying investigation here decided to proceed with consideration of Resolute's challenge on legal grounds, despite Commerce's objection that the facts were different from the CAFC cases.  *See* Panel Decision, *Softwood Lumber from Canada: Final Affirmative Determination of Sales at Less Than Fair Value*

31

*and Affirmative Final Determination of Critical Circumstances*, NAFTA No. USA-CDA-2017-1904-03 (Oct. 5, 2023) at 22-23; 26-28 ("NAFTA AD Panel Decision").

According to Commerce, the use of "the full population of U.S. prices in both the test and comparison groups," as opposed to a sample, renders the underlying assumptions of Cohen's *d* inapplicable. IDM at 17, P.R. 45.  In *SeAH Steel Corp. v. United States*, issued in 2021, this Court refused to make a distinction between populations and samples: "In accordance with the U.S. Court of Appeals for the Federal Circuit's decision in *Stupp*, this Court concludes that use of a population, instead of a sample, does not negate the assumptions inherent to the Cohen's *d* test."  *SeAH Steel Corp., Inc.,* 539 F. Supp. 3d at 1351.

Since briefing before Commerce in the underlying Expedited Sunset Review (and the filing of this appeal), the NAFTA Panel issued a decision in the review of the AD order on *Softwood Lumber from Canada.  See* NAFTA AD Panel Decision. Resolute brought this pending appeal to the attention of the Court in the Joint Status Report.  *See* Joint Status Report and Proposed Briefing Schedule, July 12, 2023, at 2 (Resp. to Quest. D, ¶ 1).

The central issue on appeal before the NAFTA Panel was Commerce's use of the DPM.  Because briefing for the NAFTA Panel concluded in 2018, the Parties to the appeal late last year requested permission from the Panel to file supplemental briefs on subsequent authorities. Major changes have emerged in relevant jurisprudence since the close of the original briefing.

The Canadian Parties faced an objection from Commerce and Petitioner that the Canadian Parties had not raised certain Cohen's *d* issues before Commerce and, therefore, had not exhausted administrative remedies.  Although the Panel agreed with

32

Commerce as to exhaustion of administrative remedies, it applied an exception, ruling that "GOC and Resolute may present arguments flowing from the effects of *Stupp* and *Mid Continent I & II* on Commerce's {DPM}, as those decisions are intervening judicial authority which might have altered the result and the arguments are not precluded by the doctrine of exhaustion and waiver."  NAFTA AD Panel Decision at 7-8.

Resolute and the Government of Canada argued that, as in *Stupp*, Commerce failed to apply the underlying statistical assumptions governing the Cohen's *d* test (*i.e.,* sufficient size, normal distribution, roughly equal variance).  Commerce also used simple averages for standard deviations in calculating the Cohen's *d* denominator, contrary to what the CAFC found required in *Mid Continent I & II* (that the statistical literature called for the use of weighted, not simple averages).  Commerce argued that its use of the entire population of a respondent's sales, as opposed to a sample, rendered the Canadian Parties' arguments (and judicial precedent) inapposite.

The Panel noted that, under NAFTA, it was bound by the decisions of the CAFC and not adverse CIT decisions that had been cited by Commerce.  It remanded for Commerce to provide an explanation as to whether Commerce was required to adhere to the same underlying assumptions of the Cohen's *d* test in other cases before the CAFC that the Canadian Parties had presented as an issue in the case before the Panel.  *See id.*  Commerce was also "invited to clarify its argument concerning availability of the full universe of sales data."  The Panel further remanded to Commerce to explain its "choice for the Cohen's *d* denominator." *Id.*

33

(2)     Statistical Scholarship On The Record

Resolute explained to Commerce that the courts have relied on scientific statistical literature in questioning the reasonableness of Commerce's Cohen's *d* test. *See, e.g.,* Resolute's Case Br. at 35-37, P.R. 36.   Resolute showed "good cause" by placing on the record of the review a new expert analysis by Professor Larry Hedges exposing issues in Commerce's use of the Cohen's *d* test when performing antidumping calculations. *See* Hedges' Report (Exh. 9 to Resolute's Sub. Resp.), P.R. 28, C.R. 1.

