**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE**

| | |
|---|---|
| RESOLUTE FP CANADA INC., <br><br>         Plaintiff, <br><br>    v. <br><br> UNITED STATES, <br><br>         Defendant, <br><br>    and <br><br> COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS, *et al.*, <br><br>         Defendant-Intervenors. | Court No. 23-00095 |

**PROPOSED JUDGMENT**

Before the Court are the complaint and USCIT R. 56.2 motion filed in this matter challenging the final determination of the United States Department of Commerce regarding *Certain Softwood Lumber Products From Canada: Final Results of the Expedited First Sunset Review of the Antidumping Duty Order*, 88 Fed. Reg. 20,479 (Dep't Commerce Apr. 6, 2023) ("*Final Results*").

It is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that the *Final Results* by Commerce are **SUSTAINED**.

                            _____

                            Jane A. Restani, Judge

Dated: _____
      New York, New York

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE**

| | |
|---|---|
| RESOLUTE FP CANADA INC., | |
| Plaintiff, | |
| v. | |
| UNITED STATES, | Court No. 23-00095 |
| Defendant, | |
| and | |
| COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS, *et al.*, | |
| Defendant-Intervenors. | |

**RESPONSE BRIEF OF THE COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Jessica M. Link
Andrew W. Kentz
Zachary J. Walker

**PICARD KENTZ & ROWE LLP**
1750 K Street NW, Suite 800
Washington, DC 20006
(202) 888-0595

*Counsel to the COALITION*

February 26, 2024

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES...................................................................................................... ii

INTRODUCTION .................................................................................................................. 1

STATEMENT PURSUANT TO RULE 56.2(c) ............................................................... 1

      A.    The Administrative Determination Under Review ............................................ 1

      B.    Issues Presented For Review........................................................................... 2

STATEMENT OF FACTS ..................................................................................................... 3

     I.    Issuance of the AD Order ................................................................................. 3

     II.    Conduct of Commerce's Expedited Sunset Review ...................................... 4

     III.    Resolute's Appeal of Commerce's Final Results.......................................... 8

SUMMARY OF THE ARGUMENT .................................................................................... 8

STANDARD OF REVIEW ................................................................................................... 9

ARGUMENT ........................................................................................................................ 10

     I.    Legal Framework for Commerce Sunset Review Determinations ........................... 10

     II.    Commerce Lawfully Determined that Revocation of the Order Would Be Likely to Lead to the Continuation or Recurrence of Dumping ........................................... 12

         A.    Commerce Lawfully Conducted its Review on an Order-Wide Basis............. 12

         B.    Commerce's Likelihood Determination Under Section 752(c)(1) of the Act Was Lawful and Not an Abuse of Discretion................................................... 14

         C.    Commerce Properly Determined No Good Cause Was Shown to Consider Other Factors Under Section 752(c)(2) of the Act ........................................... 18

     III.    Commerce Lawfully Reported Dumping Margins from the Investigation to the Commission as the Margins Most Likely to Prevail if the Order Was Revoked ....... 23

CONCLUSION...................................................................................................................... 29

# TABLE OF AUTHORITIES

## Cases

*AG der Dillinger Huttenwerke v. United States*,
193 F. Supp. 2d 1339 (Ct. Int'l Trade 2002) .......................................................................... 27

*Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*,
419 U.S. 281 (1974) ..................................................................................................... 10

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962) ..................................................................................................... 10

*Citizens to Preserve Overton Park v. Volpe*,
401 U.S. 402 (1971) ..................................................................................................... 10

*Gov. of Uzbekistan v. United States*,
25 C.I.T. 1084 (2001) .................................................................................................. 27

*Micron Tech., Inc. v. United States*,
243 F.3d 1301 (Fed. Cir. 2001) .................................................................................... 11

*Mid Continent Steel & Wire, Inc. v. United States*,
31 F.4th 1367 (Fed. Cir. 2022) ..................................................................................... 16

*Mid Continent Steel & Wire, Inc. v. United States*,
940 F.3d 662 (Fed. Cir. 2019) ...................................................................................... 16

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .................................................................................................. 10, 23

*Neenah Foundry Co. v. United States*,
142 F. Supp. 2d 1008 (Ct. Int'l Trade 2001) ................................................................. 9

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2008) .................................................................................... 28

*Stupp Corp. v. United States*,
58 F.4th 1341 (Fed. Cir. 2021) ................................................................................ 16, 21

*Trinity Mfg., Inc. v. United States*,
549 F. Supp. 3d 1370 (Ct. Int'l Trade 2021) ................................................................. 9

## Statutes

19 U.S.C. § 1516a ............................................................................................................. 9

19 U.S.C. § 1673 ................................................................................................ 14

19 U.S.C. § 1675 ......................................................................................... *passim*

19 U.S.C. § 1675a ....................................................................................... *passim*

19 U.S.C. § 1677f-1 ........................................................................................... 14

19 U.S.C. § 3512 ................................................................................................ 11

## Regulations

19 C.F.R. § 351.218 .............................................................................. 5, 6, 24, 26

## Administrative Determinations

*Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Advance Notification of Sunset Review*, 87 Fed. Reg. 65,748 (Dep't Commerce Nov. 1, 2022) ........... 5

*Certain Preserved Mushrooms From Chile, India, Indonesia and the People's Republic of China: Final Results of Expedited Third Sunset Reviews of the Antidumping Duty Orders*, 80 Fed. Reg. 39,053 (Dep't Commerce July 8, 2015) ................................................ 27

*Certain Softwood Lumber Products From Canada: Antidumping Duty Order and Partial Amended Final Determination*, 83 Fed. Reg. 350 (Dep't Commerce Jan. 3, 2018)............. 1, 4

*Certain Softwood Lumber Products From Canada: Continuation of Antidumping and Countervailing Duty Orders*, 89 Fed. Reg. 1,537 (Dep't Commerce Jan. 10, 2024) .............. 8

*Certain Softwood Lumber Products From Canada: Final Affirmative Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, 82 Fed. Reg. 51,806 (Dep't Commerce Nov. 8, 2017)............................ 4, 23

*Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 76,519 (Dep't Commerce Nov. 30, 2020)................................................................................................................. 4

*Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty Administrative Review; 2019*, 86 Fed. Reg. 68,471 (Dep't Commerce Dec. 2, 2021)............. 4

*Certain Softwood Lumber Products From Canada: Final Results of the Expedited First Sunset Review of the Antidumping Duty Order*, 88 Fed. Reg. 20,479 (Dep't Commerce Apr. 6, 2023) ..................................................................................................... *passim*

*Certain Softwood Lumber Products From Canada: Initiation of Less-Than-Fair-Value Investigation*, 81 Fed. Reg. 93,892 (Dep't Commerce Dec. 22, 2016).................................... 3

*Continuation of Countervailing and Antidumping Duty Orders on Oil Country Tubular Goods From Argentina, Italy, Japan, Korea and Mexico, and Partial Revocation of Those Orders From Argentina and Mexico With Respect to Drill Pipe*, 66 Fed. Reg. 38,630 (Dep't Commerce July 25, 2001) ...................................................... 17

*Final Results of Expedited Sunset Review: Tapered Roller Bearings, Over Four Inches, and Parts Thereof, Finished and Unfinished, From Japan*, 64 Fed. Reg. 60,266 (Dep't Commerce Nov. 4, 1999) ..................................................................... 24, 26

*Final Results of Expedited Sunset Reviews: Oil Country Tubular Goods From Argentina, Italy, Japan, and Korea*, 65 Fed. Reg. 66,701 (Dep't Commerce Nov. 7, 2000) ............. 24, 26

*Fresh and Chilled Atlantic Salmon From Norway: Final Results of the Full Sunset Review of Antidumping Duty Order*, 70 Fed. Reg. 77,378 (Dep't Commerce Dec. 30, 2005) ........... 19

*Initiation of Five-Year (Sunset) Reviews*, 87 Fed. Reg. 73,757 (Dep't Commerce Dec. 1, 2022) ........................................................................................................ 5

