## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

RESOLUTE FP CANADA INC.,

        Plaintiff,

   v.

UNITED STATES,

        Defendant,

   and

COMMITTEE OVERSEEING ACTION
FOR LUMBER INTERNATIONAL TRADE
INVESTIGATIONS OR NEGOTIATIONS,
*et al.*,

        Defendant-Intervenors.

Court No. 23-00095

## PROPOSED JUDGMENT

Before the Court are the complaint and USCIT R. 56.2 motion filed in this matter

challenging the final determination of the United States Department of Commerce regarding

*Certain Softwood Lumber Products From Canada: Final Results of the Expedited First Sunset*

*Review of the Antidumping Duty Order*, 88 Fed. Reg. 20,479 (Dep't Commerce Apr. 6, 2023)

("*Final Results*").

It is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that the *Final Results* by

Commerce are **SUSTAINED**.

 

_____
Jane A. Restani, Judge

Dated: _____
   New York, New York

## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE: HON. JANE A. RESTANI, JUDGE

RESOLUTE FP CANADA INC.,

               **Plaintiff,**

v.

UNITED STATES,

               **Defendant,**

    **and**

COMMITTEE OVERSEEING ACTION FOR
LUMBER INTERNATIONAL TRADE
INVESTIGATIONS OR NEGOTIATIONS, *et al.*,

               **Defendant-Intervenors.**

Court No. 23-00095

---

### SIERRA PACIFIC INDUSTRIES', INCLUDING ITS SUBSIDIARY SENECA SAWMILL COMPANY, MEMORANDUM IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

David J. Ross
Jeffrey I. Kessler
Stephanie E. Hartmann
Kanzanira Thorington

WILMER CUTLER PICKERING HALE AND
DORR LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
(202) 663-6000

*Counsel for Defendant-Intervenor Sierra
Pacific Industries, including its
subsidiary Seneca Sawmill Company*

February 26, 2024

# TABLE OF CONTENTS

Page

**INTRODUCTION** .................................................................................................... 1

      A.     Administrative Decision Under Review ..................................................... 1

      B.     Issues Presented and Summary of Arguments ....................................... 1

             1.     Whether Commerce erred in conducting the expedited sunset review on an order-wide basis and rejecting Resolute's request for a company-specific determination ....................................... 1

             2.     Whether Commerce erred in rejecting Resolute's request to re-examine its dumping margin ................................................ 2

**STATEMENT OF FACTS** .......................................................................................... 2

**STANDARD OF REVIEW** ........................................................................................ 6

**ARGUMENT** ............................................................................................................. 7

I.     Resolute Fails to Demonstrate That Commerce's Decision to Consider Revocation On An Order-Wide Basis Was Unlawful .......................................... 7

II.    Resolute Fails to Demonstrate that Commerce's Evaluation of the Likelihood of Continuation or Recurrence of Dumping Based on Margins Calculated Using Its DPM and Cohen's d Test Is Unlawful ............................................................ 12

      A.     Commerce's Calculation of Dumping Margins ..................................... 12

      B.     Resolute Fails to Demonstrate that Commerce's Sunset Review Determination Is Contrary to Law Because Recent Jurisprudence Supports Commerce's Continued Use of the DPM and Cohen's *d* Test ....... 15

      C.     Resolute Fails to Demonstrate that Commerce's Sunset Review Determination Is Unsupported by Substantial Evidence and Otherwise Note In Accordance with Law ................................................................ 19

III.   Conclusion ................................................................................................ 22

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Al Ghurair Iron & Steel LLC v. United States*, 65 F.4th 1351 (CIT 2023) .................................. 21

*Apex Frozen Foods Priv. Ltd. v. United States*, 144 F. Supp. 3d 1308 (CIT 2016), *aff'd*, 862 F.3d 1337 (Fed. Cir. 2017) ................................. 15, 16

*Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1322 (Fed. Cir. 2017) ............... 15, 16

*Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.*, 419 U.S. 281 (1974) ....................... 6

*Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012) ................................................................................. 6

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) .................................. 7

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negot. v. United States*, 483 F. Supp. 3d 1253 (CIT 2020) ................................. 8

*Corus Staal BV v. Dep't of Commerce*, 395 F.3d 1343 (Fed. Cir. 2007) .................................. 18

*Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283 (Fed. Cir. 2021) .................................. 6

*Dillinger France S.A. v. United States*, 981 F.3d 1318 (Fed. Cir. 2020) .................................. 18

*Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369 (Fed. Cir. 2015) .................... 6

*Government of Uzbekistan v. United States*, No. 00-08-00392, 2001 WL 1012780 (CIT Aug. 30, 2001) ................................................................. 20

*Marmen Inc. v. United States*, 627 F. Supp. 3d 1312 (CIT 2023) .................................. 18

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984) .................................. 6

*Mid Continent Steel & Wire, Inc. v. United States*, 31 F.4th 1367 (Fed. Cir. 2022) ............... 5, 12

*Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662 (Fed. Cir. 2019) ................... 15

*Mid Continent Steel & Wire, Inc. v. United States*, No. 15-00213, 2024 WL 546362 (CIT Feb. 12, 2024) ................................................................. 11, 19

*Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056 (Fed. Cir. 2001) ................... 7

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ................... 7

*N. Star Steel Ohio v. United States*, 824 F. Supp. 1074 (CIT 1993) .................................. 7

*Nat'l Ass'n of Mirror Mfrs. v. United States*, 696 F. Supp. 642 (CIT 1988) .................... 7

*NEXTEEL Co. v. United States*, No. 18-0083, 2023 WL 8715793 (CIT Dec. 18, 2023) ............ 18

*NMB Singapore Ltd. v. United States*, 557 F.3d 1316 (Fed. Cir. 2009) .................... 7, 21

*NSK Ltd. v. U.S.*, 34 CIT 1344, 2010 WL 4055932 (Oct. 15, 2010) .................... 18

*SeAH Steel Corp. v. United States*, 589 F. Supp. 3d 1288 (CIT 2022) .................... 17

*SeAH Steel Corp. v. United States*, 619 F. Supp. 3d 1309 (CIT 2023) .................... 15

*SeAH Steel Corp. v. United States*, Nos. 2023-1109, 2023-1657, 2023
    WL 3244018 (Fed. Cir. May 4, 2023) .................... 18

*SeAH Steel Corp. v. United States*, Nos. 2023-1657, 2023 WL 3316548 (Fed. Cir.
    May 9, 2023) .................... 18

*SeAH Steel Corp. v. United States*, 539 F. Supp. 3d 1341 (CIT 2021) .................... 17

*SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216 (Fed. Cir. 2018) .................... 6

*Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021) .................... 12, 16

*Stupp Corp. v. United States*, 619 F. Supp. 1314 (CIT 2023), *appeal docketed*,
    No. 1314 (CIT 2023), *appeal docketed*, No. 23-1663 (Fed. Cir.
    Mar. 27, 2023) .................... 5, 16, 19

*Techsnabexport v. United States*, 515 F. Supp. 2d 1363 (CIT 2007) .................... 19, 20

*Torrington Co. v. United States*, 156 F.3d 1361 (Fed. Cir. 1998) .................... 7

*USEC Inc. v. United States*, 259 F. Supp. 2d 1310 (CIT 2003) .................... 6

*Yeda Research & Dev. Co. v. Mylan Pharms. Inc.*, 906 F.3d 1031
    (Fed. Cir. 2018) .................... 22

**STATUTORY PROVISIONS**

19 U.S.C. § 1516a(b)(1)(B)(i) .................... 6
19 U.S.C. § 1516a(b)(3) .................... 18
19 U.S.C. § 1675(d)(2) .................... 9
19 U.S.C. § 1675a(c)(1) .................... 2, 19, 21
19 U.S.C. § 1675a(c)(2) .................... 2, 19
19 U.S.C. § 1675a(c)(4)(A) .................... 21
19 U.S.C. § 1677f-1(d)(1)(A)(ii) .................... 12
19 U.S.C. § 1677f-1(d)(1)(B) .................... 13
19 U.S.C. § 3512(d) .................... 8

# REGULATORY PROVISIONS

19 C.F.R. § 351.218(e)(1)(ii)(C)(1) .................................................................4
19 C.F.R. § 351.414(c)(2) ............................................................................12

# ADMINISTRATIVE DECISIONS

*Certain Softwood Lumber Products From Canada: Antidumping Duty Order and Partial Amended Final Determination*, 83 Fed. Reg. 350 (Dep't Commerce Jan. 3, 2018) ....................................................................2, 3, 4, 5, 6

*Certain Softwood Lumber Products From Canada: Final Affirmative Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, 82 Fed. Reg. 51,806 (Dep't Commerce Nov. 8, 2017) ..................2

*Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020*, 87 Fed. Reg. 48,465 (Dep't Commerce Aug. 9, 2022) ...............................................15

*Certain Softwood Lumber Products From Canada: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 82 Fed. Reg. 19,657 (Dep't Commerce Apr. 28, 2017) ........................................................................3

*Certain Softwood Lumber Products From Canda: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2021*, 88 Fed. Reg. 50,106 (Dep't Commerce Aug. 1, 2023) ........................................................3

*Certain Steel Nails From the Sultanate of Oman: Final Results of the First Five-Year Sunset Review of the Antidumping Duty Order*, 86 Fed. Reg. 7,355 (Dep't Commerce Jan. 28, 2021) ......................................................................10

*Certain Softwood Lumber Products From Canada: Final Results of the Expedited First Sunset Review of the Antidumping Duty Order*, 88 Fed. Reg. 20,479 (Dep't Commerce Apr. 6, 2023) ................................................1, 6, 11

*Continuation of Countervailing and Antidumping Duty Orders on Oil Country Tubular Goods From Argentina, Italy, Japan, Korea and Mexico, and Partial Revocation of Those Orders From Argentina and Mexico With Respect to Drill Pipe*, 66 Fed. Reg. 38,630 (Dep't Commerce July 25, 2001) ....................................10

*Lightweight Thermal Paper From Germany: Final Results of the First Full Sunset Review of the Antidumping Duty Order*, 79 Fed. Reg. 32,218 (Dep't Commerce June 4, 2014) .....................................................................9

*Xanthan Gum From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Partial Rescission of the Antidumping Duty Administrative Review, and Final Determination of No Shipments; 2021-2022*, 89 Fed. Reg. 8,165 (Dep't Commerce Feb. 6, 2024) ............................................ 15

## OTHER AUTHORITIES

*Differential Pricing Analysis; Request for Comments*, 79 Fed. Reg. 26,720 (Dep't Commerce May 9, 2014) ............................................ 14

*Initiation of Five-Year (Sunset) Reviews*, 87 Fed. Reg. 73,757 (Dep't Commerce Dec. 1, 2022) ............................................ 3, 4

Panel Decision, *Softwood Lumber from Canada: Final Affirmative Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, NAFTA No. USA-CDA-2017-1904-03 (Oct. 5, 2023) ............................................ 18

*Policies Regarding the Conduct of Five-Year ("Sunset") Reviews of Antidumping and Countervailing Duty Orders; Policy Bulletin*, 63 Fed. Reg. 18,871 (Dep't Commerce Apr. 16, 1998) ............................................ 9

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, Vol. 1, reprinted in 1999 U.S.C.C.A.N. ............................................ 8

Uruguay Round Agreements Act, H.R. Rept. 103-826, Part 1 ............................................ 8

# I.  INTRODUCTION

Defendant-Intervenor Sierra Pacific Industries, including its subsidiary Seneca Sawmill Company (collectively "Sierra Pacific"), respectfully submits this response in opposition to the Rule 56.2 motion for judgment upon the agency record filed on November 6, 2023 by Plaintiff Resolute FP Canada Inc. ("Resolute" or "Plaintiff").  Pl.'s Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R. (Nov. 6, 2023), ECF No. 28-1 ("Pl. Br.").  Contrary to Resolute's arguments, the Court should not compel Commerce to deviate from its statute-based, longstanding practice for deciding sunset reviews.

## RULE 56.2 STATEMENT

### A.  Administrative Decision Under Review

The administrative determination under review is the final determination by the U.S. Department of Commerce ("Commerce") in the expedited first sunset review of the antidumping duty order on softwood lumber from Canada.  *See Certain Softwood Lumber Products From Canada: Final Results of the Expedited First Sunset Review of the Antidumping Duty Order*, 88 Fed. Reg. 20,479 (Dep't Commerce Apr. 6, 2023), P.R. 46 ("*Final Results*") and accompanying Issues and Decision Memorandum ("IDM"), P.R. 45.

### B.  Issues Presented and Summary of Arguments

**1.  Whether Commerce erred in conducting the expedited sunset review on an order-wide basis and rejecting Resolute's request for a company-specific determination.**

No.  Commerce did not err in conducting the expedited sunset review on an order-wide basis and rejecting Resolute's request for a company specific determination.  To the contrary, Commerce's decision was reasonable, supported by substantial evidence, and otherwise in accordance with law.  Although Resolute argues that Commerce's rejection of its request was

arbitrary and capricious, the legislative history of the antidumping statute and Commerce's past practice directly contradict Resolute's arguments and show that Commerce's decision was correct.