Commerce, in *Softwood Lumber from Canada* (and many other AD proceedings), took a test from the behavioral sciences and applied it to economic and commercial facts.  Professor Hedges questioned the validity of using the Cohen's *d* test for international trade analysis, concluding that "Cohen contends, and others have demonstrated empirically, that these conventions are not appropriate for other scientific contexts (such as in certain specific areas of the behavioral sciences and other sciences)."  *Id.* at 4.  Commerce's use of the Cohen's *d* test as the basis of a targeted dumping analysis makes little sense scientifically.

Professor Hedges' report also examined the issue central to *Stupp,* the unreasonableness of the Department's failure to meet the underlying statistical assumptions of the Cohen's *d* test.  Professor Hedges demonstrated through numerous examples and citations to the scholarly literature that "the relations between Cohen's *d* and measures of overlap used to interpret *d* do not hold when the distributions being compared do not have equal standard deviations or are not normally distributed." *Id.* at 3-4; *see also id.* Part V.  He also reviewed the literature cited by Commerce (and the other parties) in court cases pertaining to the Cohen's *d* test.  His detailed analysis, at Appendix II of his report, shows that "certain of Commerce's fundamental positions are

based on unambiguous misinterpretations of the literature." *Id.* & App. II.  Professor

Hedges concluded that, "{b}ecause the data analyzed by Commerce do not meet

Cohen's assumptions, reliance on these conventions is not justified by Cohen's work or

the statistical literature." *Id.* at 4.   Commerce never once even acknowledged Professor

Hedges' report.

(3)    Additional Factors

Resolute demonstrated several other grounds for "good cause" during the Sunset

Review proceeding, including WTO jurisprudence on the DPM and zeroing.  *See*

Resolute's Case Br. at 24-35, P.R. 36.  Pursuant to the *Charming Betsy* doctrine, a

longstanding canon of statutory construction, Commerce, if possible, must interpret U.S.

law in harmony with "the law of nations" (in this case, the WTO Agreements).  *Murray v.*

*Schooner Charming Betsy*, 6 U.S. 64, 118 (1804).   The CAFC, in *Allegheny Ludlum*

*Corp. v. United States*, effectively renewed the authority of this early nineteenth century

doctrine for the twenty-first century and recognized the utility and importance of

international law.  *See Allegheny Ludlum Corp. v. United States*, 367 F. 3d 1339, 1348

(Fed. Cir. 2004).

The WTO Appellate Body has ruled that certain applications of the DPM,

including the use of zeroing in calculating dumping margins under the A-T method, are

inconsistent with the United States' obligations under the AD Agreement.  *See* Appellate

Body Report, *United States - Anti-Dumping and Countervailing Measures on Large*

*Residential Washers From Korea* ("*US – Washers*"), WT/DS464/AB/R (adopted Sep.

26, 2016).  The WTO has also struck down zeroing in investigations and administrative

reviews.  *See, e.g.,* Appellate Body Report, *United States – Continued Existence and*

*Application of Zeroing Methodology*, WT/DS350/AB/R (adopted Feb. 19, 2009);

Appellate Body Report*, United States – Final Anti-Dumping Measures on Stainless*

*Steel from Mexico*, WT/DS344/AB/R (adopted May 20, 2008) ; Appellate Body Report,

*United States – Measures Relating to Zeroing and Sunset Reviews*, WT/DS322/AB/R

(adopted Jan. 23, 2007).