*Large Residential Washers From the Republic of Korea: Preliminary Results of the First Five-Year Sunset Review of the Antidumping Duty Order*, 83 Fed. Reg. 18,275 (Dep't Commerce Apr. 26, 2018) ............................................................................ 13

*Lightweight Thermal Paper From Germany: Final Results of the First Full Sunset Review of the Antidumping Duty Order*, 79 Fed. Reg. 32,218 (Dep't Commerce June 4, 2014) ....... 13

*Lightweight Thermal Paper From Germany: Preliminary Results of the First Full Sunset Review of the Antidumping Duty Order*, 79 Fed. Reg. 7,644 (Dep't Commerce Feb. 10, 2014) ................................................................................................... 19

*North American Free Trade Agreement (NAFTA), Article 1904 Binational Panel Review: Notice of Completion of Panel Review*, 85 Fed. Reg. 42,828 (Dep't Commerce July 15, 2020) .................................................................................................... 3

*North American Free Trade Agreement (NAFTA), Article 1904 Binational Panel Review: Notice of Request for Panel Review*, 82 Fed. Reg. 60,002 (Dep't Commerce Dec. 18, 2017) .................................................................................................... 4

*Oil Country Tubular Goods From Mexico; Final Results of Sunset Review of Antidumping Duty Order*, 66 Fed. Reg. 14,131 (Dep't Commerce Mar. 9, 2001) ...................................... 14

*Softwood Lumber Products from Canada*, 88 Fed. Reg. 89,726 (Int'l Trade Comm'n Dec. 28, 2023) ................................................................ 8, 18

*Softwood Lumber Products From Canada; Determinations*, 82 Fed. Reg. 61,587 (Int'l Trade Comm'n Dec. 28, 2017) ................................................................... 3

**Other Authorities**

*Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification*, 77 Fed. Reg. 8,101 (Dep't Commerce Feb. 14, 2012) ........................................................... 28

*Procedures for Conducting Five-Year ("Sunset") Reviews of Antidumping and Countervailing Duty Orders*, 63 Fed. Reg. 13,516 (Dep't Commerce Mar. 20, 1998) ...................... 10, 13, 24

Uruguay Round Agreements Act, H.R. Rep. No. 103-826, Part 1 (1994) .............................. 11, 13

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, Vol. 1 (1994) .......................................................................... *passim*

## INTRODUCTION

Pursuant to Rule 56.2 of this Court's rules, defendant-intervenor, the Committee Overseeing Action for Lumber International Trade Investigations or Negotiations ("COALITION"), submits this response to the motion for judgment on the agency record filed by plaintiff Resolute FP Canada Inc. ("Resolute").  *See* Pl.'s Rule 56.2 Mot. for J. on the Agency Record, Nov. 6, 2023, ECF 28.  Resolute challenges the final results of the U.S. Department of Commerce's ("Commerce") expedited sunset review of the antidumping duty ("AD") order on certain softwood lumber products from Canada.  As demonstrated below, Commerce's determination that revocation of the order would be likely to lead to the continuation or recurrence of dumping, as well as its determination to report a weighted-average dumping margin from the underlying less-than-fair-value investigation as the dumping margin likely to prevail in the event of revocation, were not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  Accordingly, the COALITION respectfully requests that this Court sustain the final results of Commerce's expedited sunset review and enter judgment in favor of defendant United States.

## STATEMENT PURSUANT TO RULE 56.2(c)

A.    The Administrative Determination Under Review

The administrative determination under review is the final results of the first expedited sunset review of the AD order on certain softwood lumber products from Canada.[1]  The challenged determination was published in the *Federal Register* on April 6, 2023 as *Certain*

---

[1] As further detailed in this brief, the AD order on certain softwood lumber products from Canada was issued in 2018 following affirmative determinations by Commerce and the U.S. International Trade Commission ("Commission").  *See Certain Softwood Lumber Products From Canada: Antidumping Duty Order and Partial Amended Final Determination*, 83 Fed. Reg. 350 (Dep't Commerce Jan. 3, 2018) ("*AD Order*").

*Softwood Lumber Products From Canada: Final Results of the Expedited First Sunset Review of the Antidumping Duty Order*, 88 Fed. Reg. 20,479 (Dep't Commerce Apr. 6, 2023) ("*Final Results*"), P.R. 46.  The determinations, findings, and conclusions challenged in this appeal by Resolute are set out primarily in the "Issues and Decision Memorandum" accompanying the *Final Results*.  *See* Commerce Memorandum, "Issues and Decision Memorandum for the Final Results of the Expedited First Sunset Review of the Antidumping Duty Order on Softwood Lumber from Canada" (Mar. 31, 2023) ("IDM"), P.R. 45.[2]

B.    <u>Issues Presented For Review</u>

Resolute presents the following four issues for this Court's review:

1.    Whether Commerce's determinations not to conduct its expedited sunset review on a company-specific basis and not to grant Resolute a company-specific revocation were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

2.    Whether Commerce's determination, made on an order-wide basis, that revocation of the order would be likely to lead to continuation or recurrence of dumping was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

3.    Whether Commerce's factual finding that Resolute failed to demonstrate "good cause" for the agency to consider "other factors" as part of its likelihood determination under section 752(c)(2) of the Tariff Act of 1930 (the "Act"), 19 U.S.C. § 1675a(c)(2), was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

---

[2]  Documents on the administrative record are referred to within this brief by the document number assigned in the administrative record index filed by Commerce with the Court on June 20, 2023.  *See* ECF 19.  Citations in this brief to public documents (or public versions of business proprietary documents) and are identified with the rubric "P.R." followed by the relevant document number from the public record index.  *See* ECF 19-3.  Similarly, citations to business proprietary documents are identified with the rubric "C.R." followed by the relevant document number from the confidential record index.  *See* ECF 19-2.

4.    Whether Commerce's determination to report to the Commission a dumping margin calculated in the underlying investigation as the magnitude of the margin of dumping that is likely to prevail if the order is revoked, as opposed to a zero margin that has never been calculated and published in any prior determination, was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## STATEMENT OF FACTS

### I.    Issuance of the AD Order

On November 25, 2016, the COALITION filed AD and countervailing duty ("CVD") petitions with Commerce and the U.S. International Trade Commission ("Commission") concerning imports of softwood lumber products from Canada.  *See Certain Softwood Lumber Products From Canada: Initiation of Less-Than-Fair-Value Investigation*, 81 Fed. Reg. 93,892 (Dep't Commerce Dec. 22, 2016).  Thereafter, Commerce conducted a nearly year-long investigation into whether imports of such merchandise were being, or were likely to be, sold in the United States at less-than-fair value.[3]  *See id.*, 81 Fed. Reg. at 93,892.  During its investigation, Commerce individually examined four Canadian producers, including Resolute, ultimately calculating above *de minimis* dumping margins for each company.[4]  *See Certain*

---

[3]  While Commerce was investigating whether imports of softwood lumber products from Canada were being dumped, the Commission was concurrently investigating whether an industry in the United States was materially injured or threatened with material injury by reason of such imports.  *See Softwood Lumber Products From Canada; Determinations*, 82 Fed. Reg. 61,587 (Int'l Trade Comm'n Dec. 28, 2017).  The Commission's material injury finding was sustained by a binational panel composed under the NAFTA.  *See North American Free Trade Agreement (NAFTA), Article 1904 Binational Panel Review: Notice of Completion of Panel Review*, 85 Fed. Reg. 42,828 (Dep't Commerce July 15, 2020).

[4]  As further discussed, multiple parties, including the COALITION and Resolute, challenged aspects of Commerce's final determination of sales at less than fair value.  *See North American Free Trade Agreement (NAFTA), Article 1904 Binational Panel Review: Notice of*

*Softwood Lumber Products From Canada: Final Affirmative Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, 82 Fed. Reg. 51,806 (Dep't Commerce Nov. 8, 2017) ("*Final Affirmative Determination*").  As a result of the affirmative determinations reached by Commerce and the Commission, an AD order was published in the *Federal Register*.  *See AD Order*, 83 Fed. Reg. at 350.