> **2.** **Whether Commerce erred in rejecting Resolute's request to re-examine its dumping margin from the LTFV investigation.**

No.  Commerce reasonably found that "good cause" did not exist under 19 U.S.C. § 1675a(c)(2), and lawfully based its decision on the factors in 19 U.S.C. § 1675a(c)(1). Resolute's arguments to the contrary are based on a flawed interpretation of unsettled case law addressing a specific aspect of Commerce's methodology, namely the differential pricing methodology ("DPM").  Accordingly, the Court should uphold Commerce's findings regarding the likelihood of continuation or recurrence of dumping as to Resolute, which were based on the statute as well as Commerce's longstanding, lawful practice.

## STATEMENT OF FACTS

Consistent with Rule 81(k), the facts provided in this section are limited to those necessary to correct inaccuracies and omissions in Plaintiff's brief.  Other relevant facts specific to the issues challenged by Plaintiff are discussed below in the context of each argument. On November 8, 2011, the U.S. Department of Commerce ("Commerce") published its affirmative final determination in the less-than-fair-value ("LTFV") investigation of softwood lumber from Canada.  *See Certain Softwood Lumber Products From Canada: Final Affirmative Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, 82 Fed. Reg. 51,806 (Dep't Commerce Nov. 8, 2017) and accompanying Issues and Decision Memorandum ("LTFV IDM"); *Certain Softwood Lumber Products From Canada: Antidumping Duty Order and Partial Amended Final Determination*, 83 Fed. Reg. 350 (Dep't

Commerce Jan. 3, 2018) ("*AD Order*").  In the final determination in the LTFV investigation, Commerce applied a differential pricing analysis to determine whether it was appropriate to use the average-to-average ("A-to-A") method to calculate the weighted-average dumping margins for respondents Resolute, Canfor Corporation, West Fraser Mills Ltd., and Tolko Industries Ltd. and Tolko Marketing & Services, Ltd.  LFTV IDM at 50; *Certain Softwood Lumber Products From Canada: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 82 Fed. Reg. 19,657 (Dep't Commerce Apr. 28, 2017), and accompanying Preliminary Decision Memorandum at 13-15. Based on the results of the differential pricing analysis, Commerce calculated the weighted-average dumping margin for Resolute using the average-to-transaction ("A-to-T") comparison method.  LFTV IDM at 50.  This calculation established a dumping margin of 3.2 percent for Resolute.  *AD Order*, 83 Red. Reg. at 351.  Since the original investigation, Commerce has completed four administrative reviews.  In the first administrative review, Resolute was assigned a dumping margin of 1.15 percent.  IDM at 22.  In subsequent administrative reviews of the *AD Order*, Commerce did not select Resolute as a mandatory or voluntary respondent, and therefore, Resolute received the non-selected companies rates.  *See id*. In the most recent completed administrative review, covering the period of January 1, 2021, through December 31, 2021, Commerce calculated dumping margins of 6.20 percent for non-selected companies.  *See Certain Softwood Lumber Products From Canda: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2021*, 88 Fed. Reg. 50,106 (Dep't Commerce Aug. 1, 2023).

On December 1, 2022, Commerce published a notice of initiation of the first sunset review of the *AD Order*.  *See Initiation of Five-Year (Sunset) Reviews*, 87 Fed. Reg. 73,757

(Dep't Commerce Dec. 1, 2022) ("*Initiation Notice*"), P.R. 20. On January 5, 2023, Commerce received a substantive response from Resolute, and domestic interested parties filed a rebuttal to Resolute's substantive response. *See* Resolute's Letter, "Initiation of Five-Year (Sunset) Reviews," 87 Fed. Reg. 73,757 (Dep't of Commerce Dec. 1, 2022)," dated Jan. 5, 2023. On January 25, 2023, Commerce informed the U.S. International Trade Commission (the "Commission") that respondent interested parties did not provide adequate responses to the *Initiation Notice*, and therefore, that Commerce would conduct an expedited sunset review of the *AD Order* pursuant to 19 C.F.R. § 351.218(e)(1)(ii)(C)(1). *See* Commerce Letter, "Sunset Reviews Initiated December 1, 2022," dated Jan. 25, 2023, P.R. 31.

On March 3, 2023, Resolute filed a case brief arguing that Commerce should revoke the *AD Order* as to Resolute because recent jurisprudence of this Court and the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") concerning Commerce's DPM allegedly provided "good cause" for Commerce to consider "other factors" and find that there is no likelihood that Resolute would continue dumping upon revocation of the *AD Order*. *See* Brief From Baker & Hosteller LLP to Sec of Commerce Pertaining to Resolute Case Brief ("Resolute Case Br."), at 8-10, 38-42, P.R. 36. According to Resolute, but for Commerce's use of its DPM to calculate Resolute's dumping margin in the LTFV investigation, Commerce would have found that Resolute was not dumping subject merchandise in the United States. Therefore, Resolute argued that Commerce should abandon its normal practice of making determinations on an order-wide basis and instead provide Resolute with a company-specific determination and report to the Commission a likely dumping margin of zero for Resolute. *Id*.

On March 17, 2023, Sierra Pacific filed a rebuttal brief, arguing that Resolute's arguments were meritless. Specifically, Sierra Pacific noted that the Statement of Administrative

Action ("SAA") and the House Report for the Uruguay Round Agreements Act ("URAA") both state explicitly that Commerce and the Commission "will make their sunset determinations on an order-wide, rather than a company-specific, basis." *See* Brief From Wilmer Cutler Pickering Hale and Dorr LLP to Sec of Commerce Pertaining to Sierra Pacific Rebuttal Brief ("Sierra Pacific Rebuttal Br."), at 2, P.R. 43. Sierra Pacific also noted that Commerce's *Policy Bulletin* states that Commerce "will make its determinations of likelihood on an order-wide basis." *Id.* For both of these reasons, Sierra Pacific argued that Resolute's request that the Department make a negative determination of likelihood with respect to Resolute was in direct conflict with the SAA and the Department's established practice, and that Commerce should reject it. *Id.*

Sierra Pacific further argued that even if Commerce were inclined to ignore Congressional intent and its established practice and improperly consider Resolute on a company-specific basis, it should not deviate from its normal DPM practice because Resolute had failed to establish that Commerce should consider other factors in making its determination. *Id.* Among other things, Sierra Pacific noted that in the third administrative review of the *AD Order* Commerce had addressed and rejected the same arguments that Resolute was making in the sunset review, such that there was no basis for Commerce to deviate from its standard approach in making its likelihood determination. *Id.* at 3. Moreover, Sierra Pacific noted that the courts had not, in fact, invalidated Commerce's use of the DPM. To the contrary, in one of the cases that Resolute had cited, the Federal Circuit had remanded to Commerce for further explanation and the CIT had upheld Commerce's remand determination, while the other case was "unsettled" (as Resolute itself had noted) and the litigation in the case remained pending. *See id.* (citing *Stupp Corp. v. United States*, 619 F. Supp. 3d 1314; *Mid Continent Steel & Wire, Inc. v. United States*, 31 F.4th 1367 (Fed. Cir. 2022) ("*Mid Continent II*")). As such, Sierra

Pacific urged Commerce to reject Resolute's arguments and find that revocation of the *AD Order* would likely lead to a continuation or recurrence of dumping. *See id*. at 3-5.