Although not binding on Commerce, WTO jurisprudence represents a source of

persuasive authority for interpreting the meaning of the WTO AD Agreement that the

URAA was intended to implement. *See* URAA SAA, 1994 U.S.C.C.A.N. at 4178.  Two

decades of precedent and, especially, the persuasive Appellate Body opinion in *US –*

*Washing Machines,* should have guided Commerce's interpretation of the AD

Agreement as it pertains to the DPM and zeroing in this case.  At a minimum,

Commerce was required to explain why it rejected the WTO jurisprudence rather than

dismiss it because it is not binding.

Resolute also asked Commerce to consider arguments it had made in the

investigation and review as to the unreasonableness of the DPM.  *See* Resolute's Case

Br. at 33-35, P.R. 36.  Resolute had argued, *inter alia*, that (1) the DPM aggregates

separate possible patterns of price differences for customers, regions, or periods of time

to find a significant price difference and (2) the "meaningful difference" component of

the DPM deliberately and systematically ignores alternative explanations for price

observations and persuasive justification for reliance on the preferred A-A price

comparison method.  *See id.* at 34-35.  These shortcomings further demonstrated the

unreasonableness of the DPM and zeroing.

b.    Commerce Failed To Articulate And Apply The Correct
Standard

(1)    Commerce Should Have Reached A No Likelihood
Finding By Considering The Only Lawful Dumping
Margin On The Record In The Review

Commerce, in this proceeding, is required by statute to examine the respondents'

weighted-average dumping margins in the investigation and administrative reviews as

part of the likelihood inquiry.  *See* 19 U.S.C. § 1675a(c)(1)(A).  The initial question

presented is which margin on the record in this review Commerce should have used

when analyzing the likelihood of continuation or recurrence of dumping.  *See* Resolute's

Case Br. at 38-39, P.R. 36.

During the investigation, Commerce applied the DPM to Resolute's U.S. sales

data, finding that 73.56 percent of its sales in the United States passed the Cohen's *d*

test.  *See* Resolute's Final AD Calc Memo INV at 7 (Exh. 1 to Resolute's Sub. Resp.),

P.R. 28, C.R. 1.  As part of the meaningful difference test, Commerce calculated an A-A

rate of 0.00 percent and an A-T rate (with zeroing) of 3.20 percent.  *Id.*   Relying on the

DPM, and contrary to law, Commerce imposed a final investigation rate of 3.20 percent

on Resolute; instead, Commerce should have found Resolute not to be dumping and

hence excluded from the AD order.  (The NAFTA Panel has remanded this

determination, recognizing Commerce's failure to conform with CAFC jurisprudence.

*See* NAFTA AD Panel Decision at 30-32.

The DPM inflated Resolute's rate above *de minimis* in the first AD administrative

review and affected calculations of the non-examined companies' rate in the

subsequent reviews of the AD order where Resolute was not individually investigated.

*See* Resolute's AD Final Analysis Memo AR1 (Exh. 2 to Resolute's Sub. Resp.), P.R. 28, C.R. 1; Resolute's Case Brief at 40-41 & accompanying notes, P.R. 36.  As Resolute demonstrated, however, that binding CAFC jurisprudence, backed by statistical expertise, showed rates calculated with the DPM were unreasonable and, consequently, unlawful.  The only rate on the record lawfully calculated was the investigation's A-A rate of zero (confirmed as *de minimis* in AR1).[14]  Because Resolute was never dumping, Commerce should have found that there was no likelihood of continuation or recurrence of dumping by Resolute.

> (2)   Commerce's Insufficient Explanation And Erroneous Application Of 19 U.S.C. § 1675a(c)(2) Are Arbitrary And Capricious

Commerce rejected the A-A rate for Resolute: "In the underlying investigation of the Order, Commerce found dumping at above-*de minimis* levels and assigned weighted-average dumping margins ranging from 3.20 percent to 7.28."  IDM at 18.  Commerce also rejected the opportunity for informed decision-making presented by the idea of "good cause" that enables consideration of "other factors."