Since the AD order was issued, Commerce has conducted annual administrative reviews to determine the amount of any antidumping duty.  *See, e.g.*, *Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 76,519 (Dep't Commerce Nov. 30, 2020) ("*AR1 Final Results*").  Resolute has participated in each administrative review segment before Commerce, including as a "mandatory respondent" in the agency's first administrative review ("AR1").  *See id.*, 85 Fed. Reg. at 76,520 (calculating a weighted-average dumping margin of 1.15 percent for Resolute).  In administrative reviews conducted since the order was issued, Commerce has calculated weighted-average dumping margins of up to 17.12 percent, showing that Canadian producers of subject merchandise continue to sell into the United States at less than fair value.  *See Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty Administrative Review; 2019*, 86 Fed. Reg. 68,471 (Dep't Commerce Dec. 2, 2021) ("*AR2 Final Results*").

## II.   <u>Conduct of Commerce's Expedited Sunset Review</u>

On November 1, 2022, Commerce published advance notice of its initiation of the first five-year sunset review of the AD order.[5]  *Antidumping or Countervailing Duty Order, Finding,*

---

*Request for Panel Review*, 82 Fed. Reg. 60,002 (Dep't Commerce Dec. 18, 2017).  That appeal remains ongoing.

[5] Unlike other Commerce proceedings, such as administrative reviews, that are only conducted if a timely request is received by the agency, sunset reviews initiate automatically every five years.  *Compare* 19 U.S.C. § 1675(a) (explaining that Commerce will conduct

*or Suspended Investigation; Advance Notification of Sunset Review*, 87 Fed. Reg. 65,748 (Dep't Commerce Nov. 1, 2022).  Commerce's formal initiation notice was published in the *Federal Register* thirty days later.  *See Initiation of Five-Year (Sunset) Reviews*, 87 Fed. Reg. 73,757 (Dep't Commerce Dec. 1, 2022) ("*Initiation Notice*").

On December 5, 2022, the COALITION notified Commerce of its intent to participate in the agency's sunset review in accordance with 19 C.F.R. § 351.218(d)(1).[6]  Letter from Picard Kentz & Rowe LLP to Commerce, "Notice of Intent to Participate" (Dec. 5, 2022), P.R. 10. Another domestic interested party, Sierra Pacific Industries ("SPI"), also filed a timely notice of intent to participate.  Letter from Wilmer Cutler Pickering Hale and Dorr LLP to Commerce, "Notice of Intent to Participate in Sunset Review" (Dec. 16, 2022), P.R. 21.

Between December 30, 2022 and January 5, 2023, three interested parties filed substantive responses to Commerce's initiation notice, while a fourth, West Fraser Mills Ltd. ("West Fraser"), filed a "statement of waiver," disclaiming its right to participate in Commerce's sunset review.[7]  *See* Letter from Picard Kentz & Rowe LLP to Commerce, "Substantive Response to Notice of Initiation" (Dec. 30, 2022), P.R. 22; Letter from Wilmer Cutler Pickering Hale and Dorr LLP to Commerce, "Substantive Response to the Notice of Initiation" (Jan. 3, 2022) ("SPI Substantive Response"), P.R. 26; Letter from Baker & Hostetler LLP to Commerce,

---

administrative reviews each 12-month period "if a request for such a review has been received"), *with id.* § 1675(c) (stating that Commerce "shall conduct a {five-year sunset} review").

[6] If no domestic interested party files a notice of intent to participate in a sunset review, Commerce will "issue a final determination revoking the order."  19 C.F.R. § 351.218(d)(1)(iii)(B).

[7] West Fraser's statement of waiver acknowledged that the company would be likely to dump if the order were revoked.  *See* Letter from Gibson, Dunn & Crutcher LLP to Commerce, "Statement of Waiver" (Jan. 3, 2022), at 2, P.R. 27.

"Substantive Response of Resolute FP Canada Inc. to the Department of Commerce's Notice of Initiation" (Jan. 5, 2023) ("Resolute Substantive Response"), C.R. 1-2, P.R. 28-29; Letter from Gibson, Dunn & Crutcher LLP to Commerce, "Statement of Waiver" (Jan. 3, 2022), P.R. 27. The substantive response filed by Resolute was the only such response filed by a respondent interested party to Commerce's initiation notice. *See* IDM at 2, P.R. 45.

On January 25, 2023, Commerce notified the Commission that it would conduct an expedited sunset review and issue the final results of its determination "not later than 120 days after the date of publication of the *Federal Register* notice of initiation," after concluding that respondent interested parties provided an inadequate response to the notice of initiation.[8] Letter from Commerce to International Trade Commission, "Sunset Reviews Initiated Dec. 1, 2022" (Jan. 25, 2023), P.R. 31; *see also* IDM at 2 (explaining that "Resolute failed to show that it accounts for 50 percent or more of total exports of subject merchandise to the United States from Canada"), P.R. 45.[9] Thereafter, Resolute filed a case brief arguing that the AD order should be

---

[8] Commerce's regulations differentiate between an "expedited sunset review" and a "full sunset review." *See* 19 C.F.R. § 351.218. Normally, Commerce will only conduct a full sunset review where the agency receives adequate responses to the notice of initiation from both domestic and respondent interested parties. *Id.* § 351.218(e)(2)(i). While Commerce evaluates the adequacy of response from respondent interested parties "on a case-by-case basis," the agency will normally conclude that the substantive response of respondent interested parties is "adequate" when it accounts "for more than 50 percent . . . of the total exports of subject merchandise to the United States over the five calendar years preceding the year of publication of the notice of initiation." *Id.* § 351.218(e)(1)(ii)(A). In this case, Commerce found that Resolute "failed to show that it accounts for 50 percent or more of total exports of subject merchandise to the United States during the five years preceding the year of the initiation of these sunset reviews." IDM at 2, P.R. 45.

[9] Resolute's substantive response provided information on the quantity and value of its exports of subject merchandise to the United States. *See* Resolute Substantive Response at 15-16, C.R. 1, P.R. 28. Despite Commerce's requirement that respondent interested parties provide that party's share of the total exports of subject merchandise in their substantive responses, *see* 19 C.F.R. § 351.218(d)(3)(iii)(D), Resolute did not attempt to provide this information, instead declaring that "Resolute does not have this information." *Id.* at 16. *But see* Letter from Picard Kentz & Rowe LLP to Commerce, "Rebuttal to Resolute's Substantive

revoked as to the company.  Letter from Baker & Hostetler LLP to Commerce, "Resolute's Case Brief" (Mar. 3, 2023) ("Resolute's Case Brief"), at 45-47, P.R. 36.  Resolute's case brief claimed that Commerce "never lawfully found Resolute to be dumping."  *Id.* at 45.  According to Resolute, the company was only found to be dumping because of Commerce's application of its differential pricing methodology, a set of analyses used to evaluate whether the agency should apply an alternative comparison methodology.  *Id.* at 1.  Resolute asserted that the differential pricing methodology is "an unworthy tool in the Department's quest to unmask targeted dumping," *id.* at 1, and argued that revocation of the order as to Resolute was proper "because Resolute was never selling merchandise at less than fair value and should not have been subject to the order."  *Id.* at 7.

The COALITION and SPI filed rebuttal briefs responding to Resolute's arguments.  *See* Letter from Picard Kentz & Rowe LLP to Commerce, "Rebuttal Brief" (Mar. 17, 2023) ("COALITION Rebuttal Brief"), P.R. 41; Letter from Wilmer Cutler Pickering Hale and Dorr LLP to Commerce, "Rebuttal Brief" (Mar. 17, 2023) ("SPI Rebuttal Brief"), P.R. 43.  The COALITION and SPI explained in their respective rebuttal briefs that Resolute failed to demonstrate "good cause" that would support Commerce considering "other factors" beyond those identified in section 752(c)(1)(A)-(B) of the Act, 19 U.S.C. § 1675a(c)(1)(A)-(B), in determining whether revocation of the order would be likely to lead to continuation or recurrence of dumping.  *See* COALITION Rebuttal Brief at 11-12, P.R. 41; SPI Rebuttal Brief at 2-4, P.R. 43.  The COALITION and SPI likewise explained that there were no "extraordinary

---

Response" (Jan. 10, 2023), at 5-6 (calculating adequacy of response from respondent interested parties), C.R. 3, P.R. 30.  Resolute does not contest in this action Commerce's finding that it did not receive adequate substantive responses from the respondent interest parties or the resulting decision to conduct an expedited sunset review.

circumstances" that would permit Commerce to report a zero percent dumping margin to the Commission for Resolute. COALITION Rebuttal Brief at 13-15, P.R. 41; SPI Rebuttal Brief at 4-5, P.R. 43.