On April 6, 2023, Commerce published the *Final Results* and found that "revocation of the {*AD Order*} would likely lead to a continuation or recurrence of dumping at the magnitude of a weighted-average dumping margin of up to 7.28 percent." *See Final Results*, 88 Fed. Reg. at 20,480*;* IDM at 22.

## STANDARD OF REVIEW

In reviewing Commerce's determinations, this Court will hold unlawful any determination, finding, or conclusion found "to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1295 (Fed. Cir. 2021) (citing *SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216, 1222 (Fed. Cir. 2018)). This standard of review also encompasses the "arbitrary and capricious" standard established under the Administrative Procedure Act. *See Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012) (citing *Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974)).

Substantial evidence is such "evidence that a reasonable mind might accept as adequate to support a conclusion." *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1374 (Fed. Cir. 2015) (internal quotation marks and citation omitted). "The Court's function is not to re-weigh the evidence," *USEC Inc. v. United States*, 259 F. Supp. 2d 1310, 1317 (CIT 2003), and "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (citation omitted). Absent

some showing to the contrary, Commerce is entitled to the presumption that it considered the record evidence as a whole. *Nat'l Ass'n of Mirror Mfrs. v. United States*, 696 F. Supp. 642, 648 (CIT 1988) (holding that "the Commission is presumed to have considered all of the evidence in the record"); *see also Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1062 (Fed. Cir. 2001).

The courts have granted Commerce substantial deference under *Chevron* in interpreting the antidumping law and in interpreting and applying its own regulations. *See Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984); *Torrington Co. v. United States*, 156 F.3d 1361 (Fed. Cir. 1998); *N. Star Steel Ohio v. United States*, 824 F. Supp. 1074, 1078 (CIT 1993). While Commerce must reasonably explain its findings, its explanations are not required to be "perfect," as long as "the path of Commerce's decision {is} reasonably discernable to a reviewing court." *NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009); *see also Motor Vehicle Mfs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("We will . . . 'uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned.'").

## ARGUMENT

### I. Resolute Fails to Demonstrate That Commerce's Decision to Consider Revocation On An Order-Wide Basis Was Unlawful

Resolute argues that the sunset provisions of the Tariff Act of 1930, as amended (the "Tariff Act"), provide for company-specific determinations and revocations of antidumping duty orders and that Commerce acted arbitrarily in denying Resolute company-specific relief. Resolute's argument finds no support in the text of the statute and directly conflicts with the statute's legislative history and Commerce's established practice. Accordingly, the Court should

reject Resolute's argument and uphold Commerce's determination to consider revocation on an order-wide basis.

As an initial matter, Resolute claims that Commerce did not address its arguments on this issue and that its alleged failure to do so was unlawful. Pl. Br. at 18. Resolute is incorrect. In setting out the legal framework for its analysis, Commerce explained that "{i}n accordance with the guidance provided in the legislative history accompanying the Uruguay Round Agreements Act, . . . Commerce's determinations of the likelihood of recurrence of dumping will be made on an order-wide, rather than a company-specific, basis." *See* IDM at 5 (citing Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, Vol. 1, reprinted in 1999 U.S.C.C.A.N. at 4205 ("SAA"); Uruguay Round Agreements Act, H.R. Rept. 103-826, Part 1, at 56 ("House Report")). Consistent with this framework, Commerce summarized the parties' comments on the issue, stated that it disagreed with Resolute, and repeated that its "determination of whether the revocation of an order would likely lead to the continuation of dumping will be made on an order-wide basis." *Id*. at 8 (citing SAA at 4205; House Report at 56). Given the clear and unambiguous guidance in the legislative history, nothing more was required.[1]

Further, there is no support for Resolute's argument in the text of the statute. For example, Resolute anchors its claim that "Commerce retains the authority to revoke on a company specific basis" on the fact that section 751(d)(1) of the Tariff Act states that Commerce

---

[1] This Court has held that "Congress expressly approved the SAA in the URAA," noting that "the SAA 'shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the {URAA} in any judicial proceedings in which a question arises concerning such interpretation or application.'" *Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negot. v. United States*, 483 F. Supp. 3d 1253, 1258 (CIT 2020) (citing 19 U.S.C. § 3512(d), *aff'd in part, remanded in part* 66 F.4th 968, 972 (Cir. 3d 1253, 1258 (CIT 2020)).

"may revoke, **in whole or in part**, a countervailing duty order or an antidumping duty order" as a result of an administrative review or a changed circumstances review. *See* Pl. Br. at 22 (emphasis in original). As Resolute concedes, however, section 751(d)(1) does not apply to sunset reviews, and the provision that does apply to such reviews – section 751(d)(2) – does **not** state that Commerce may revoke a countervailing duty or antidumping duty "in whole or in part" as a result of such proceedings. *See* 19 U.S.C. § 1675(d)(2). While Resolute seeks to avoid the implications of this clear textual difference by arguing that Commerce should have "construed" sections 751(d)(1) and (2) in a similar manner, *see* Pl. Br. at 23, this would have been unlawful in light of the clear and unambiguous guidance in the legislative history.