In Part V of the IDM, on the legal framework for the Sunset Review, Commerce does not mention "good cause" at all.  Commerce's own limited discussion of the standard appears just once, in a single paragraph on page 18 of the IDM, and in

---

[14] Commerce need not undertake any new or complex calculations; Commerce need only consider the "weighted average dumping margins determined in the investigation" and select the A-A rate already on the record. *See* Resolute's Final AD Calc Memo INV, at 3 (Exh. 1 to Resolute's Sub. Resp.) (reporting proper dumping margin reported in the column marked "AD VALOREM WEIGHTED AVERAGE MARGIN RATE (PERCENT) STANDARD METHOD"), P.R. 28, C.R. 1.

reference to a regulatory provision (19 C.F.R. § 351.218(d)(3)(iv)(A)) that Resolute did not cite in its briefing.

Commerce conflated the subject of the "good cause" showing with the margin reported to the Commission: "Therefore, we do not believe that there is 'good cause,' as Resolute claims, to report to the ITC a *de minimis* rate for Resolute that was not calculated in the underlying investigation of the Order or any prior administrative review."  IDM at 18, P.R. 45.

Commerce repeated this erroneous reference to Resolute's briefing at the start of the rate analysis, asserting again that "Resolute has not demonstrated that there is 'good cause' pursuant to Commerce's regulations to report to the ITC a *de minimis* rate for Resolute that was not calculated in the underlying investigation of the Order or any prior administrative review."  *Id.* at 21.

Resolute never made the argument that Commerce rejected.  "Good cause" is not about the rate reported to the Commission.  Rather, Commerce is to determine whether a respondent has made an adequate showing of "good cause," *see* 19 U.S.C. § 1675a(c)(1)-(2), which, here, concerned the significant development of the relevant jurisprudence and the accumulating evidence from experts in statistics.

Once there is a finding of "good cause," Commerce "shall" examine other relevant factors as part of its assessment on the likelihood of continuation or recurrence of dumping.  Only then does it proceed to 19 U.S.C. § 1675a(c)(3) and select a margin to report to the Commission.

Commerce produced multiple pages of boilerplate on the jurisprudence of the DPM and the Cohen's *d* test and why Commerce thought those cases were inapplicable to the present Sunset Review, or otherwise not properly before Commerce in the

Sunset Review.  *See* IDM at 6-19, P.R. 45.  Commerce answered arguments that Resolute never made.  *See, e.g., id.* at 10 (application of A-T to all sales in meaningful difference test); *id.* at 11 (applicability of Administrative Procedure Act); *id.* at 12 (ratio test cut offs).

Missing from the IDM is Commerce's own interpretation of the statutory provision at issue.  Commerce "disagree{s} with Resolute that there is 'good cause,'" but Commerce does not reveal what it thinks "good cause" is or should be.  *Id.* at 18.  It does not enumerate what "other price, cost, market, or economic factors" "it deems relevant" 19 U.S.C. §1675a(c)(2).  Commerce arbitrarily and without explanation did not find "good cause," without criteria and without reasoning.

This Court has found agency action arbitrary and capricious when Commerce has "'entirely failed to consider an important aspect of the problem.'" *Guangzhou Jangho Curtain Wall Sys. Eng'g Co.,* 181 F. Supp. 3d at 1278; *Shijiazhuang Goodman Trading Co.,* 172 F. Supp. 3d at 1380; *see also Motor Vehicle Mfrs. Ass'n.,* 463 U.S. at 43.  This Court, citing to the Supreme Court, has also explained that "{o}ne of the basic procedural requirements" applicable to administrative action is that the agency "'must give adequate reasons for its decisions . . . .  But where an agency has failed to provide even that minimal level of analysis its action is arbitrary and capricious and so cannot carry the force of law.'"  *Jilin Forest Indus. Jinq1ao Flooring Grp. Co. v. United States*, 617 F. Supp. 3d 1343, 1355 n.15 (Ct. Int'l Trade 2023) (citing *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016)).  Here, had there been no need for a demonstration of "good cause," Commerce would have found no dumping.  Having rejected this conclusion, Commerce arbitrarily and without reasoning denied Resolute's statutory argument that new jurisprudence constitutes "good cause."