On March 31, 2023, Commerce released the final results of its expedited sunset review. *See* IDM at 1, P.R. 45. Commerce's final results rejected Resolute's arguments and determined that revocation of the AD order would be likely to lead to the continuation or recurrence of dumping at a margin up to 7.28 percent. *Id.* at 22.[10]

### III.    Resolute's Appeal of Commerce's Final Results

Resolute commenced this challenge to the final results of Commerce's expedited sunset review on May 8, 2023. *See* Summons, May 8, 2023, ECF 1; Compl., May 8, 2023, ECF 2. Resolute moved for judgment on the agency record pursuant to USCIT Rule 56.2 on November 6, 2023. Pl.'s Mot.; *see also* Mem. of P. & A. in Supp. of Rule 56.2 Mot. for J. on the Agency R. by Pl. Resolute, Nov. 6, 2023 ("Pl.'s Br."), ECF 28-1.

### SUMMARY OF THE ARGUMENT

Commerce's determination that revocation of the AD order would be likely to lead to the continuation or recurrence of dumping was lawful and not an abuse of discretion. As an initial matter, contrary to Resolute's argument, Commerce properly conducted its expedited sunset review on an order-wide basis, as opposed to a company-specific basis, in accordance with

---

[10]    On December 28, 2023, the Commission published notice of its determination that revocation of the AD order would be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time. *Softwood Lumber Products from Canada*, 88 Fed. Reg. 89,726, 89,727 (Int'l Trade Comm'n Dec. 28, 2023) ("*ITC Final Affirmative Determination*"). As a result of the affirmative determinations reached by Commerce and the Commission, a notice of continuation of the AD order was published in the *Federal Register* by Commerce. *Certain Softwood Lumber Products From Canada: Continuation of Antidumping and Countervailing Duty Orders*, 89 Fed. Reg. 1,537 (Dep't Commerce Jan. 10, 2024).

Commerce's well-established practice.  Further, Resolute has failed to support its claim that

Commerce was required to disregard dumping margins calculated and published in prior

determinations and report a zero margin for the company.  Accordingly, Commerce did not err in

denying Resolute's request for a company-specific revocation.

Moreover, despite Resolute's arguments, Commerce acted lawfully when it declined to

consider "other factors" under section 752(c)(2) of the Act, 19 U.S.C. § 1675a(c)(2), as part of its

likelihood determination because Resolute failed to demonstrate "good cause."

Finally, Resolute has not shown that Commerce acted unlawfully when it reported to the

Commission a dumping margin calculated in the less-than-fair-value investigation as the margin

of dumping most likely to prevail should the AD order be revoked.  Accordingly, the Court

should reject the Resolute's claims and hold that the *Final Results* are lawful and are not

arbitrary, capricious, or an abuse of discretion.

**STANDARD OF REVIEW**

Commerce issued the final results in this expedited sunset review pursuant to 19 U.S.C.

§§ 1675(c)(3) and 1675a(c).  *Final Results*, 88 Fed. Reg. at 20,480.  Under 19 U.S.C.

§ 1516a(a)(1)(D), this Court reviews "a final determination by the administering authority . . .

under {19 U.S.C. § 1675(c)(3)}" applying the standard of review set forth in 19 U.S.C.

§ 1516a(b)(1)(B)(ii).  Under that standard of review, "{t}he court shall hold unlawful any

determination, finding, or conclusion found . . . to be arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(ii); *see also Neenah*

*Foundry Co. v. United States*, 142 F. Supp. 2d 1008, 1013-14 (Ct. Int'l Trade 2001) (discussing

legislative history and standard of review applied in actions contesting an expedited sunset

determination); *Trinity Mfg., Inc. v. United States*, 549 F. Supp. 3d 1370, 1374 (Ct. Int'l

Trade 2021) (same).

The Supreme Court has explained that "{t}he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) ("*Burlington Truck Lines*")). When reviewing an agency's explanation, a court "must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id.* (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285 (1974); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)).

## ARGUMENT

## I.     Legal Framework for Commerce Sunset Review Determinations

The Uruguay Round Agreements Act ("URAA") revised the Act by adding the requirement that Commerce conduct five-year "sunset" reviews of AD and CVD orders and revoke such orders unless revocation would be likely to lead to a continuation or recurrence of dumping or a countervailable subsidy, and material injury to the domestic industry. *See* 19 U.S.C. § 1675(c). Relevant to this appeal, the Department is responsible for determining whether revocation of an order "would be likely to lead to continuation or recurrence of dumping." *Id.* § 1675(c)(1); *see also Procedures for Conducting Five-Year ("Sunset") Reviews of Antidumping and Countervailing Duty Orders*, 63 Fed. Reg. 13,516 (Dep't Commerce Mar. 20, 1998) ("*Policy Bulletin*").

In determining the likelihood of continuation or recurrence of dumping, Commerce is directed to consider:

10

    (A)  the weighted average dumping margins determined in the investigation and subsequent reviews, and

    (B)  the volume of imports of the subject merchandise for the period before and the period after the issuance of the antidumping duty order.

19 U.S.C. § 1675a(c)(1)(A)-(B).  If "good cause is shown," Commerce is further instructed to "consider such other price, cost, market, or economic factors as it deems relevant."  *Id.* § 1675a(c)(2).

The Statement of Administrative Action ("SAA") accompanying the URAA instructs that Commerce, in considering the statutory factors, "examine the relationship between dumping margins, or the absence of margins, and the volume of imports of the subject merchandise, comparing the periods before and after the issuance of an order."  Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, Vol. 1, at 889 (1994) ("SAA").[11]  The SAA also provides that "Commerce and the Commission will make their sunset determinations on an order-wide, rather than a company-specific, basis."  *Id.* at 879; *see also* Uruguay Round Agreements Act, H.R. Rep. No. 103-826, Part 1, at 56 (1994) ("House Report") ("Commerce and the Commission will make their sunset determinations on an order-wide, rather than a company-specific, basis.").

Further, Commerce is required under section 752(c)(3) of the Act to provide to the Commission "the magnitude of the margin of dumping that is likely to prevail if the order is revoked."  19 U.S.C. § 1675a(c)(3).  In selecting this margin, "Commerce normally will select

---

[11]  The SAA is to be "regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and {the Uruguay Round Agreements} Act in any judicial proceeding in which a question arises concerning such interpretation or application."  19 U.S.C. § 3512(d); *see also Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1309 (Fed. Cir. 2001) (noting that the SAA "is more than mere legislative history").

the rate from the investigation, because that is the only calculated rate that reflects the behavior

of exporters and foreign governments without the discipline of an order . . . in place." SAA

at 890.  The SAA cautions that Commerce is not to engage in "undue speculation" in

determining the dumping margin reported to the Commission and should rely on dumping

margins other than those calculated and published in prior determinations "{o}nly under the

most extraordinary circumstances."  *Id.* at 891.

## II.    Commerce Lawfully Determined that Revocation of the Order Would Be Likely to Lead to the Continuation or Recurrence of Dumping

### A.    Commerce Lawfully Conducted its Review on an Order-Wide Basis

Underpinning Resolute's appeal is its argument that Commerce should have made a

"Resolute-specific determination as to the likelihood of the continuation or recurrence of

dumping."  Pl.'s Br. 18.  In seeking to have the AD order revoked as to itself, Resolute claims

that the Act "generally established a company-specific approach to dumping."  *Id.* at 18.

According to Resolute, a company-specific determination in this sunset proceeding would have

demonstrated that Resolute "was never dumping" and, therefore, unlikely to do so in the future.