Moreover, Resolute ignores that Commerce has had an established practice for over 25 years of making its likelihood determinations in sunset reviews on an order-wide basis. *See Policies Regarding the Conduct of Five-Year ("Sunset") Reviews of Antidumping and Countervailing Duty Orders; Policy Bulletin*, 63 Fed. Reg. 18,871, 18,872 (Dep't Commerce Apr. 16, 1998) ("Consistent with the SAA at 879, and the House Report at 56, the Department will make its determination of likelihood on an order-wide basis.") ("*Policy Bulletin*"); *Lightweight Thermal Paper From Germany: Final Results of the First Sunset Review of the Antidumping Duty Order*, 79 Fed. Reg. 32,218 (Dep't Commerce June 4, 2014), and accompanying Issues and Decision Memorandum at 10. Resolute fails to identify any case in which Commerce has made a likelihood determination on a company-specific basis, and indeed Commerce has consistently rejected arguments that it should do so. *See Lightweight Thermal Paper From Germany: Final Results of the First Full Sunset Review of the Antidumping Duty Order*, 79 Fed. Reg. 32,218 (Dep't Commerce June 4, 2014), and accompanying Issues and Decision Memorandum at 10 ("we stress that the determination of likelihood is made on an

order-wide basis, not a company-specific basis as Koehler suggests. The SAA specifically states that both the Department and the {Commission} 'will make their sunset determinations on an order-wide, rather than a company-specific, basis.'"); *Certain Steel Nails From the Sultanate of Oman: Final Results of the First Five-Year Sunset Review of the Antidumping Duty Order*, 86 Fed. Reg. 7,355 (Dep't Commerce Jan. 28, 2021), and accompanying Issues and Decision Memorandum at 5 ("Commerce's determinations of likelihood of the continuation or recurrence of dumping will be made on an order-wide, rather than a company specific, basis").

Finally, Resolute argues that *Oil Country Tubular Goods* demonstrates that Commerce may "perform a 'partial revocation' of an order" in a sunset review, *see* Pl. Br. at 22-24, but the facts of that case are readily distinguishable. In *Oil Country Tubular Goods*, Commerce conducted a full sunset review of the countervailing and antidumping duty orders on oil country tubular goods from Argentina, Italy, Japan, Korea, and Mexico and found that it was appropriate to revoke the antidumping duty orders as to Argentina and Mexico with respect to drill pipe. *Continuation of Countervailing and Antidumping Duty Orders on Oil Country Tubular Goods From Argentina, Italy, Japan, Korea and Mexico, and Partial Revocation of Those Orders From Argentina and Mexico With Respect to Drill Pipe*, 66 Fed. Reg. 38,630 (Dep't Commerce July 25, 2001). As Resolute acknowledges, Commerce's decision to partially revoke the orders on Argentina and Mexico was based on the Commission's separate like product and negative injury determination with respect to drill pipe, and Commerce's subsequent decision to modify the scope of the orders to remove drill pipe. *See id.* at 38,631; Pl. Br. at 22. A partial revocation of an antidumping duty order because of a scope change is an entirely different issue from the company-specific revocation Resolute is seeking in this case. Thus, *Oil Country Tubular Goods*

does not support Resolute's argument that it was unlawful for Commerce to examine the likelihood of dumping on an order-wide basis.

**II.    Resolute Fails to Demonstrate that Commerce's Evaluation of the Likelihood of Continuation or Recurrence of Dumping Based on Margins Calculated Using Its DPM and Cohen's *d* Test Is Unlawful**

Resolute argues that Commerce's continued reliance on dumping margins calculated based on its DPM is unlawful.  Specifically, Resolute argues that, due to recent jurisprudence, "good cause" exists for Commerce to abandon its DPM – and specifically use of the Cohen's *d* test as one step in the analysis – and that Commerce erred in disregarding this case law.  *See, e.g.*, Pl. Br. at 28-29, 37-38.  Resolute's challenge of the *Final Results* hinges on the incorrect premise that Commerce's calculation of Resolute's dumping margins in administrative reviews based on the DPM and Cohen's *d* test was inherently flawed, and therefore unlawful.  However, contrary to Resolute's arguments, the courts have not ruled that the DPM and Cohen's *d* test are unlawful, and more recent case law has affirmed Commerce's use of Cohen's *d* test as reasonable.  *See, e.g.*, *Mid Continent Steel & Wire, Inc. v. United States*, No. 15-00213, 2024 WL 546362 (CIT Feb. 12, 2024).  Further, Commerce adequately addressed, and reasonably rejected, Resolute's arguments that the evolving case law constituted "good cause" for Commerce to re-examine the dumping margins that it calculated in the LTFV investigation and subsequent administrative reviews.

As a threshold matter, it is important to recognize that if the Court accepts the argument in Section I, then Resolute's "good cause" argument is moot.  This is because the final results of Commerce's sunset review are based not only on dumping margins for Resolute but also those for other Canadian respondents, in both the LTFV investigation and administrative reviews.  *See* IDM at 18.  Resolute does not argue that the dumping margins assigned to other Canadian

respondents are unlawful. Accordingly, even if it were correct that Resolute's dumping margin in the LTFV investigation would have been *de minimis* without Commerce's DPM – a fact that Resolute fails to establish – Commerce's dumping margins for other respondents, and its consequent order-wide determination in the sunset review, would have been the same.

### A.       Commerce's Calculation of Dumping Margins

In LTFV investigations, Commerce compares normal value with the actual or constructed export price, reflecting the price at which the merchandise is sold in the United States. This comparison is made using the average-to-average ("A-to-A") method by comparing weighted-average export prices (or constructed export prices) to weighted-average normal values unless Commerce determines another method is appropriate in a particular case. However, the "A-to-A" method is not the only available comparison method – the Tariff Act and Commerce's regulations permit two other comparison methods. *See Mid Continent Steel II*, 31 F.4th at 1370. Under the transaction-to-transaction method, Commerce may calculate dumping margins by comparing the export prices (or constructed export prices) of individual transactions with normal values of individual transactions. *See* 19 U.S.C. § 1677f-1(d)(1)(A)(ii); 19 C.F.R. § 351.414(c)(2). Alternatively, Commerce may use the average-to-transaction ("A-to-T") method to compare the export prices (or constructed export prices) of individual transactions with the weighted-average normal value.

The purpose of the A-to-T method is to "uncover 'targeted' dumping," which occurs when an exporter's low pricing of certain U.S. sales is "'masked' (offset) by the exporter's other, higher priced sales if only overall averages are considered." *See Mid Continent Steel II*, 31 F.4th at 1370-71 (citing *Stupp Corp. v. United States*, 5 F.4th 1341, 1345 (Fed. Cir. 2021)). Commerce may use the A-to-T method if it finds that "there is a pattern of export prices (or

constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and {Commerce} explains why such differences cannot be taken into account using {the A-to-A method}." *See* 19 U.S.C. § 1677f-1(d)(1)(B). The statute provides Commerce with discretion to determine whether these conditions are met, and Commerce has consistently used a two-part "differential pricing" analysis to assess whether an A-to-T comparison is appropriate.