(3)    Commerce's Disregard For Key Record Evidence
(Hedges' Report) Is Arbitrary And Capricious

Commerce disregarded the expert report of Professor Larry Hedges, a rigorous statistical analysis confirming the unreasonableness of the Cohen's *d* test when applied to trade remedies. *See* Hedges' Report (Exh. 9, Resolute's Sub. Resp.), P.R. 28, C.R. 1.  Professor Hedges restricted his review to the scholarly literature already cited by Commerce (and the other parties) in court cases pertaining to the Cohen's *d* test.  His detailed analysis, at Appendix II of his report, shows that "certain of Commerce's fundamental positions are based on unambiguous misinterpretations of the literature." *Id.* at 4 & App. II (Exh. 9, Resolute's Sub. Resp.).  This expert report constituted additional evidence in support of Resolute's argument that, without the Cohen's *d* test and DPM, Commerce would not have found Resolute to be dumping. *See* Resolute's Case Br. at 35-37, P.R. 36.

Commerce nowhere acknowledged nor otherwise discussed the Hedges' Report in the Final Results.  Instead, it asserted, "No . . . academic literature is on the record of this sunset review or the completed administrative reviews."  IDM at 17, P.R. 45. Commerce's conclusion ignores the courts' view of academic literature specifically in the context of the Cohen's *d* test and disregards Professor Hedges' own citations to and discussion of the academic literature.

Commerce itself adopted Cohen's *d* as a "'generally recognized' test' " and has asserted that "'the Cohen's *d* coefficient is a prominent and widely accepted statistical measure that has been developed to evaluate practical significance.'" *Mid Continent Steel I*, 940 F. 3d at 673. The courts have relied on and acknowledged the importance of academic literature to understanding the complexity of Commerce's own

41

methodology, which was allegedly derived in reference to the literature Commerce apparently now would like to ignore.  *See, e.g., id.; Mid Continent II,* 31 F. 4th at 1381; *Stupp,* 5 F. 4th at 1358.

The CAFC has held Commerce to its methodological choice. *See, e.g., Stupp,* 5 F. 4th at 1360 (remanding "to give Commerce an opportunity to explain whether the limits on the use of the Cohen's *d* test prescribed by Professor Cohen and other authorities were satisfied in this case or whether those limits need not be observed when Commerce uses the Cohen's *d* test in less-than-fair-value adjudications"); *Mid Continent II,* 31 F. 4th at 1381 (recognizing that "Commerce needs a reasonable justification for departing from what the acknowledged literature teaches about Cohen's *d*").  More recently, in the *NEXTEEL* case, this Court criticized Commerce's failure to adhere to statistical fundamentals and remanded to Commerce "for reconsideration of the academic literature cited in the Final IDM."  *NEXTEEL CIT Remand,* 2023 WL 3017973, at *10; *see also Mid Continent CIT Remand,* 628 F. Supp. 3d at 1326 ("Commerce's claim that academia supports the simple average appears to be contradicted by the literature itself.").

An agency is not free to dismiss relevant evidence.  The courts have found that "an agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action."  *Butte Cnty. V. Hogen,* 613 F. 3d 190, 194 (D.C. Cir. 2010); *see also Seneca Foods Corp. v. United States,* 2023 Ct. Int'l Trade LEXIS 154 at *27 (2023) (remanding because "Commerce's failure to consider and address Seneca's representations and email evidence resulted in arbitrary and capricious decision making").  Resolute had submitted on the record of the Sunset Review an expert report by Professor Hedges that discussed the literature on which Commerce itself has relied.