*Id.* at 18.  As explained below, Resolute fails to demonstrate that Commerce's decision to

conduct this review on an order-wide basis was arbitrary, capricious, or otherwise not in

accordance with law.

Section 751(d)(2) of the Act requires that Commerce revoke an AD order unless the

agency "makes a determination that dumping . . . would be likely to continue or recur."

19 U.S.C. § 1675(d)(2).  In explaining Commerce's obligations under the URAA amendments to

the Act, the SAA and the House Report both recognize that Commerce will make its sunset

determinations on an order-wide basis.  For example, the SAA states explicitly that "Commerce

and the Commission will make their sunset determinations on an order-wide, rather than a

company-specific, basis." SAA at 879. The House Report includes the same language. H.R.

Rep. No. 103-826, Part I, at 56. Consistent with the intent of Congress, Commerce, in issuing its

procedures for conducting sunset reviews, stated that such reviews will be conducted on an

"order-wide basis." *Policy Bulletin*, 63 Fed. Reg. at 18,872.

Commerce's IDM responded to Resolute's request for company-specific revocation of the

order. *See* IDM at 8, P.R. 45. Citing the SAA and the House Report, Commerce explained that a

determination that there is no likelihood as to the continuation or recurrence of dumping with

respect to Resolute is inconsistent with Commerce's practice of making likelihood

determinations on an order-wide basis. *Id.* (citations omitted); *see also id.* at 5 ("Commerce's

determinations of the likelihood of recurrence of dumping will be made on an order-wide, rather

than a company-specific, basis."). Commerce's decision in this proceeding to make its

likelihood determination on an order-wide basis is consistent with the SAA, the agency's *Policy*

*Bulletin*, and its established practice. *See, e.g.*, *Large Residential Washers From the Republic of*

*Korea: Preliminary Results of the First Five-Year Sunset Review of the Antidumping Duty Order*,

83 Fed. Reg. 18,275 (Dep't Commerce Apr. 26, 2018), and accompanying PDM at 9-10

(rejecting respondent's request for a company-specific determination and explaining that

Commerce's "determination of likelihood of recurrence of dumping is to be made on an order-

wide basis" (citations omitted)); *Lightweight Thermal Paper From Germany: Final Results of*

*the First Full Sunset Review of the Antidumping Duty Order*, 79 Fed. Reg. 32,218 (Dep't

Commerce June 4, 2014), and accompanying IDM at 10 (rejecting respondent's argument to

exclude certain imports from Commerce's sunset analysis and "stress{ing} that the determination

of likelihood is made on an order-wide basis" (citations omitted)); *Oil Country Tubular Goods*

*From Mexico; Final Results of Sunset Review of Antidumping Duty Order*, 66 Fed. Reg. 14,131

(Dep't Commerce Mar. 9, 2001), and accompanying IDM at Comment 1 ("We also disagree with Hylsa's claims that we should have made a separate sunset finding for it based on company-specific import data. . . . Section 702(c) of the Act does not require company-specific sunset determinations and Section II.A.2 of the *Policy Bulletin* expressly provides that the Department 'will make its determination of likelihood on an order-wide basis.'").

In arguing that Commerce erred in declining to make a Resolute-specific determination, Resolute claims that "{t}he Tariff Act generally establishes a company-specific approach to dumping." Pl.'s Br. 18. While Resolute is correct that the "general" rule of calculating individual dumping margins is company-specific in certain Commerce proceedings, *see* 19 U.S.C. § 1677f-1(c)(1), it is incorrect in arguing that Commerce's determination as to whether revocation of an AD order would be likely to lead to continuation or recurrence of dumping should be made on a company-specific basis. Importantly, a determination of whether or not to impose an AD order, and, accordingly, whether to impose duties, is made on a product-specific (*i.e.*, order-wide) basis, not a company-specific basis. *See* 19 U.S.C. § 1673. Thus, Commerce lawfully conducts its review of whether to continue to impose such duties in sunset reviews on an order-wide basis. *See* SAA at 879. Making company-specific determinations in sunset reviews would be inconsistent with the fact that duties are not imposed on a producer-specific basis. Accordingly, Commerce acted lawfully in declining to make a company-specific likelihood determination.

B.     Commerce's Likelihood Determination Under Section 752(c)(1) of the Act Was Lawful and Not an Abuse of Discretion

Commerce lawfully determined in the final results that revocation of the AD order would be likely to lead to the continuation or recurrence of dumping. *See Final Results*, 88 Fed. Reg. at 20,479. As described above, pursuant to the statute, Commerce's likelihood determination is

based on: (1) The weighted-average dumping margins determined by the agency; and (2) the

volume of imports of subject merchandise both before and after the issuance of the antidumping

duty order.  *See* 19 U.S.C. § 1675a(c)(1).

Here, Commerce's consideration of these statutory factors supports its determination that

revocation of the AD order would be likely to lead to continuation or recurrence of dumping

because Canadian softwood lumber producers (including Resolute) have continued to dump

following the issuance of the AD order.  As Commerce noted in the final results, dumping

margins ranged from 3.20 percent to 7.28 percent in the underlying investigation, and remained

above *de minimis* in subsequent administrative reviews of the AD order.  *See* IDM at 18

(citations omitted), P.R. 45.  Thus, Commerce's consideration of the weighted-average dumping

margins determined by the agency support its conclusion that "any entries of subject

merchandise into the U.S. after the issuance of the *Order* were subject to above-*de minimis* AD

rates."  *Id.*  Further, Commerce examined import data on the record and supported its factual

finding that "while import volumes of softwood lumber have fluctuated by up to 13 percent

following imposition of the *Order*, import volumes of softwood lumber have remained relatively

the same or higher in the comparison period than pre-*Order* levels."  *Id.* at 19 (citation omitted).

In analyzing the volume of imports for the period before and the period after the order was

issued, Commerce complied with the requirements of section 752(c)(1)(B) of the Act.  *See*

19 U.S.C. § 1675a(c)(1)(B).  These facts taken together support Commerce's conclusion that "it

is unlikely that respondents would be able to sell at pre-*Order* volumes without dumping," and

thus, that "dumping would likely continue or recur if the *Order* were revoked."  *Id.*; *see also*

SAA at 890 ("If companies continue to dump with the discipline of an order in place, it is

reasonable to assume that dumping would continue if the discipline were removed.").

In contesting Commerce's determination that revocation of the order would be likely to lead to continuation or recurrence of dumping, Resolute argues that Commerce should have assigned Resolute a zero rate of dumping. According to the company, "{t}he dumping finding in the investigation was the result of a methodology unlawfully applied," and therefore "the company should not have been subject to the order for the last five years." Pl.'s Br. 2. As an initial matter, though various aspects of Commerce's differential pricing methodology have been considered and reviewed by this Court and the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit"), there have been no decisions holding the methodology or its "application" to be unlawful. Indeed, Resolute's specific challenge to Commerce's application of this methodology in deciding whether to apply an alternate methodology to determine whether subject merchandise was sold at less than fair value in the investigation is currently pending before a binational review panel formed pursuant to the North American Free Trade Agreement ("NAFTA"). As noted by Resolute, that Panel remanded Commerce's final determination in an October 5, 2023 decision where the panel stated:

> We remand the differential pricing methodology issue to Commerce to address its consistency with the United States Court of Appeals for the Federal Circuit's determinations in *Stupp Corp. v. United States*, 58 F.4th 1341 (Fed. Cir. 2021) {("*Stupp*")}, *Mid Continent Steel & Wire Inc. v. United States*, 940 F.3d 662 (Fed. Cir. 2019), and *Mid Continent Steel & Wire Inc. v. United States*, 31 F.4th 1367 (Fed. Cir. 2022) {(collectively, "*Mid Continent I & II*")}.