The first stage of the differential pricing analysis examines whether there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or time periods. Commerce evaluates all U.S. sales by purchaser, region, and time period to determine whether a pattern of prices that differ significantly exists. To conduct this analysis Commerce first applies the Cohen's *d* test. The Cohen's *d* coefficient is a generally recognized statistical measure of the extent of the difference between the means (*i.e.*, weighted-average price) between a test group and a comparison group. Commerce calculates the Cohen's *d* coefficient for the comparable merchandise when the test and comparison groups of data for a particular purchase, region, or time period each have at least two observations (*i.e.*, sales prices), and if the sales quantity for the comparison group accounts for at least five percent of the total sales quantity of the comparable merchandise. The Cohen's *d* coefficient is then used to assess the extent to which the prices to a particular purchaser, region, or time period differ significantly from the prices of all other sales of comparable merchandise. In a Cohen's *d* test analysis, the extent of these differences can be quantified by the following fixed thresholds: small (0.2), medium (0.5), or large (0.8). Commerce has explained that the "large threshold provides the strongest indication that there is a significant difference between the means of the test and comparison groups, while the small threshold provides the weakest indication that such a

difference exists." *Differential Pricing Analysis; Request for Comments*, 79 Fed. Reg. 26,720, 26,722 (Dep't Commerce May 9, 2014). If the calculated Cohen's *d* coefficient is equal to or exceeds the large threshold (*i.e.*, 0.8), the difference is considered significant and the sales in the test group are found to pass the Cohen's *d* test. *Id*.

Next, Commerce applies the ratio test to the Cohen's *d* results: if the total percentage of "passing" sales to purchasers, regions, and time periods is 33 percent or less, Commerce uses the default A-to-A method to calculate the weighted average dumping margin. However, if the total percentage is 66 percent or more, then Commerce considers applying the A-to-T method to all sales as an alternative to the A-to-A method. If the total percentage is between 33 percent and 66 percent, Commerce selects a hybrid approach in which it applies the A-to-T method to those transactions passing the Cohen's *d* test and the A-to-A method to the remainder of the transactions.

If both the Cohen's *d* test and the ratio test support the consideration of an alternative comparison method, Commerce then performs the second stage of the differential pricing analysis by applying the "meaningful difference test" to determine whether using the default A-to-A method can account for the different pricing patterns that were discovered in the first stage. To make this determination, Commerce examines whether there is a "meaningful difference" between the weighted dumping margin using the A-to-A method and the alternative comparison method. "Comparison of these results reflect whether the differences in U.S. prices mask or hide dumping when normal values are compared with average U.S. prices (the A-to-A method) as opposed to when normal values are compared with transaction-specific U.S. prices (the A-to-T method)." LTFV IDM at 56. If the margin for the A-to-A method is below the *de minimis* threshold and the margin for the A-to-T method is above that threshold, or if both are above that

14

threshold and the margin for the A-to-T method is 25 percent greater than the A-to-A margin, then Commerce finds that there is a meaningful difference and select the alternative method.

Commerce has consistently used its differential pricing methodology to determine whether an A-to-T comparison is appropriate. *See, e.g.*, *Certain Softwood Lumber Products From Canada: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020*, 87 Fed. Reg. 48,465 (Dep't Commerce Aug. 9, 2022), and accompanying Issues and Decision Memorandum at 20-23, 28-37; *Xanthan Gum From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Partial Rescission of the Antidumping Duty Administrative Review, and Final Determination of No Shipments; 2021-2022*, 89 Fed. Reg. 8,165 (Dep't Commerce Feb. 6, 2024), and accompanying Issues and Decision Memorandum at 28-36.

### B. Resolute Fails to Demonstrate that Commerce's Sunset Review Determination Is Contrary to Law Because of Changes in Jurisprudence Addressing Commerce's Use of the DPM and Cohen's *d* Test

This Court and the Federal Circuit have repeatedly upheld Commerce's use of the DPM and Cohen's *d* test as reasonable. *See, e.g.*, *SeAH Steel Corp. v. United States*, 619 F. Supp. 3d 1309, 1310 (CIT 2023) ("*SeAH Steel II*") ("The {Federal Circuit} and the U.S. Court of International Trade have held the steps underlying the differential pricing analysis as applied by Commerce to be reasonable.") (citing *Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 670-74 (Fed. Cir. 2019) ("*Mid Continent I*"); *Apex Frozen Foods Priv. Ltd. v. United States*, 144 F. Supp. 3d 1308, 1314-35 (CIT 2016), *aff'd*, 862 F.3d 1337 (Fed. Cir. 2017); *Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1322 (Fed. Cir. 2017)). In *Mid Continent I*, the Federal Circuit upheld Commerce's use of zeroing and the 0.8 threshold for the Cohen's *d* test. *See Mid Continent I*, 940 F.3d at 670-74. In *Apex Frozen Foods*, the CIT held that

Commerce's adoption of the DPM was "not arbitrary" and as Commerce "gains greater experience with addressing potentially hidden or masked dumping that can occur when {Commerce} determines weighted-average dumping margins using the {A-to-A} comparison method," Commerce expects to "continue{} to develop its approach with respect to the use of {an alternative comparison method}." *Apex Frozen Foods*, 144 F. Supp. 3d at 1314-35. The Federal Circuit subsequently affirmed the CIT's holding. *Apex Frozen Foods*, 862 F.3d 1337.

Resolute argues that Commerce should have abandoned its DPM in this sunset review because the Federal Circuit in *Stupp* identified a "critical defect" in Commerce's application of the Cohen's *d* test to data that did not meet the statistical criteria of normal distribution, equal variance, and sufficient observation size. Pl. Br. at 28-29. However, Resolute mischaracterizes the Federal Circuit's holding in *Stupp*. The Federal Circuit did not invalidate Commerce's use of the Cohen's *d* test under any circumstance; rather, the Federal Circuit remanded the underlying administrative review to Commerce for further explanation as to how the Cohen's *d* limits should apply, or whether such limits need even be observed, when Commerce uses the DPM. *See Stupp Corp.*, 5 F.4th at 1360 ("We therefore remand to give Commerce an opportunity to explain whether the limits on the use of the Cohen's *d* test . . . were satisfied in this case or whether those limits need not be observed when Commerce uses the Cohen's *d* test in less-than-fair-value adjudications.").

On remand, the CIT upheld Commerce's explanation of its application of the Cohen's *d* test as part of its differential pricing analysis. *See Stupp Corp. v. United States*, 619 F. Supp. 3d 1314, 1321 (CIT 2023), *appeal docketed*, No. 23-1663 (Fed. Cir. Mar. 27, 2023). In reviewing Commerce's remand determination, the CIT held that Commerce's application of the Cohen's *d* test "does not operate in a vacuum, but as part of the differential pricing analysis as a whole." *Id*.

at 1324.  Therefore, "even if the Cohen's *d* values of small test groups were less accurate than for

large test groups, this difference does not by itself render Commerce's use of Cohen's test

unreasonable, because the ratio test and meaningful difference test compensate for inaccuracies."