Commerce had a full opportunity to engage on the technical details of its methodological choices.  Instead, it ignored the expert report and then fell back on an unsupportable assertion about the absence of academic literature on the record.  Commerce's treatment of the Hedges' Report (or rather, lack thereof) was arbitrary and capricious and otherwise not in accordance with law.

2. Commerce Never Addressed Resolute's Claim Of "Extraordinary Circumstances" And Should Have Reported To The Commission A Zero Margin As To Resolute

The Final Results are arbitrary and capricious for yet another reason.  Under 19 U.S.C. § 1675a(c)(3), Commerce is required to "provide to the Commission the magnitude of the margin of dumping that is likely to prevail if the order is revoked or the suspended investigation is terminated."  Commerce "shall normally" select and report a margin from the investigation or administrative reviews.  *Id*.  Commerce derived a margin for Resolute, albeit with an unlawful methodology, which was repeated in the IDM.  *See* IDM at 3, 21-22, P.R. 45.  Commerce reported the rate likely to prevail as up to 7.28 percent, an approach which used the highest respondent rate from the investigation, presumably including by implication the remaining lower rates.  Here, Commerce had calculated the proper and lawful margin for Resolute, but did not rely on it.[15]

---

[15] Resolute recognizes that revocation of the AD order as to Resolute in this case does not involve the Commission because, in the absence of dumping, there can be no injury caused by dumping.  Although a likelihood of continued or resumed dumping might be found for other parties and, therefore, that the conduct of other parties may cause or threaten injury, there could be no threat or injury caused by Resolute.  The issue, therefore, is that Commerce reported to the Commission a general dumping margin of up to 7.28 percent, unresponsive to Resolute's request for a sunset review, confirming Commerce's refusal to consider the terms of Resolute's request and implying that Resolute could be a source of injury.

Under the most extraordinary circumstances," Commerce may "rely on dumping margins. . . other than those it calculated and published in its prior determinations." URAA SAA, 1994 U.S.C.C.A.N. at 4214.  Resolute asked Commerce to find "extraordinary circumstances" in this case and to report a zero margin as to Resolute. *See* Resolute's Case Br. at 42-44, P.R. 36.  Commerce, never addressing Resolute's claim, reported that dumping margins of up to 7.28 percent would likely prevail in the event of revocation.  *See* IDM at 21-22, P.R. 45.  For Resolute, the dumping margin should have been zero.  In neither the investigation nor the first administrative review, the two times Resolute was examined, did Resolute's highest rate rise to even half what Commerce chose to report.

Neither the statute nor the SAA defines "extraordinary circumstances" but courts have found such circumstances to exist and if Commerce were to consider actual margins, it should have found extraordinary circumstances to report them accurately here.  *See, e.g., AG der Dillinger Huttenwerke*, 193 F. Supp. 2d at 1352; *see also Government of Uzbekistan v. United States*, 25 Ct. Int'l Trade 1084, 1087 n. 5 (2001). As Commerce itself has admitted in other proceedings, "The SAA makes no mention of 'unmodified' rates from the investigation and, indeed, rates from the investigation may be modified, such as pursuant to remand."  IDM for the Final Results of Full Sunset Reviews of the Antidumping Duty Orders on Corrosion Resistant Carbon Steel Flat Products from Germany and the Republic of Korea, Nov. 30, 2012, at 4.  Applying this interpretation, Commerce has found "extraordinary circumstances" and adjusted the investigation rates reported to the Commission where the original rates were tainted by WTO-inconsistent methodology (as here). *See, e.g.*, *id.* at 5; *see also* IDM for the Final Results of the Expedited Third Sunset Reviews of the Antidumping Duty Orders on

Certain Preserved Mushrooms from Chile, India, Indonesia, and the People's Republic of China, June 30, 2015, at 13; Final Results of the Expedited Third Sunset Review of the Antidumping Duty Order on Certain Preserved Mushrooms from Indonesia; Recalculation of the LTFV Investigation Margin, June 30, 2015, at 1.