Panel Decision, *Certain Softwood Lumber from Canada: Final Affirmative Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, NAFTA No. USA-CDA-2017-1904-03 (Oct. 5, 2023). As part of its decision, the Panel recognized that challenges to aspects of the differential pricing methodology "are currently before the courts in ongoing litigation, and not yet resolved." *Id.* at 29. Further, the Panel did not invalidate the differential pricing methodology, but remanded Commerce's determination for

further explanation based on intervening judicial decisions.  *See id.* at 30 ("We therefore follow *Stupp* and remand to Commerce for an explanation of whether the limits on the use of the Cohen's *d* test were met in this case or whether those limits need not be followed by Commerce."); *id.* at 31-32 ("We therefore follow *Mid Continent I & II* and remand to Commerce for an explanation of its choice for the Cohen's *d* denominator, either simple averaging or an alternate choice.").  Thus, Resolute's central argument contesting Commerce's application of the differential pricing methodology in deciding whether to apply an alternate methodology to determine whether subject merchandise is being sold at less than fair value in the investigation is without merit.  As such, this Court should reject Resolute's attempt to simultaneously litigate the dumping margin calculated in Commerce's original investigation in two forums.

Second, Resolute contends that Commerce acted arbitrarily in denying Resolute's request for company-specific revocation, *see* Pl.'s Br. 21-24, but fails to identify a single circumstance in which Commerce has ever considered a company-specific revocation in the context of a sunset review.  Resolute attempts to argue that *Oil Country Tubular Goods* supports a partial revocation during a sunset review.  *See id.* at 22 (citing *Continuation of Countervailing and Antidumping Duty Orders on Oil Country Tubular Goods From Argentina, Italy, Japan, Korea and Mexico, and Partial Revocation of Those Orders From Argentina and Mexico With Respect to Drill Pipe*, 66 Fed. Reg. 38,630 (Dep't Commerce July 25, 2001) ("*Oil Country Tubular Goods*")).  However, that case does not concern a company-specific revocation, but instead involves the Commission's determination that there was no likelihood of injury for a certain domestic like product.  *See Oil Country Tubular Goods*, 66 Fed. Reg. at 38,631 n.7 (revising the scope of the orders to remove drill pipe from the Mexico and Argentina orders based on the Commission's negative determinations with respect to this merchandise).  Here, the Commission affirmed that

there is a likelihood of injury for all products within the domestic like product definition.  *See*

*ITC Final Affirmative Determination*, 88 Fed. Reg. at 89,726.  Thus, the case cited by Resolute is

inapposite and does not demonstrate that Commerce acted arbitrarily, capriciously, or abused its

discretion by not granting Resolute a company-specific revocation of the order.

      C.    <u>Commerce Properly Determined No Good Cause Was Shown to Consider Other</u>
<u>Factors Under Section 752(c)(2) of the Act</u>

      In addition to the factors Commerce is directed to consider under section 752(c)(1) of the

Act, the statute provides that "{i}f good cause is shown," Commerce shall "also consider such

other price, cost, market, or economic factors as it deems relevant" as part of its determination of

likelihood of continuation or recurrence of dumping.  19 U.S.C. § 1675a(c)(2).  Here, Commerce

rejected Resolute's arguments, finding that there was no good cause to consider or rely on "a *de*

*minimis* rate for Resolute that was not calculated in the underlying investigation of the *Order* or

any prior administrative review."  IDM at 18, P.R. 45.  Resolute contends that Commerce's

determination that there was no "good cause" to consider other factors under section 752(c)(2) of

the Act is arbitrary and otherwise not in accordance with law.  *See* Pl.'s Br. 24-43.  Resolute's

contention is largely based on the premise that the differential pricing methodology is unlawful

and that Commerce should have evaluated the likelihood of Resolute's continued or recurring

dumping on a company-specific basis based on a margin that Resolute believes it should have

been assigned.  *See id.* at 25 ("Commerce, bound to apply the law as it now stands, should have

abandoned reliance on the A-T rate, which was calculated using the now unlawful {differential

pricing methodology}.").  But neither the law nor the facts support this.

      Under the "good cause" standard in section 752(c)(2) of the Act, "the 'burden' is on an

interested party to provide information or evidence that would warrant consideration of the other

factors in question."  *Fresh and Chilled Atlantic Salmon From Norway: Final Results of the Full*

*Sunset Review of Antidumping Duty Order*, 70 Fed. Reg. 77,378 (Dep't Commerce Dec. 30, 2005), and accompanying IDM at Comment 1. In prior proceedings, Commerce has rejected certain "good cause" arguments which it determined to be speculative, unsupported, and inapplicable to an order-wide analysis:

> We agree with Appvion that Koehler failed to demonstrate that "good cause" exists for the Department to consider either the status of its manufacturing capacity or its profitability in making a likelihood determination. Koehler's arguments appear to suggest that these factors indicate it has less motivation to sell the subject merchandise at LTFV if the *AD Order* were revoked. The arguments Koehler presents for the consideration of "other such price, cost, market or economic factors" contemplated under section 752(c)(2) of the Act, however, are speculative.
>
> Furthermore, Koehler has not demonstrated that the Department's normal, statutorily-mandated criteria are not, by themselves, appropriate factors for purposes of making the likelihood determination. The burden is on the respondent to demonstrate this through record evidence. In this case, Koehler failed to meet this burden. Additionally, even if Koehler had demonstrated good cause to consider "other factors," Koehler failed to provide any quantitative information concerning its manufacturing capacity or its profitability, nor explained how this information supports the conclusion that Koehler is not likely to continue to make sales of LWTP at LTFV if the *AD Order* were revoked. Koehler failed to identify and explain in detail any causal link between either of these factors and their impact on Koehler's pricing behavior of its sales of LWTP in the United States. Moreover, as noted above, the Department's likelihood determination is made on an order-wide basis, and no information has been provided for any other exporter of LWTP from Germany regarding the impact of other factors on the Department's determination.

*Lightweight Thermal Paper From Germany: Preliminary Results of the First Full Sunset Review of the Antidumping Duty Order*, 79 Fed. Reg. 7,644 (Dep't Commerce Feb. 10, 2014), and accompanying PDM at 12. Likewise, here, Resolute has failed to demonstrate that the normal statutorily-mandated criteria were insufficient for purposes of Commerce's likelihood determination. *See* IDM at 18, P.R. 45.

Additionally, rather than presenting "a compelling reason to go beyond the default considerations," Pl.'s Br. 26, the "other factors" identified by Resolute are entirely speculative, grounded in allegations related to separate litigation. For instance, Resolute argues that

"Commerce, bound to apply the law as it now stands, should have abandoned reliance on the A-T rate, which was calculated using the now unlawful {differential pricing methodology}." *Id.* at 25. However, as explained above, Commerce's use of the differential pricing methodology in the investigation has not been held to be unlawful. Further, contrary to Resolute's arguments, *see id.* at 27-33, there is no binding court decision invalidating Commerce's differential pricing methodology such that the agency could not rely on the margins calculated and published in the original investigation in this sunset review. Resolute also points to no authority or prior practice in which Commerce has considered potential future litigation outcomes in making its likelihood determination. Nor has Resolute established that Commerce was required to recalculate previously calculated antidumping duty margins based on court decisions in unrelated proceedings, or that Commerce's failure to do so was an abuse of discretion.

The remaining arguments presented by Resolute regarding the reasonableness of the differential pricing methodology do not constitute "good cause" factors nor disturb Commerce's reliance on margins calculated and published in the original investigation. For instance, Resolute argues that Commerce failed to give due consideration to "statistical scholarship" Resolute placed on the record which "question{s} the validity of using the Cohen's *d* test for international trade analysis," Pl.'s Br. 34-35, 41-43, and that Commerce should have considered certain WTO reports and Resolute's prior arguments regarding Commerce's differential pricing methodology as "good cause" factors. *See id.* at 35-36. Resolute further contends that Commerce offered insufficient explanation in response to various arguments raised by Resolute. *See id.* at 37-40.