*Id*. at 1325.  Thus, *Stupp* does not mandate Commerce to abandon its DPM or use of the Cohen's

*d* test in calculating dumping margins.

The other cases that Resolute cites similarly fail to demonstrate a "fundamental

transformation of jurisprudence" as to the lawfulness of Commerce's DPM, as Resolute asserts.

Pl. Br. at 28-32.  For example, Resolute argues that *SeAH Steel Corp. v. United States* – which

involved the 2017-2018 administrative review of *OCTG From Korea* – calls into question

Commerce's use of a population, as opposed to samples, for the Cohen's *d* test.  Pl. Br. at 32

(citing *SeAH Steel Corp.  v. United States*, 539 F. Supp. 3d 1341, 1351 (CIT 2021)).  In *SeAH

Steel Corp.*, this Court held that, under *Stupp*, Commerce was required to explain whether the

population data it used in the DPM met the assumptions of the Cohen's *d* test.  *See SeAH Steel

Corp.*, 539 F. Supp. at 1351.  However, on remand, Commerce found no difference between the

A-to-T and A-to-A calculation methodologies, because both resulted in a zero or *de minimis*

dumping margin due to a change in the particular market situation adjustment, and thus its

application of the DPM was moot.  *See SeAH Steel Corp. v. United States*, 589 F. Supp. 3d 1288,

1293-94 (CIT 2022).  Thus, *SeAH Steel Corp.* does not stand for the proposition that

Commerce's DPM and use of the Cohen's *d* test as applied to population data is unlawful.

Notably, in a similar case challenging Commerce's use of the Cohen's *d* test in the 2016-

2017 administrative review of *OCTG From Korea*, which the Court also issued in 2021, this

Court upheld as reasonable Commerce's application of the Cohen's *d* test to population data.

*SeAH Steel Corp. v. United States*, 513 F. Supp. 3d 1367, 1382-83 (CIT 2021) ("*SeAH Steel I*")

("Commerce's application of the Cohen's *d* test to determine whether there was a significant pattern of differences was reasonable. Commerce did not need to consider sample size, sample distribution, and the statistical significance of the sample."). Further, in *SeAH Steel II*, this Court denied a motion to reconsider its holding in *SeAH Steel I* in light of *Stupp*, explaining: "The concerns described in *Stupp* that might be raised when the Cohen's *d* test is applied to samples are inapplicable because in this case, Commerce applied the Cohen's *d* test to a population." *SeAH Steel II*, 619 F. Supp. 3d at 1313.[2]

Moreover, contrary to Resolute's argument, the more recent court decisions issued post-*Stupp* similarly support Commerce's continued application of Cohen's *d* test as part of its DPM.[3] Pl. Br. at 29-32; *see NEXTEEL Co. v. United States*, No. 18-0083, 2023 WL 8715793, at *6-9 (CIT Dec. 18, 2023) (sustaining Commerce's uses of the Cohen's *d* test as reasonable "when applied as a component of its differential pricing analysis"); *Marmen Inc. v. United States*, 627 F. Supp. 3d 1312, 1322 (CIT 2023) ("Because Commerce adequately explained how its methodology is reasonable, the Court holds that Commerce's use of the Cohen's *d* test applied as a component of its differential pricing analysis is in accordance with law."); *Stupp Corp. v.*

---

[2] Based on an unopposed motion to voluntarily dismiss, the Federal Circuit dismissed the *SeAH Steel* appeals challenging the 2016-2017 administrative reviews. *See SeAH Steel Corp. v. United States*, Nos. 2023-1109, 2023-1657, 2023 WL 3244018, at *1 (Fed. Cir. May 4, 2023); *see also SeAH Steel Corp. v. United States*, No. 2023-1657, 2023 WL 3316548, at *1 (Fed. Cir. May 9, 2023).

[3] Resolute also argues that the Court should consider rulings from NAFTA panels and the WTO. *See* Pl. Br. at 31-33, 35-36. However, NAFTA and WTO panel decisions are not binding on this Court. *See* 19 U.S.C. § 1516a(b)(3); *NSK Ltd. v. United States*, 34 C.I.T. 1344, 1348-49, 2010 WL 4055932 (Oct. 15, 2010); *Corus Staal BV v. Dep't of Commerce*, 395 F.3d 1343, 1349 (Fed. Cir. 2005) ("{W}e therefore refuse to overturn Commerce's zeroing practice based on any ruling by the WTO or other international body unless and until such {a report} has been adopted pursuant to the specified statutory scheme."); *Dillinger France S.A. v. United States*, 981 F.3d 1318, 1325-26 (Fed. Cir. 2020) ("WTO decisions are 'not binding on the United States, much less this court.'") (citing *Corus*, 395 F.3d at 1348). Moreover, the NAFTA Panel did not find that Commerce's use of the Cohen's *d* test is in itself unlawful; rather, in recognition of the "ongoing litigation of these issues" the Panel remanded Commerce's application of the Cohen's *d* test for further explanation. *See* Panel Decision, *Certain Softwood Lumber Products from Canada: Final Affirmative Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, NAFTA No. USA-CDA-2017-1904-03 (Oct. 5, 2023) at 31-32.

*United States*, 619 F. Supp. 3d at 1326-28 (CIT 2023) (holding that Commerce's remand results were supported by substantial evidence and complied with the Federal Circuit's mandate because "Commerce has adequately explained how its {Cohen's *d*} methodology is reasonable."); *Mid Continent Steel & Wire, Inc. v. United States*, 2024 WL 546362, at *8 (sustaining Commerce's use of a simple average of standard deviations in the denominator of Cohen's *d* test because "Commerce has explained how its choice is reasonable and has addressed any evidence or arguments that might detract from the reasonableness of its choice.").

Thus, Resolute fails to demonstrate that Commerce's consideration in this sunset review of dumping margins calculated based on its DPM and the Cohen's *d* test was contrary to jurisprudence on these issues or otherwise not in accordance with law.