Resolute's showing of "good cause" under 19 U.S.C. § 1675a(c)(2) justified consideration of other factors and a finding of no likelihood of continued or resumed dumping under § 1675a(c)(1) because Resolute was not dumping during the investigation period and, therefore, it could not continue to do so after revocation of the AD order.  When considering the rate likely to prevail without the AD order in place pursuant to 19 U.S.C. § 1675a(c)(3), Commerce should have recognized that the original inflated rate from the investigation – 3.20 percent – was based on a defective methodology (one rejected by the courts and statistical experts) and found instead that the proper and lawful rate as to Resolute was zero percent (*i.e.,* no dumping).  Considering these "extraordinary circumstances," although not so extraordinary, Commerce should have reported Resolute's zero margin to the Commission.

The IDM never discussed Resolute's argument on "extraordinary circumstances." *See* IDM at 21-22, P.R. 45.  Similar to the "good cause" exception, Commerce interpreted the statute to give it no application to the facts.[16]  Instead, it chose and

---

[16] Likewise, in the companion CVD sunset review, Commerce calculated entirely new CVD margins and reported them to the Commission as the margins likely to prevail. *See* CVD Sunset IDM at 9.  Commerce never invoked "extraordinary circumstances" or otherwise justified its decision to depart from the statutory preference for published rates from the investigation or administrative reviews.  *See* 19 U.S.C. § 1675a(c)(3).  Apparently, Commerce has concluded it can ignore the statute and legislative history, a whimsical approach that is arbitrary and capricious.

reported an overall rate for all respondents of up to 7.28 percent, notwithstanding that no other companies were participating in the sunset review.

Commerce's failure to address arguments and facts was arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n.,* 463 U.S. at 43 (finding that an agency had acted arbitrarily and capriciously, including "when the agency has . . . entirely failed to consider an important aspect of the problem"); *see also Shijiazhuang Goodman Trading Co.*, 172 F. Supp. 3d at 1380 ("The court concludes that the Department's decision . . . was arbitrary and capricious, and therefore contrary to law, because Commerce failed to address the merits of the question before it.").  Asserting that it does not have to consider everything, or that it does not have to comment on everything it considered, is not acceptable agency action.  *See, e.g., Seneca Foods Corp. v. United States,* 2023 Ct. Int'l Trade LEXIS 154, at *20 ("The court concludes that Commerce's denials were arbitrary and capricious because they failed to acknowledge and address evidence on the record that contradicted the agency's findings.")  Resolute deserved better.  This Court should remand for a lawful result.

## VII.    CONCLUSION

For the reasons set forth in this Memorandum of Points and Authorities, Resolute respectfully requests that this Court find Commerce's Final Results to be arbitrary, capricious and otherwise not in accordance with law.  Resolute asks for a remand to Commerce with instructions to (i) find that there is no likelihood of the continuation or recurrence of dumping as to Plaintiff; (ii) revoke the antidumping duty order on softwood lumber from Canada as to Plaintiff; and (iii) grant Plaintiff such additional relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Elliot J. Feldman

Elliot J. Feldman
Michael S. Snarr
Ronald J. Baumgarten
Tung A. Nguyen

Baker Hostetler LLP
Counsel to Resolute FP Canada Inc.

Dated: November 6, 2023

**CERTIFICTE OF COMPLIANCE**

Pursuant to U.S. Court of International Trade Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Resolute FP Canada Inc.'s Memorandum in Support of Rule 56.2 Motion for Judgment on the Agency Record, as computed by Baker Hostetler's word processing system (Microsoft Word 2302), is 13,082 words.

/s/ Elliot J. Feldman
Signature of Attorney

Elliot J. Feldman
Name of Attorney

Resolute FP Canada Inc.
Representative Of

November 6, 2023
Date