However, Commerce did provide a fulsome explanation of the lawfulness and reasonableness of the differential pricing methodology and specifically addressed Resolute's arguments. *See* IDM at 9-18, P.R. 45. For example, Commerce explained:

{W}e disagree with Resolute's argument that Commerce should revoke the *Order* with respect to Resolute because the margins calculated for Resolute in the *Final Determination* and subsequent administrative reviews would have been zero or *de minimis* had Commerce not used its "flawed" differential pricing methodology and had Commerce not assigned to Resolute a margin that was calculated using "zeroing." Commerce notes that it has already addressed arguments at length concerning the legality of Commerce's differential pricing methodology and its application of "zeroing" when relying on an average-to-transaction (A-to-T) comparison methodology in calculating a weighted-average dumping margin. Specifically, in the third administrative review of the *Order*, Commerce stated:

> . . . both the CAFC and the CIT have found that there is nothing barring Commerce from aggregating the value of sales whose prices differ significantly for various purchasers, region and time periods. Given that aggregating the value of those sales whose prices differ significantly is consistent with Commerce's past practice, as well as consistent with legal precedent, we will continue to employ this methodology for the final results.

Additionally, Commerce disagrees with Resolute's assertion that Commerce failed to provide an explanation of why a comparison other than A-to-A is appropriate. As an initial matter, Commerce notes that there is nothing in section 777A(d) of the Act that mandates how Commerce measures whether there is a pattern of prices that differ significantly or explains why the A-to-A method can or cannot account for such differences. On the contrary, carrying out the purpose of the statute here is an exercise properly conducted by Commerce. Commerce's differential pricing analysis, including the use of the Cohen's *d* test as a component in this analysis, is reasonable and is in accordance with law.

In carrying out the statutory objective, Commerce determines whether "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and … explains why such differences cannot be taken into account using {the A-to-A comparison method}." Commerce finds that the purpose of section 777A(d)(1)(B) of the Act is to evaluate whether the A-to-A method is the appropriate method to determine if, and if so, to what extent, a given respondent is dumping the subject merchandise in the U.S. market.

*Id.* at 9-10 (citations omitted). Commerce then proceeded to address the numerous decisions of this court and Federal Circuit concerning Commerce's differential pricing methodology, *id.* at 10-18, as well as Resolute's specific arguments regarding the holdings of *Stupp* and *Mid Continent*:

Notably, Resolute cites the CAFC's decisions in *Stupp* and *Mid Continent* to assert that Commerce cannot rely on the Cohen's *d* test in its differential pricing methodology. However, the CAFC's concerns in *Stupp* and *Mid Continent* were specific to the facts of those particular cases. In *Stupp*, for example, the CAFC concluded there was a lack of analysis regarding the size of the data groups and what constitutes normality and the distribution of variances. Accordingly, the CAFC remanded the underlying redetermination for Commerce to provide further explanation. To be clear, however, the CAFC did not find that Commerce's use of the Cohen's d test was unlawful. In response to the CAFC remand order in *Stupp*, Commerce provided further explanation and the CIT recently sustained Commerce's redetermination, holding that "Commerce has adequately explained how its methodology is reasonable." The CIT has also sustained Commerce's use of the Cohen's *d* as in accordance with law in other recent cases in which the CAFC's *Stupp* decision was similarly raised as a challenge to the Cohen's *d* test.

With respect to the *Mid Continent* litigation, Commerce has provided further explanation consistent with the remand order in that case and the redetermination is pending before the CIT. We note that in *Mid Continent*, the CAFC remanded the underlying redetermination back to Commerce to provide further explanation; but at no point did it find that Commerce's use of a simple average of the standard deviations to be unlawful.

For these reasons, Commerce continues to find that our reliance on our differential pricing methodology, including the Cohen's *d* test, is reasonable. Commerce's differential pricing analysis for Resolute in each segment of the proceeding has been both lawful, reasonable, and within Commerce's discretion in executing the trade statute.

*Id.* at 16 (citations omitted). Lastly, with respect to record evidence, the agency found that

Commerce's development of the differential pricing analysis and the application of this analysis in this case, including the thresholds relied upon herein, are consistent with established law. Resolute has submitted no factual evidence or argument that demonstrates that these thresholds should be modified for Resolute for the purposes of this sunset review.

*Id.* at 12.

Thus, contrary to Resolute's contention, Commerce provided nearly 10 pages of explanation in support of its use of the differential pricing methodology and in response to the arguments raised by Resolute. Under the standard of review, Commerce is only required to "examine the relevant data and articulate a satisfactory explanation for its action including a

'rational connection between the facts found and the choice made,'" which it has done here.  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

In short, Resolute has failed to demonstrate any errors in Commerce's determination that there was no "good cause" to consider other factors beyond the weighted-average dumping margins actually calculated by Commerce and the volume of imports.

### III.    Commerce Lawfully Reported Dumping Margins from the Investigation to the Commission as the Margins Most Likely to Prevail if the Order Was Revoked

Resolute argues that the final results are arbitrary and capricious because Commerce failed to report to the Commission a "zero margin" as the magnitude of the dumping margin that is likely to prevail if the order is revoked.  Pl.'s Br. 43-46.  Ignoring the fact that Resolute was found to be dumping at above *de minimis* levels during the original investigation (and in subsequent administrative reviews), Resolute claims that Commerce should have reported a zero percent margin because "the proper and lawful" dumping margin from the original investigation was zero percent.[12]  *Id.* at 45.  In its brief, Resolute acknowledges that Commerce is directed by the statute to "select and report a margin from the investigation or administrative reviews," *id.* at 43 (citing 19 U.S.C. § 167a(c)(3)), but claims that "extraordinary circumstances" warranted consideration of a different rate in this particular case.  *Id.* at 44-45.

As noted above, Commerce is required to provide to the Commission with "the magnitude of the margin of dumping that is likely to prevail if the order is revoked."  19 U.S.C.

___

[12]  Commerce actually calculated a dumping margin of 3.20 percent for Resolute in the investigation.  *Final Affirmative Determination*, 82 Fed. Reg. at 51,808.  While Resolute (and other parties) have appealed that determination to a binational panel, the dumping margin assigned to Resolute has not been modified or otherwise reduced.  Throughout its arguments, Resolute has failed to explain why it should be granted relief in this proceeding based on its contentions made regarding another administrative determination that has not been fully adjudicated.  Resolute's arguments imply that the relief possible through a NAFTA binational panel are inadequate, but Resolute makes no attempt to demonstrate this implication.

§ 1675a(c)(3).  Since the enactment of the URAA, Commerce's "preference is to select a rate from the investigation because it is the only calculated rate that reflects the behavior of producers and exporters without the discipline of an order in place."  IDM at 21 (citing *Policy Bulletin*, 63 Fed. Reg. 18,873), P.R. 45; *see also* SAA at 890 ("Commerce normally will select dumping margins or net countervailable subsidies determined in the original investigation or in a prior review.").  Commerce's regulations explain that "{e}ven where the Department conducts a *full sunset review*, only under the most extraordinary circumstances will the Secretary rely on . . . a dumping margin other than those it calculated and published in its prior determinations."  19 C.F.R. § 351.218(e)(2)(i) (emphasis added).  Implicit in the structure of Commerce's regulations is the fact that the agency will not consider a rate other than one calculated and published in a prior determination when conducting an *expedited sunset review*.  As explained by Commerce:

> The Sunset Regulations . . . explain that "extraordinary circumstances" may be considered by the Department in the context of a full sunset review, where the substantive response from both domestic and respondent interested parties are adequate.  In the Argentine case, however, the Department determined to conduct an expedited review because of its finding that Siderca did not provide adequate substantive responses.  Thus, the instant case does not warrant consideration of "extraordinary circumstances" as requested by the domestic interested parties because it is not a full sunset review.

*Final Results of Expedited Sunset Reviews: Oil Country Tubular Goods From Argentina, Italy, Japan, and Korea*, 65 Fed. Reg. 66,701 (Dep't Commerce Nov. 7, 2000) ("*OCTG from Argentina, Italy, Japan, and Korea*"), and accompanying IDM (citation omitted); *see also Final Results of Expedited Sunset Review: Tapered Roller Bearings, Over Four Inches, and Parts Thereof, Finished and Unfinished, From Japan*, 64 Fed. Reg. 60,266, 60,268-69 (Dep't Commerce Nov. 4, 1999) ("*TRBs from Japan*") (rejecting argument that Commerce should adjust the dumping margin reported to the Commission to account for the agency's findings on

duty absorption and noting that it "will normally provide to the Commission the margin that was determined in the final determination in the original investigation").