## C. Resolute Fails to Demonstrate that Commerce's Sunset Review Determination Is Unsupported by Substantial Evidence, Arbitrary and Capricious, or Otherwise Not In Accordance with Law

Commerce's finding that "good cause" did not exist to consider "other factors" pursuant to 19 U.S.C. § 1675a(c)(2) is supported by substantial evidence. The statute directs Commerce in making a determination of the likelihood of continuation or recurrence of dumping to consider: (a) the weighted average dumping margins determined in the investigation and subsequent reviews; and (b) the volume of imports of subject merchandise before and after issuance of the order. 19 U.S.C. § 1675a(c)(1). The statute only provides for consideration of "other price, cost, market, or economic factors" Commerce deems relevant "if good cause is shown." *See id.* § 1675a(c)(2); *Techsnabexport v. United States*, 515 F. Supp. 2d 1363, 1370 (CIT 2007). Resolute argues that the Federal Circuit's decision in *Stupp* and other purported changes in jurisprudence concerning the lawfulness of the Cohen's *d* test provide "good cause" for Commerce to consider "other factors." However, as explained above, *Stupp* did not rule that

Commerce's DPM and Cohen's *d* test are *per se* unlawful, and more recent court decisions have affirmed the reasonableness of the Cohen's *d* test as part of its DPM.

Moreover, even if the recent jurisprudence demonstrated that the courts view the DPM as unlawful – which it does not – unsettled case law that involves ongoing judicial and administrative proceedings does not meet the high threshold for "good cause." The only case that Resolute cites, *Techsnabexport*, illustrates this point. In *Techsnabexport*, this Court remanded Commerce's sunset review determination due to the change of political and economic factors arising from the dissolution of the Soviet Union ("USSR") and Russia's graduation to market economy status. *See Techsnabexport*, 515 F. Supp. 2d at 1370; *see also Government of Uzbekistan v. United States*, No. 00-08-00392, 2001 WL 1012780, at *3-4 (CIT Aug. 30, 2001) (remanding Commerce's sunset review results to reconsider likely dumping margins in light of the "extraordinary situation" in Uzbekistan following the dissolution of the USSR). The evolving jurisprudence on Commerce's DPM and the Cohen's *d* test discussed above in section II.A does not represent a similar "extraordinary situation" that would merit reconsideration of the dumping margins that Commerce calculated in prior administrative reviews.

Resolute also argues that Commerce's sunset review determination is unlawful because the agency failed to address its "good cause" and related "extraordinary circumstances" arguments. Pl. Br. at 25-40. This is inaccurate. To the contrary, Commerce summarized Resolute's "good cause" arguments and gave a reasoned explanation for rejecting them, including its arguments about the relevance of *Stupp* and *Mid Continent*. *See* IDM at 8-18. Resolute's "extraordinary circumstances" arguments – both before Commerce and this Court – are predicated on its "good cause" arguments. *See* Pl. Br. at 43-46; Resolute Case Br., P.R. 36 at 43-44 ("The Department may rely on the 'extraordinary circumstances' present in this case to

report a zero margin to the Commission. Resolute's showing of 'good cause' under 19 U.S.C. § 1675a(c)(2) leads to this outcome. Here, changes in the case law are also the factors that have created the 'most extraordinary circumstances.'") (internal footnotes omitted). Commerce's explanation for rejecting Resolute's "good cause" arguments provides a reasonably clear path for the court to follow and is sufficient to afford adequate review. *See NMB Singapore Ltd.*, 557 F.3d at 1319; *Al Ghurair Iron & Steel LLC v. United States*, 65 F.4th 1351, 1362 (Fed. Cir. 2023) ("While Commerce must reasonably explain its findings, its explanations are not required to reach a certain level, only that they are sufficient to afford adequate review.") (citation omitted). Specifically, Commerce stated that "the methodology Commerce relied on to calculate Resolute's margin in the underlying investigation of the Order was in accordance with law." IDM at 18. Furthermore, Commerce pointed out that there was no *de minimis* dumping margin calculated in the LTFV investigation. *Id.* Accordingly, Commerce found that there was not "good cause" to consider factors other than those identified in 19 U.S.C. § 1675a(c)(1). *Id.* There is no defect in Commerce's reasoning, let alone one that would warrant a finding of unlawfulness.

The fact that Commerce did not explicitly reference Resolute's "extraordinary circumstances" argument as separate from its "good cause" argument does not mean the agency did not consider it.[4] Resolute's "extraordinary circumstances" argument and its "good cause"

---

[4] Resolute also argues that Commerce's sunset review determination is unlawful because, but for Commerce's use of its DPM, Resolute would have had zero percent dumping margins in the LTFV investigation. Pl. Br. at 37-38, 43-45. However, Resolute's argument fails because even if Commerce had done as Resolute suggests and reexamined the dumping margins calculated in the investigation and sunset reviews as evidence of the likelihood of continued dumping, Commerce would not necessarily have calculated a zero dumping margin as Resolute assumes. Furthermore, the statute and Commerce's regulations firmly establish that the existence of *de minimis* or zero margins does not compel Commerce to determine that there is no likelihood of continuation or recurrence of dumping. *See* 19 U.S.C. § 1675a(c)(4)(A); IDM at 21 (citing *Policy Bulletin*, 63 Fed. Reg. at 18,873).

argument share the same premise: that Commerce's DPM is unlawful in light of the Federal Circuit's decisions in *Stupp* and *Mid-Continent*. As Commerce addressed the case law and found that no good cause existed, it was not necessary for it to make further findings as to Resolute's extraordinary circumstances argument. *See* IDM at 8-18. *See, e.g.*, *Yeda Research & Dev. Co. v. Mylan Pharms. Inc.*, 906 F.3d 1031, 1046 (Fed. Cir. 2018) ("{F}ailure to explicitly discuss every . . . minor argument does not alone establish that the {agency} did not consider it."). Thus, Commerce's determination is not unsupported by substantial evidence, or arbitrary and capricious.

## III. CONCLUSION

In sum, the Court should uphold Commerce's sunset review determination on an order-wide basis and reject Resolute's motion for judgment on the administrative record.

Dated: February 26, 2024

Respectfully submitted,

/s/ David J. Ross
David J. Ross
Jeffrey I. Kessler
Stephanie E. Hartmann
Kanzanira Thorington*

WILMER CUTLER PICKERING
HALE and DORR LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
(202) 663-6000

*Counsel for Proposed Defendant-Intervenor Sierra Pacific Industries, including its subsidiary Seneca Sawmill Company*

*\*Resident in WilmerHale's New York office: 7 World Trade Center*

*250 Greenwich Street*
*New York, NY 10007*

23

**CERTIFICATE OF COMPLIANCE**

Pursuant to U.S. Court of International Trade Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Sierra Pacific Industries' Memorandum in Opposition to Plaintiff's Rule 56.6 Motion for Judgment on the Agency Record, as computed by WilmerHale's word processing system (Microsoft Word 2308), is 6852 words.


/s/ David J. Ross_____
Signature of Attorney

David J. Ross_____
Name of Attorney

Sierra Pacific Industries, including its subsidiary Seneca Sawmill Company
Representative Of

February 26, 2024_____
Date