Here, in the context of its expedited sunset review, Commerce declined to consider margins other than those in the investigation, and "determine{d} that revocation of the *Order* would be likely to lead to a continuation or recurrence of dumping at the magnitude of a weighted-average dumping margin of up to 7.28 percent." IDM at 21-22, P.R. 45. The magnitude of the margin of dumping reported to the Commission is lawful. Section 752 of the Act is silent as to how Commerce decides the magnitude of dumping reported to the Commission. However, Congress, through the SAA, explained that "Commerce normally will select dumping margins . . . determined in the original investigation or in a prior review." SAA at 890. The SAA further clarifies that dumping margins "other than those it calculated and published in its prior determinations," should only be relied on in "the most extraordinary circumstances." *Id.* at 891.

In this case, Commerce lawfully found that it was not "appropriate to provide the ITC with a zero percent margin using a calculation methodology (*i.e.*, A-to-A comparison methodology) that was not determined in the underlying investigation or an administrative review of the *Order*." IDM at 21, P.R. 45. Resolute contends that Commerce should have found "extraordinary circumstances" to report this alternative margin, *see* Pl.'s Br. 43-46, but this argument fails for several reasons. As an initial matter, because this is an expedited sunset review, Commerce will not consider a rate other than one calculated and published in a prior determination. Therefore, this case does not warrant consideration of "extraordinary

circumstances."[13]  This is particularly the case in light of Commerce's regulations and established practice described above that limit the agency's consideration of "extraordinary circumstances" to full sunset reviews.  *See* 19 C.F.R. § 351.218(e)(2)(i); *TRBs from Japan*, 64 Fed. Reg. at 60,268-69; *OCTG from Argentina, Italy, Japan, and Korea* IDM.  Additionally, Resolute failed to show that "extraordinary circumstances" exist in this case.  As noted by Commerce, the agency calculated above *de minimis* dumping margins for Resolute on both occasions that the respondent's own sales and cost data were analyzed.[14]  *See* IDM at 21-22, P.R. 45.  There have been no court decisions invalidating these margins or Commerce's ability to apply an alternative comparison methodology when the requirements of section 777A(d)(1)(B) of the Act are met.  Put simply, as a zero percent dumping margin has never been calculated and published with respect to Resolute, there is no basis in law that would permit such a margin to be transmitted to the Commission.

Further, Resolute contends that Commerce "never addressed" Resolute's claim of "extraordinary circumstances," *see* Pl.'s Br. 43-46, however, this is incorrect.  Commerce considered Resolute's argument regarding whether it was appropriate to report a zero percent dumping margin as to Resolute.  *See* IDM at 21, P.R. 45.  For instance, Commerce stated that it "disagree{d} with Resolute's argument . . . to report to the ITC the *de minimis* dumping margin calculated using the A-to-A methodology in the underlying investigation for Resolute," citing its

---

[13]  Resolute does not challenge Commerce's decision to conduct this review on an expedited basis after determining that the response from respondent interested parties was inadequate.  *See* Compl. ECF 2.

[14]  The dumping margins calculated in prior segments of this proceeding for Resolute were determined by the respondent's own pricing decisions in both the U.S. and Canadian markets.  The Cohen's *d* test is not used by Commerce to measure dumping.  Rather, the Cohen's *d* simply indicates that U.S. prices, *whether or not dumped*, differ significantly amongst themselves.

earlier determination that Resolute had not demonstrated "good cause" under the regulations to consider such an alternative margin.  *Id.*  This was entirely responsive to Resolute's arguments, as the respondent's case brief argued that "Resolute's showing of 'good cause' under 19 U.S.C. § 1675a(c)(2) leads to {a showing of "extraordinary circumstances"}."  Resolute Case Brief at 43-44, P.R. 36.  Thus, contrary to Resolute's claims, Commerce addressed the merits of the question before it, concluding that there was no reason to report a margin that was never assigned to Resolute.  IDM at 21, P.R. 45.  Because Commerce considered Resolute's argument as to the margin of dumping reported to the Commission and provided a reasoned explanation, Commerce's decision is not arbitrary and capricious.

Moreover, Resolute's citations to case law discussing the "extraordinary circumstances" language found in Commerce's regulations ignore the fact that the sunset reviews at issue in those cases involved full sunset reviews (as opposed to the expedited sunset proceeding at issue here).  *See* Pl.'s Br. 44 (citing *AG der Dillinger Huttenwerke v. United States*, 193 F. Supp. 2d 1339, 1352 (Ct. Int'l Trade 2002), *Gov. of Uzbekistan v. United States*, 25 C.I.T. 1084 (2001)).  Resolute's citation to *Certain Preserved Mushrooms from Chile, India, Indonesia, and the People's Republic of China* is also readily distinguishable.  *See* Pl.'s Br. 44-45 (citing *Certain Preserved Mushrooms From Chile, India, Indonesia and the People's Republic of China: Final Results of Expedited Third Sunset Reviews of the Antidumping Duty Orders*, 80 Fed. Reg. 39,053 (Dep't Commerce July 8, 2015) ("*Certain Preserved Mushrooms*"), and accompanying IDM).  In that proceeding, Commerce recalculated rates from the original investigation involving Indonesia based on a published policy pronouncement.  *See Certain Preserved Mushrooms* IDM at 13.  Specifically, Commerce explained that its decision to rely on margins other than those calculated and published in its prior determinations was done consistent

with a specific policy pronouncement to address adverse WTO decisions. *Id.* at 8 (citing *Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification*, 77 Fed. Reg. 8,101, 8103 (Dep't Commerce Feb. 14, 2012)). There has been no such policy pronouncement with respect to the differential pricing methodology that would have supported a similar recalculation of Resolute's dumping margin in this case.

Lastly, Resolute argues in a footnote that Commerce acted arbitrarily in reporting updated subsidy programs to the Commission in the companion expedited sunset review of the CVD order, but not Resolute's hypothetical zero margin in the expedited sunset review of the AD order. *See* Pl.'s Br. 45 n.16 (citation omitted). Setting aside that arguments raised in footnotes are not properly raised or preserved, *see, e.g.*, *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2008) ("{A}rguments raised in footnotes are not preserved." (citation omitted)), Resolute's argument ignores differences in the statutory framework that guide sunset reviews of CVD orders. Specifically, Commerce is required to consider changes in subsidy programs when evaluating whether revocation of a CVD order would be likely to lead to continuation or recurrence of a countervailable subsidy. 19 U.S.C. § 1675a(b)(1)(B). Thus, while Commerce is required to consider "whether any change in the program which gave rise to the net countervailable subsidy . . . has occurred that is likely to affect that net countervailable subsidy," there is no such statutory requirement with respect to the magnitude of the margin of dumping Commerce reports to the Commission in a sunset review of an AD order.

In sum, Commerce's determination to report to the Commission dumping margins from the underlying investigation, as opposed to the zero margin that Resolute has declared it should

have been awarded, was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## CONCLUSION

For these reasons, we request that this Court deny Resolute's motion for judgment on the agency record, sustain the *Final Results* in their entirety, and enter judgment in favor of the United States.

Respectfully submitted,

/s/ Jessica M. Link

Jessica M. Link
Andrew W. Kentz
Zachary J. Walker

**PICARD KENTZ & ROWE LLP**
1750 K Street NW, Suite 800
Washington, DC 20006
(202) 331-5008

*Counsel to the COALITION*

February 26, 2024

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel hereby certifies that this brief in response to Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record, complies with the 14,000 word-count limitation described in part 2(B)(1) of the Court's Chambers Procedures.  This response brief contains 9,327 words according to the word-count function of the word-processing software used to prepare the memorandum, excluding the table of contents, table of authorities, and counsel's signature block.

Respectfully submitted,

/s/ Jessica M. Link
Jessica M. Link

**PICARD KENTZ & ROWE LLP**
1750 K Street NW, Suite 800
Washington, DC 20006
(202) 331-5008

*Counsel to the COALITION*

February 26, 2024