## UNITED STATES COURT OF INTERNATIONAL TRADE

*Before*: The Honorable Jane A. Restani

| | |
|---|---|
| **RESOLUTE FP CANADA INC.,** | |
| **Plaintiff,** | |
| **v.** | |
| **UNITED STATES,** | **Court No. 23-00095** |
| **Defendant,** | |
| **and** | **PUBLIC DOCUMENT** |
| **COMMITTEE OVERSEEING ACTION FOR LUMBER INTERNATIONAL TRADE INVESTIGATIONS OR NEGOTIATIONS, et al.,** | |
| **Defendant-Intervenors.** | |

## REPLY BRIEF OF PLAINTIFF RESOLUTE FP CANADA INC.

Elliot J. Feldman
Michael S. Snarr
Ronald J. Baumgarten
Tung A. Nguyen

**Baker Hostetler LLP**
1050 Connecticut Ave., NW
Suite 1100
Washington, D.C.  20036

Counsel for Resolute FP Canada Inc.

Dated:  May 2, 2024

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................. 1

II.  ARGUMENT ....................................................................................... 3

    A.  RESOLUTE IS NOT ATTEMPTING TO RELITIGATE THE NAFTA APPEAL ... 3

    B.  RESOLUTE IS ENTITLED TO COMPANY-SPECIFIC RELIEF ......................... 8

       1.  The Statutory Scheme Supports A Company-Specific Approach To Sunset Reviews ................................................................. 8

       2.  The Meaning Of "Revocation" Is Ambiguous And Allows For Company-Specific Relief In Sunset Reviews ........................................... 10

    C.  COMMERCE'S DETERMINATION IS BASED ON AN ARBITRARY AND UNLAWFUL APPLICATION OF THE "GOOD CAUSE" STANDARD ............. 11

       1.  Commerce Failed To Articulate The Applicable Standard For "Good Cause" ................................................................. 12

       2.  The Jurisprudence On The Cohen's *d* Test Represents "Good Cause" .. 14

       3.  The Government Has No Justification For Ignoring Material Expert Evidence On The Record .................................................. 16

       4.  The Government Misconstrues Resolute's Argument On The Role Of WTO Jurisprudence ................................................... 18

    D.  "EXTRAORDINARY CIRCUMSTANCES" PROVIDE A LEGAL BASIS TO ASSIGN A ZERO MARGIN TO RESOLUTE IN THE SUNSET REVIEW PROCEEDING ................................................................. 18

       1.  Commerce's Failure To Address The Statute, Case Law, And Past Practice Was Arbitrary and Capricious ..................................... 19

       2.  Recourse To "Extraordinary Circumstances" Is Not Limited To Full Sunset Reviews .......................................................... 22

III.  THE EQUITIES CALL FOR A DIFFERENT OUTCOME ....................... 24

IV.  CONCLUSION ............................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*AG der Dillinger Huttenwerke v. United States*, 26 C.I.T. 298 (2002)................... 6, 7, 12

*Allegheny Ludlum Corp. v. United States*, 367 F. 3d 1339 (Fed. Cir. 2004)................. 18

*Bhullar v. United States,* 259 F. Supp. 2d 1332 (Ct. Int'l Trade 2003)........................... 4

*CS Wind Vietnam Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) ..................... 13

*Govt. of Uzbekistan v. United States,* 25 C.I.T. 1804 (2001)........................................ 21

*Grobest & I-Mei Indus. Vietnam Co. v. United States,*
53 F. Supp. 2d 1352 (Ct. Int'l Trade 2012) ................................................................... 11

*Guangdong Chems. Imp. & Exp. Corp. v. United States,*
414 F. Supp. 2d 1300 (Ct. Int'l Trade 2006) ................................................................. 17

*Guangzhou Jangho Curtain Wall Sys. Eng'g Co. v. United States,*
181 F. Supp. 3d 1265 (Ct. Int'l Trade 2016)................................................................. 17

*Hyundai Steel Co. v. United States*, 658 F. Supp. 3d 1331 (Ct. Int'l Trade 2023)........... 9

*JSW Steel, Inc. v. United States*, 466 F. Supp. 3d 1320 (Ct. Int'l Trade 2020) ............. 13

*Koyo Seiko Co., Ltd. v. United States,* 764 F. Supp 1108 (Ct. Intl. Trade 1990)........... 24

*Matra Ams., LLC v. United States,* 2024 Ct. Intl. Trade LEXIS 15 (2024) ..................... 15

*Mid Continent Steel & Wire Inc. v. United States*, 31 F. 4th 1367 (Fed. Cir. 2022) ....... 14

*Mid Continent Steel & Wire, Inc. v. United States*, 940 F. 3d 662 (Fed. Cir. 2019) ....... 15

*Mid Continent Steel & Wire, Inc. v. United States*, 941 F. 3d 530 (Fed. Cir. 2019) ....... 13

*Murray v. Schooner Charming Betsy*, 6 U.S. 64 (1804) ................................................. 18

*Nat'l Ass'n of Mirror Mfrs. v. United States,*
696 F. Supp. 642 (Ct. Int'l Trade 1988)....................................................................... 17

*NEXTEEL Co., Ltd. v. United States,* 28 F. 4th 1226 (Fed. Cir. 2022) .......................... 14

*SeAH Steel Corp. v. United States,* 539 F. Supp. 3d 1341 (Ct. Int'l Trade 2021)........... 8

*SEC v. Chenery Corp.,* 332 U.S. 194 (1947)................................................................. 12

*Stupp Corp. v. United States,* 5 F. 4th 1341 (Fed. Cir. 2021).............................. 2, 14, 15

*Stupp Corp. v. United States,* 619 F. Supp. 3d 1314 (Ct. Int'l Trade 2023)..................... 7

*West Virginia v. EPA*, 142 S. Ct. 2587 (2022) ................................................................. 9

*Zhaoqing Tifo New Fibre Co., Ltd. v. United States,*
60 F. Supp. 3d 1328 (Ct. Intl'l Trade 2015) ................................................ 12, 13, 17, 19

**Statutory Provisions**

19 U.S.C. § 1516a(a)(1)(D) .................................................................. 4

19 U.S.C. § 1516a(c)(2) ....................................................................... 5

19 U.S.C. § 1516a(g)(1) ....................................................................... 4

19 U.S.C. § 1516a(g)(2) ....................................................................... 4

19 U.S.C. § 1673a(c)(3) ....................................................................... 9

19 U.S.C. § 1673d(c)(2) ....................................................................... 5

19 U.S.C. § 1673d(c)(B)(i)(I)-(II) .................................................... 9, 10

19 U.S.C. § 1675(c)(3)(B) .................................................................. 23

19 U.S.C. § 1675(c)(4) ......................................................................... 9

19 U.S.C. § 1675(d) ......................................................................... 3, 8

19 U.S.C. § 1675(d)(1) ....................................................................... 10

19 U.S.C. § 1675(d)(2) ....................................................................... 10

19 U.S.C. § 1675(d)(3) ......................................................................... 6

19 U.S.C. § 1675a(c) ........................................................................... 5

19 U.S.C. § 1675a(c)(1)(A) & (B) ......................................................... 5

19 U.S.C. § 1675a(c)(2) ......................................................... 11, 13, 16

19 U.S.C. § 1675a(c)(3) .................................................................. 9, 22

19 U.S.C. § 1677f-1(c)(1) ............................................................... 9, 10

19 U.S.C. § 1677f-1(e) ....................................................................... 10

**Regulatory Provisions**

19 C.F.R. § 351.218(d)(2) ..................................................................... 9

19 C.F.R. § 351.218(d)(3)(iv)(A) & (B) ............................................... 23

19 C.F.R. § 351.218(e)(1)(ii)(A) ......................................................... 23

19 C.F.R. § 351.218(e)(2)(i) ............................................................... 22

19 C.F.R. § 351.222(a) ....................................................................... 10

**Administrative Decisions**

*Continuation of Countervailing and Antidumping Duty Orders on OCTG
From Argentina, Italy, Japan, Korea and Mexico, and Partial Revocation
of Those Orders From Argentina and Mexico With Respect to Drill Pipe*,
66 Fed. Reg. 38,630 (Dep't Commerce July 25, 2001) ................................ 11

**Other Authorities**

*Calculation of the Weighted-Average Dumping Margin and*
*Assessment Rate in Certain Antidumping Proceedings; Final Modification*,
77 Fed. Reg. 8,101 (Dep't of Commerce Feb. 14, 2012) ............................................. 20

*Policies Regarding the Conduct of Five-year ("Sunset") Reviews*
*of Antidumping and Countervailing Duty Orders; Policy Bulletin*,
63 Fed. Reg. 18,871 (Dep't Commerce Apr. 16, 1998) .................................................. 9

Uruguay Round Agreements Act, Statement of Administrative Action,
H.R. Doc. 103-316, Vol. 1 (1994), 1994 U.S.C.C.A.N. 4040, 4214 ........................passim

I.     **INTRODUCTION**

This brief is submitted on behalf of Plaintiff Resolute FP Canada Inc. ("Resolute" or "Plaintiff") in reply to the Response Briefs submitted by Defendant United States ("the Government"), Defendant-Intervenor the Committee Overseeing Action for Lumber International Trade Investigations or Negotiations ("the Coalition"), and Defendant-Intervenor Sierra Pacific Industries ("Sierra Pacific") in the appeal of the Final Results of the expedited first sunset review of the antidumping duty ("AD") order on softwood lumber from Canada, Case No. A-122-857.  *See Certain Softwood Lumber Products from Canada: Final Results of the Expedited First Sunset Review of the Antidumping Duty Order*, 88 Fed. Reg. 20,479 (Dep't Commerce Apr. 6, 2023), P.R. 46 ("Final Results") and accompanying Issues and Decision Memorandum, March 31, 2023, P.R. 45 ("IDM").

The Department of Commerce ("Commerce") assigned Resolute the lowest dumping rates of any respondent in the *Softwood Lumber from Canada* investigation and the first administrative review ("AR1"):  3.20% and 1.15% respectively.  Then, Commerce stopped reviewing Resolute individually, despite Resolute's requests to be a third respondent,[1] leaving it with higher dumping margins resulting from the two

---

[1] *See* Dept. of Commerce Memorandum, *Resolute FP Canada Inc.'s Request for Selection as Voluntary Respondent,* Nov. 4, 2020 (Barcode: 4049744-01); Dept. of Commerce Memorandum, *Administrative Review of the Antidumping Duty Order on Certain Softwood Lumber Products from Canada: Respondent Selection*, Apr. 14, 2021 (Barcode: 4110813-01); Dept. of Commerce Memorandum, *Administrative Review of the Antidumping Duty Order on Certain Softwood Lumber Products from Canada: Respondent Selection*, Apr. 29, 2022 (Barcode: 4236626-01); Dept. of Commerce Memorandum, *Administrative Review of the Antidumping Duty Order on Certain Softwood Lumber Products from Canada: Respondent Selection*, Apr. 11, 2023 (Barcode: 4364560-01); Dept. of Commerce Memorandum, *Administrative Review of*

remaining mandatory respondents, starting with an 11.59% all other's rate in the second review.

As low as the rates were when Resolute was examined individually, Resolute would have been 0.0% in both the investigation and AR1 but for Commerce's application of its differential pricing methodology ("DPM").

Resolute is subject to the antidumping order only because of the DPM, which has been impugned by federal courts on appeals in other cases. The Federal Circuit in *Stupp Corp. v. United States,* 5 F. 4th 1341, 1352 (Fed. Cir. 2021) found Commerce's application of the DPM unreasonable and remanded to Commerce for further explanation. The NAFTA binational panel reviewing the final determination of the investigation as to Resolute likewise remanded the DPM to Commerce for further explanation in accordance with the Federal Circuit's decision in *Stupp*. These appeals are ongoing, but the interim remand decisions have cast serious doubt on whether the DPM will survive appeal and suggest Resolute never was dumping at all.

Commerce's sunset review determination is circular: whether a company will continue dumping in the future seems to depend on whether it was found dumping in the investigation. Yet, there never would be a sunset review were there not a finding of dumping in the investigation. Claiming there is not "good cause" here to consider any facts other than import volumes and an affirmative final determination in the investigation, Commerce has rendered the sunset review meaningless, a statutory nullity.

---

*the Antidumping Duty Order on Certain Softwood Lumber Products from Canada: Respondent Selection*, Apr. 9, 2024 (Barcode: 44540923-01).

The Government does not argue that it could not revoke the AD order for one company, nor does it argue that a partial revocation would be unprecedented.  It argues, instead, that such revocations are "atypical," even as it concedes that the "Federal Circuit has also sustained the interpretation that 19 U.S.C. § 1675(d) permits the conditional revocation of *an exporter or producer*." Govt. Brief at 15. (emphasis added).  This case warrants a finding by Commerce for Resolute that Resolute is not likely to continue or resume dumping.

## II.    ARGUMENT

### A.    RESOLUTE IS NOT ATTEMPTING TO RELITIGATE THE NAFTA APPEAL

Even as the Government relies on its affirmative determination in the investigation for its finding that Resolute is likely to continue dumping, the Government argues that Resolute is attempting "to relitigate issues from individual segments of this proceeding, some of which are currently pending before a binational panel, in the context of a sunset review."  Govt. Br. at 10-11.  The Coalition claims that "this Court should reject Resolute's attempt to simultaneously litigate the dumping margin calculated in Commerce's original investigation in two forums."  Coalition Br. at 17.

To the extent that the Government and petitioners are making a jurisdictional objection, there is no jurisdictional bar to the Court's authority over Resolute's appeal. This case, although related to some of the issues arising in the NAFTA binational panel appeal in the *Softwood Lumber* AD investigation, is a separate proceeding based entirely on different provisions of the trade law (in this case, the appeal of a sunset review).  The NAFTA Chapter 19 appeal concerns the lawfulness of Commerce's final antidumping determination in the underlying investigation and the imposition of an AD

order on Canadian respondents, including Resolute.  That appeal is now under the
exclusive jurisdiction of a NAFTA panel.  *See* 19 U.S.C. § 1516a(g)(2); *see also Bhullar
v. United States,* 259 F. Supp. 2d 1332, 1340 (Ct. Int'l Trade 2003) ("Pursuant to
§1516a(g)(2), if a binational panel is requested, the determinations are not reviewable
by this Court.").[2]

The Government acknowledges that a sunset review "is separate and distinct
from administrative reviews or investigations."  Govt. Br. at 11.  Appeals in the other
segments of the *Softwood Lumber* proceedings are ongoing and the Government and
the Coalition have cited no authority in support of any jurisdictional objection to this
sunset review appeal.

The dumping margins for Resolute in the investigation and AR1, and
Commerce's basis for determining those margins, are relevant to the sunset review.
The dumping margin in the investigation was the product of Commerce's unreasonable
use of the Cohen's *d* test, along with other missteps in the DPM, which resulted in an
above *de minimis* margin and the imposition of the AD order on Resolute's lumber
exports to the United States.  *See* Resolute Br. 32-33.  Without the use of the Cohen's *d*
test, Commerce would have found that Resolute was not dumping.  *See Antidumping
Duty Investigation of Certain Softwood Lumber Products from Canada: Analysis of Data
Submitted by Resolute FP Canada, Inc. for the Final Determination*, at 7 (Nov. 1, 2017),
P.R. 28, C.R. 1 ("Resolute's Final AD Calc Memo INV") (Exh. 1 to Resolute's

---

[2] With respect to the present case, the final results of an expedited sunset review
determination are not appealable to NAFTA binational panels.  *See* 19 U.S.C. §
1516a(a)(1)(D), (g)(1).

Substantive Response to the Notice of Initiation, Jan. 5, 2023 ("Resolute Sub. Resp.")).[3] The NAFTA binational panel has remanded once already with respect to Commerce's use of the DPM.  Should the panel affirm a final remand determination that does not employ the DPM but relies, instead, on the weighted-average to weighted-average comparisons of Resolute's normal values and export prices, the proper remedy in the NAFTA appeal will be revocation of the AD order as to Resolute from the date of imposition and a refund of cash deposits with interest.  *See* 19 U.S.C. § 1673d(c)(2).

Under the sunset review statute, Commerce determines whether there is a likelihood of continuation or recurrence of dumping.  *See* 19 U.S.C. § 1675a(c). Commerce, in making its inquiry, is required to "consider the weighted average dumping margins determined in the investigation and subsequent reviews," along with import volumes before and after the AD order was imposed.  19 U.S.C. § 1675a(c)(1)(A) & (B). By its very nature, a sunset review involves an examination of the historic dumping margins dating to the investigation.

The statute also recognizes Commerce's discretion to consider other relevant and explanatory factors upon a showing of "good cause."  19 U.S.C. § 1516a(c)(2) (providing for a review of "price, cost, market, or economic factors" in addition to margins and volumes); *see also* Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. 103-316, Vol. 1 (1994), 1994 U.S.C.C.A.N. 4040, 4214 ("SAA") (recognizing the potential existence of "information indicating that observed patterns regarding dumping margins and import volumes are not necessarily indicative

---

[3] Resolute has appealed other non-DPM issues, which are also subject to the recent Remand Redetermination.

of the likelihood of dumping"). Thus, there are common issues in these separate proceedings, and yet there are differences.

Resolute's "good cause" arguments in the sunset review, consistent with the law and made in good faith, are based on Commerce's failure to account for the unreasonableness of the Cohen's *d* test when assessing likelihood of continued dumping as to Resolute. Commerce dismissed Resolute's "good cause" claim, relied exclusively on the final published margins and volume information, and issued an affirmative determination on an order-wide basis of the likelihood of the continuation or recurrence of dumping of softwood lumber from Canada. *See* IDM at 18-19, P.R. 45. Whether Commerce should have found cause to apply the exception and consider other relevant factors as to Resolute is one of the issues before this Court.

The sunset review is prospective in nature, as is the relief being requested in this proceeding. *See* 19 U.S.C. § 1675(d)(3). Resolute is not asking the Court to go beyond its jurisdiction in this appeal to rule on or otherwise declare unlawful the underlying dumping determination. Nor is Resolute trying to relitigate the NAFTA panel appeal before this Court to achieve the same result. Commerce has an obligation to account for changes in law that affect the basis for determining whether dumping would likely continue. "It is insufficient to decline consideration of any change in law subsequent to the original determination simply based on the supposed limitation on the scope of a sunset review, as such considerations are inherent in making the likelihood determination required in the sunset review." *AG der Dillinger Huttenwerke v. United States*, 26 C.I.T. 298, 317 (2002). When Plaintiffs argued that "Commerce erred in continuing to apply its change-in-ownership methodology" in a CVD sunset review after that methodology was "found 'illegal' by the U.S. Court of Appeals for the Federal Circuit

6

and the WTO Dispute Settlement Body," the court remanded and required Commerce to consider that information.  *Id.* at 319.[4]

Courts and a binational panel have required Commerce to explain how its application of the DPM could be lawful and reasonable in light of Commerce's refusal to rely on the fundamental premises that Professor Cohen required for the application of his "Cohen's *d*" model.  Resolute is asking this Court to find that the "good cause" exception is applicable to Resolute, order Commerce to revisit the likelihood finding, and revoke the AD order as to Resolute going forward from the date of the sunset determination.

Resolute does not view "relief" under the NAFTA appeal of the investigation to be "inadequate," as the Coalition claims.  Coalition Br. at 23.  The investigation and sunset review appeals are on different tracks, dealing with different legal standards, and providing different possible remedies.  A finding that Resolute is not likely to continue or resume dumping would offer Resolute prospective relief from the AD order.  The investigation appeal may provide relief not just prospectively, but also retroactively. What this Court decides may be related to an issue before the NAFTA panel, but it does not interfere with the authority of that panel over the appeal of the Final Determination in the investigation, nor the fate of the order over the previous five years.[5]

---

[4] Plaintiffs contended that, had Commerce applied its current change-in-ownership methodology, the country-wide subsidy rate in the contested proceeding would have fallen from 14.84% to 0.21%.  Similarly, here, had Commerce abandoned its flawed DPM-based dumping calculation, it would have been left with weighted-average to weighted-average comparisons of Resolute's normal values and export prices yielding a zero dumping margin.

[5] With related or parallel proceedings there exists always the possibility of inconsistencies in legal interpretation, even within the same court.  *Compare Stupp Corp. v. United States,* 619 F. Supp. 3d 1314 (Ct. Int'l Trade 2023) (sustaining

**B.    RESOLUTE IS ENTITLED TO COMPANY-SPECIFIC RELIEF**

1.    The Statutory Scheme Supports A Company-Specific Approach To Sunset Reviews

Resolute has requested company-specific relief in this proceeding.  *See, e.g.,* Complaint, ¶ 23, Prayer for Judgment and Relief, ¶ 3; Resolute Br. at 18-24, 46.  As much as the Government and Petitioners argue that Resolute should not receive company-specific relief under the sunset review statute, relying mainly on the SAA's pronouncement that sunset determinations are made on an "order-wide basis,"[6] they do not argue that the Government has no authority or discretion to grant company-specific relief where appropriate.  The United States concedes that the "Federal Circuit has also sustained the interpretation that 19 U.S.C. § 1675(d) permits the conditional revocation of *an exporter or producer*." Govt. Br. at 15 (emphasis added).

The statute does not preclude a company-specific finding, nor a company-specific revocation in the case of a sunset review.  An interpretation of preclusion for company-specific treatment would conflict with the statutory scheme of the antidumping laws.

The dumping provisions of the Tariff Act demonstrate that dumping is fundamentally a company-specific concept.  *See* Resolute Br. at 18-24.  The default in an AD proceeding is to calculate individual margins for as many respondents as

---

Commerce's redetermination on grounds that use of entire population of data as opposed to samples rendered the underlying assumptions of the Cohen's *d* test irrelevant), *with SeAH Steel Corp. v. United States,* 539 F. Supp. 3d 1341, 1351 (Ct. Int'l Trade 2021) ("In accordance with the U.S. Court of Appeals for the Federal Circuit's decision in *Stupp*, this Court concludes that use of a population, instead of a sample, does not negate the assumptions inherent to the Cohen's *d* test.").

[6] Govt. Br. 12-13 (citing SAA, 1994 U.S.C.C.A.N. at 4205); Coalition Br. at 12-13 (same); SP Br. at 8 (same).

feasible, resorting to an all-other's rate only when the number of respondents is too large.  *See* 19 U.S.C. §§ 1673d(c)(B)(i)(I)-(II), 1677f-1(c)(1).  A company seeking to waive participation in a sunset review does so for itself, not for all companies.  *See* 19 U.S.C. § 1675(c)(4); 19 C.F.R. § 351.218(d)(2).  Commerce's longstanding practice under 19 U.S.C. § 1675a(c)(3) is to report to the Commission rates likely to prevail for each individual respondent in the event of revocation of an order.  *See, e.g., Policies Regarding the Conduct of Five-year ("Sunset") Reviews of Antidumping and Countervailing Duty Orders; Policy Bulletin*, 63 Fed. Reg. 18,871, 18,873 (Dep't Commerce Apr. 16, 1998).

The Government asserts that Resolute "conflates" the requirements for an administrative review with those of a sunset review.  Govt. Br. at 13.  Resolute, however, discussed the administrative review and other provisions to demonstrate that the dumping law is a company-specific concept and that the entire statutory scheme must inform the interpretation of the sunset review section.  *See, e.g., West Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022) ("'It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'") (quoting *Davis v. Michigan Dept. of Treasury,* 489 U. S. 803, 809 (1989)) (Roberts, C.J.); *Hyundai Steel Co. v. United States*, 658 F. Supp. 3d 1331, 1335 (Ct. Int'l Trade 2023) ("The statutory context confirms the plain meaning of 'benefit.'").  The Government also points to 19 U.S.C. § 1673a(c)(3) as the provision governing the margins reported to the Commission in a sunset review, but neglects to mention that Commerce's usual practice is to report on a company-specific basis.  *See* Govt. Br. at 13; *see also Policy Bulletin,* 63 Fed. Reg. at 18,873.

9

The Coalition claims that "{m}aking company-specific determinations in sunset reviews would be inconsistent with the fact that duties are not imposed on a producer-specific basis."  Coalition Br. at 14.  This argument twists the nature of the dumping law.  The statutory default, after all, is for company-specific individual margins.  *See* 19 U.S.C. §§ 1673d(c)(B)(i)(I)-(II), 1677f-1(c)(1).  Even the Coalition admits as much.  *See* Coalition Br. at 14 (conceding that "Resolute is correct that the 'general' rule of calculating individual dumping margins is company-specific in certain Commerce proceedings").  An AD order covers subject merchandise imported from a specific country, but margins are set for each respondent who is found dumping to the extent practicable.[7]

2.    The Meaning Of "Revocation" Is Ambiguous And Allows For Company-Specific Relief In Sunset Reviews

Resolute discussed the ambiguity of the statutory terms with respect to revocation of an order in a sunset review. *See* Resolute Br. at 22-24.  "Revocation" in the case of administrative and changed circumstances reviews may be "in whole or in part."  19 U.S.C. § 1675(d)(1).  The sunset review statute uses the word "revoke" without elaboration.  19 U.S.C. § 1675(d)(2).

A reasonable interpretation of "revoke," described as a "term of art" in Commerce regulations, 19 C.F.R. § 351.222(a), includes a revocation that may be in whole or in part.  Commerce took this very view in the sunset review of *Oil Country Tubular Goods ("OGTG"),* where it revoked an order in part (based on scope) in the sunset review.  *See Continuation of Countervailing and Antidumping Duty Orders on OCTG From Argentina,*

---

[7] The Tariff Act allows for the possibility of a country-wide CVD duty calculation.  There is no similar provision for AD proceedings.  *See* 19 U.S.C. § 1677f-1(e).

10

*Italy, Japan, Korea and Mexico, and Partial Revocation of Those Orders From Argentina and Mexico With Respect to Drill Pipe*, 66 Fed. Reg. 38,630, 38,631 n.7 (Dep't Commerce July 25, 2001).

The Government has acknowledged that it has authority to perform a partial revocation.  After attempting to discount the relevance of the *OCTG* case, the Government conceded that Commerce retains the power to make company-specific revocations.  *See* Govt. Br. at 14-15 (citing *Sahaviriya Steel Indus. Pub. Co. v. United States*, 649 F.3d 1371, 1376 (Fed. Cir. 2011)).  The Government concluded that "Commerce need not conduct sunset reviews on a company-specific basis," implying that it has the statutory authority to do so.  *Id.* at 15.

The Government's concession indicates that Commerce interprets the sunset review statute as permitting a determination and revocation on a company-specific basis.  Commerce, however, decided not to exercise its discretion to revoke the AD order as to Resolute.  Commerce's failure to do so, where the record shows that there was never dumping and no likelihood of continued or recurring dumping with respect to Resolute, is an abuse of discretion and constitutes arbitrary and capricious decision making.  *See, e.g., Grobest & I-Mei Indus. Vietnam Co. v. United States,* 53 F. Supp. 2d 1352, 1363-64 (Ct. Int'l Trade 2012) ("When the record cannot support the agency's determination or the agency's exercise of discretion exceeds the limits of the statute, the agency has abused its discretion.").

### C.    COMMERCE'S DETERMINATION IS BASED ON AN ARBITRARY AND UNLAWFUL APPLICATION OF THE  "GOOD CAUSE" STANDARD

Resolute argued before Commerce that "good cause" existed to consider other relevant factors under 19 U.S.C. § 1675a(c)(2).  *See* Resolute Case Br. at 38-42, P.R.

36; Rebuttal Br. 3-4, P.R. 42.  The jurisprudence on the Cohen's *d* test, when examined

alongside expert record evidence, provided a compelling reason for Commerce to go

outside the main factors for making a likelihood determination.[8]  Neither the

Government nor the Defendant-Intervenors can rescue Commerce's deficient

explanation for rejecting "good cause."  *See, e.g., Zhaoqing Tifo New Fibre Co., Ltd. v.*

*United States*, 60 F. Supp. 3d 1328, 1364 (Ct. Intl'l Trade 2015) ("Litigation counsel's

attempts at 'backfill' are no substitute for an agency's own reasoned decision making on

the administrative record.") (citing *Burlington Truck Lines Inc. v. United States*, 371 U.S.

156, 168-69 (1962)).

      1.     Commerce Failed To Articulate The Applicable Standard For "Good Cause"

The statute does not include a definition of "good cause," nor did Commerce

provide a reasonable explanation for the standard and why it was not met here.  A

proper analysis would have begun with the plain language of the statute: "It will not do for

a court to be compelled to guess at the theory underlying an agency's action; nor can a

court be expected to chisel that which must be precise from what the agency has left

vague and indecisive." *SEC v. Chenery Corp.,* 332 U.S. 194, 196-97 (1947); *see also*

---

[8] *Cf. AG der Dillinger Huttenwerke,* 26 C.I.T. at 316–17 ("Commerce is not barred from considering changes in the foreign or U.S. laws described above, or from considering facts underlying these changes, which may or may not have taken place after the imposition of the original CVD order. Commerce must consider and give a reasoned explanation in response to material and reasonable arguments as to why a change in U.S. … law would or would not have an impact on the likelihood of continuance or recurrence of the subsidies under review.").

*JSW Steel, Inc. v. United States*, 466 F. Supp. 3d 1320, 1332 (Ct. Int'l Trade 2020) ("It is unclear what constitutes an 'indication' of sufficient U.S. production, or why an 'indication' of U.S domestic production of the steel articles in question accords with the regulation. Commerce does not further explain how that term is used either in its regulations or in the {documents at issue}."). Commerce "must reasonably tie the determination under review to the governing statutory standard. . . by indicating what statutory interpretations the agency is adopting." *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1376 (Fed. Cir. 2016); *see also Mid Continent Steel & Wire, Inc. v. United States*, 941 F. 3d 530, 537 (Fed. Cir. 2019) (same). "Conspicuously absent from the Final {Determination} is any discussion" of "good cause." *Zhaoqing Tifo,* 60 F. Supp. 3d at 1362. Instead, Commerce offers only circular reasoning: Resolute has not demonstrated "good cause" because what Resolute has demonstrated is not "good cause."

The Government offers a non-definition, likening "good cause" to something "special." Govt. Br. at 17. The Coalition claims that "Commerce provided nearly 10 pages of explanation," Coalition Br. at 22, yet, as Resolute demonstrated, those pages amounted not to an "explanation," but "boilerplate" and "answer{s} to arguments that Resolute never made." Resolute Br. at 39-40. Nothing can excuse Commerce from its duty to define the law and apply the statutory standard to the unique facts on the record. SAA, 1994 U.S.C.A.A.N. at 4214 (noting that the standard under § 1675a(c)(2) is to be applied "on a case-by-case basis"). Commerce's "good cause" analysis is arbitrary, capricious, and not in accordance with law.

Sierra Pacific alleges that the "good cause" argument would become "moot" were the Court to find company-specific revocation unavailable to Resolute. SP Br. at 11.

Sierra Pacific's argument is irrelevant as the Government has conceded that the statute may be interpreted to allow for revocation in a sunset review on a company-specific basis.  *See* Govt. Br. at 14-15.  To determine whether Commerce exercised its discretion in an arbitrary and capricious manner, the Court cannot avoid considering the issue of "good cause." *See* Resolute Br. at 24.

          2.    The Jurisprudence On The Cohen's *d* Test Represents "Good Cause"

The Government downplays the importance of CAFC jurisprudence to the "good cause" inquiry, alleging that Resolute is asking this Court to consider mere "ongoing litigation in other proceedings."  Govt. Br. at 17.  The Government further claims that "the Court's concerns in *Stupp* and *Mid Continent* were specific to the facts of those cases" and that "it merely remanded for further explanation." *Id.* at 16.  The Coalition argues that other relevant factors introduced by Resolute are "entirely speculative" and "grounded in allegations related to separate litigation." Coalition Br. at 19.

The decisions cited by Resolute all share with this case a common issue of law on the reasonableness of a particular methodology, application of the Cohen's *d* test. *See Stupp,* 5 F. 4th at 1352 ("Commerce's differential pricing analysis does not make new law or modify existing law—it interprets the statutory provision that applies to patterns of significantly differing export prices by providing a mechanism for identifying such patterns."); *see also NEXTEEL Co., Ltd. v. United States,* 28 F. 4th 1226 (Fed. Cir. 2022); *Mid Continent Steel & Wire Inc. v. United States*, 31 F. 4th 1367 (Fed. Cir. 2022) ("*Mid Continent II*"); *Mid Continent Steel & Wire, Inc. v. United States*, 940 F. 3d 662

(Fed. Cir. 2019) ("*Mid Continent I*"). That the facts may be different from one case to another in terms of sales data and subject merchandise is irrelevant.

The CAFC in *Stupp* found Commerce's application of its Cohen's *d* test unreasonable when the requisite assumptions of the test were not respected. *See Stupp,* 5 F. 4th at 1357 ("Our concerns raise questions about the reasonableness of Commerce's use of the Cohen's *d* test in less-than-fair-value adjudications, warranting further supporting explanation from the Department."). In *Mid Continent,* the CAFC remanded to Commerce for using a simple rather than weighted average standard deviation in calculating the Cohen's *d* denominator. *See Mid Continent I*, 940 F. 3d at 674-75 ("On the record before us, we cannot conclude that Commerce's methodology was a reasonable exercise of its agency discretion in light of the statutory constraints and policies."). The data inserted into the Cohen's *d* test formulas may vary from case to case but the criteria for judging the reasonableness of the formula's application do not change.

This Court recently addressed the Government's attempt to downplay the relevance of *Stupp*: "Commerce's characterization of the Federal Circuit's holding in {*Stupp*} as a mere 'ruling issued as part of ongoing litigation' does not account for the fact that {*Stupp*} is a published, precedential decision with holdings that clarify (and indeed shape) the background law against which Commerce's actions are to be found either reasonable or unreasonable." *Matra Ams., LLC v. United States,* 2024 Ct. Intl. Trade LEXIS 15 *43 (2024) (citing *Matra Ams.* IDM at 5). Far from being tangential and inapposite, *Stupp* (and *Mid Continent*) are binding, intervening precedent that require a close examination given Commerce's arbitrary rejection of Resolute's showing of "good cause."

15

3.    The Government Has No Justification For Ignoring Material Expert
Evidence On The Record

The Government claims that "Commerce has determined that there was no academic literature on the record that might warrant 'good cause' under 19 U.S.C. § 1675a(c)(2)."  Govt. Br. at 17.  The Coalition alleges that the "statistical scholarship" on the record here does not constitute a "good cause" factor.  Coalition Br. at 20.  These arguments are inaccurate and misleading.

Commerce never discussed the expert report of Professor Larry Hedges, which Resolute placed on the record of the sunset review proceeding. *See* Hedges Report (Resolute Sub. Resp., Exh. 9), P.R. 28, C.R. 1; Resolute Br. at 41.  This comprehensive report, written by a renowned expert in statistics, offers a detailed discussion of the scholarly literature on effects size and the Cohen's *d* test.  Professor Hedges specifically refutes Commerce's misinterpretations of various studies as argued in other, related cases.  *See* Hedges Report at App. II (Resolute Sub. Resp., Exh. 9), P.R. 28, C.R. 1.  Yet, Commerce nowhere acknowledged nor otherwise discussed the Hedges Report in the Final Results of the expedited sunset review.  Instead, it asserted, "No . . . academic literature is on the record of this sunset review or the completed administrative reviews."  IDM at 17, P.R. 45.   The Government repeats this mantra as though repetition could make it true. *See* Govt. Br. at 17.

The Hedges Report contains citations to, and quotations from, relevant scholarly literature "referenced by Commerce and parties in court cases regarding application of Cohen's *d*."  Hedges Report at 4; *id.* at App. II (Resolute Sub. Resp., Exh. 9), P.R. 28, C.R. 1.  Resolute submitted the Hedges Report as an exhibit to its Substantive Response on January 5, 2023.  Commerce was on notice from that date as to all

scholarship bearing on Hedges' analysis.  Commerce could have placed the full studies on the record in the sunset review but, even without them, Commerce never addressed Professor Hedges' arguments, which were on the record of this review, as to Commerce's flawed use of the Cohen's *d* test.

Whereas Commerce is "not required to comment on every submission it receives, a pertinent submission. . . should not be ignored." *Guangdong Chems. Imp. & Exp. Corp. v. United States,* 414 F. Supp. 2d 1300, 1312 (Ct. Int'l Trade 2006); *see also Nat'l Ass'n of Mirror Mfrs. v. United States,* 696 F. Supp. 642, 649 (Ct. Int'l Trade 1988) (requiring agency to discuss "material issues of law or fact").  Here, Commerce never addressed key record evidence discussing the statistical faults with Commerce's use of the Cohen's *d* test and explaining the unreasonableness of Commerce's approach.

The Hedges Report was directly relevant and substantial proof of the invalidity of Resolute's margins using the Cohen's *d* test.  Commerce's disregard of this record evidence was arbitrary and capricious.   *See Guangzhou Jangho Curtain Wall Sys. Eng'g Co. v. United States,* 181 F. Supp. 3d 1265, 1278 (Ct. Int'l Trade 2016) ("By not addressing this argument, Commerce has 'entirely failed to consider an important aspect of the problem.'") (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, (1983)); *see also Zhaoqing Tifo,* 60 F. Supp. 3d at 1365 ("Commerce's explanation is not merely thin; it is non-existent. It thus cannot be said that 'the agency's path may reasonably be discerned.'") (quoting *State Farm*, 463 U.S. at 43).

    4.    The Government Misconstrues Resolute's Argument On The Role Of WTO Jurisprudence

Resolute argued additional grounds for "good cause" aside from binding CAFC precedent and expert record evidence.  *See* Resolute Br. at 35-36.  Commerce should have accounted for adverse WTO rulings on zeroing and the DPM when considering "good cause."  *See* Resolute Case Br. at 24-35, P.R. 36.  The Government defends Commerce's failure to consider WTO decisions, calling them "irrelevant to United States courts."  Govt. Br. at 18.  The Government discounts the *Charming Betsy* doctrine and emphasizes that WTO reports are non-binding until adopted under the statutory scheme of URAA Section 129.  *See id.*

Resolute never claimed that WTO decisions were binding on this Court (nor on Commerce).  Rather, they may serve as persuasive authority and, where possible, U.S. courts should interpret the Tariff Act in harmony with the United States' WTO obligations.  *See* Resolute Br. at 35-36; *see also Murray v. Schooner Charming Betsy*, 6 U.S. 64, 118 (1804); *Allegheny Ludlum Corp. v. United States*, 367 F. 3d 1339, 1348 (Fed. Cir. 2004); SAA, 1994 U.S.C.C.A.N. at 4178.  Here, the weight of WTO authority demonstrates further deficiencies with the DPM, thereby justifying  resort to the "good cause" exception to consider Resolute's margins without running the Cohen's *d* test.  Regardless, the Court need not reach the WTO decisions as the jurisprudential and expert evidence are themselves adequate grounds for "good cause."

**D.**    **"EXTRAORDINARY CIRCUMSTANCES" PROVIDE A LEGAL BASIS TO ASSIGN A ZERO MARGIN TO RESOLUTE IN THE SUNSET REVIEW PROCEEDING**

The Government incorrectly argues that "Resolute identifies no authority suggesting that Commerce must reassess margins calculated in investigations or

other segments of a proceeding during sunset reviews, nor does it cite any authority suggesting that Commerce should not rely on the margins established in the investigation when conducting sunset reviews." Govt. Br. at 12. Resolute has explained Commerce's authority to reexamine margins in sunset reviews. *See* Resolute Br. at 43-46.

      1.    <u>Commerce's Failure To Address The Statute, Case Law, And Past Practice Was Arbitrary and Capricious</u>

The statute does not prohibit Commerce from acknowledging changes to the law that would impact the dumping margin in a sunset review.  The SAA provides that, "under the most extraordinary circumstances," the Department may "rely on dumping margins. . . other than those it calculated and published in its prior determinations." SAA, 1994 U.S.C.C.A.N. at 4214; Resolute Br. at 44.  "Extraordinary circumstances" are undefined, in the statute and the SAA, but Resolute argued that its demonstration of "good cause," based on an evolving jurisprudence, provided the requisite basis to apply the "extraordinary circumstances" exception here.   *See* Resolute Case Br. 43-46, P.R. 36.

Commerce failed to discuss the "extraordinary circumstances" standard to any meaningful extent, *see* IDM at 21-22, P.R. 45, and its failure to respond to Resolute's arguments on this issue during the sunset review reflects arbitrary decision-making. *See* Resolute Case Br. at 42-44, 48; *see also Zhaoqing Tifo,* 60 F. Supp. 3d at 1364-65.

The Government and the Defendant-Intervenors attempt to distinguish certain cases cited by Resolute but miss the point: Commerce, and this Court, already have decided that the sunset review statute grants Commerce authority to revisit the

investigation rates and, in some cases, to redo them.  *See* Govt. Br. at 19-21; Coalition Br. at 27-28; SP Br. at 20.

Commerce took this approach, for example, in cases involving the practice of zeroing.  *See* Resolute Br. at 44-45 (citing IDMs for *Final Results of Full Sunset Reviews of the Antidumping Duty Orders on Corrosion Resistant Carbon Steel Flat Products from Germany and the Republic of Korea*; *Final Results of the Expedited Third Sunset Reviews of the Antidumping Duty Orders on Certain Preserved Mushrooms from Chile, India, Indonesia, and the People's Republic of China* ("*Certain Preserved Mushrooms* IDM"); *Final Results of the Expedited Third Sunset Review of the Antidumping Duty Order on Certain Preserved Mushrooms from Indonesia; Recalculation of the LTFV Investigation Margin*); *see also Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Proceedings; Final Modification*, 77 Fed. Reg. 8,101, 8,109 (Dep't of Commerce Feb. 14, 2012) (concluding that, in sunset reviews, "it is possible that in some instances, dumping margins will need to be recalculated to avoid reliance on such dumping margins {using zeroing}," and reserving the discretion to do so "on a case-specific basis.").[9]  This case is no different – an underlying margin is tainted by an unreasonable methodology and Commerce should have taken into account Resolute's A-A margin – on the record – showing no dumping.  *See* Resolute Br. at 38 n.14.

---

[9] The only rate in *Certain Preserved Mushrooms* that used zeroing was for an Indonesian firm. Commerce recalculated the rate but it remained above *de minimis*. Commerce ultimately made an affirmative likelihood determination.  *See Certain Preserved Mushrooms* IDM at 10-11, 13.

This Court, in *Govt. of Uzbekistan v. United States,* 25 C.I.T. 1804 (2001), also deemed the recalculation of a dumping rate appropriate in the context of a sunset review.  Commerce had relied on a Best Information Available ("BIA") preliminary dumping rate to make a likelihood finding as to imports of subject merchandise.  A suspension agreement had prevented the calculation of any other dumping margins over the review period.  The Court found that Commerce "cannot simply accept the preliminary BIA margin based on the 'normal' rules. It must use the discretion given to it by the statute to address an *extraordinary* situation so as to make some rational decisions in a fair manner." *Id.* at 1088 (emphasis added).  The Court held: "As Commerce lacks information to provide a reasonably accurate margin for Uzbekistan, it shall gather new data." *Id.*  Contrary to Sierra Pacific's argument, *see* SP Br. at 20, the circumstances in the *Uzbekistan* case are no more extraordinary than Commerce's continued insistence on an unreasonable methodology that defies statistical literature and leads to inaccurate dumping margins.

Sierra Pacific also claims that, without the use of the DPM, "Commerce would not necessarily have calculated a zero dumping margin as Resolute assumes."  SP Br. at 21 n.4.  The record, however, shows that, without the DPM and zeroing, dependent upon resort to the A-T methodology, Resolute would have had a margin of zero using the preferred A-A methodology.  *See* Res. Final AD Calc Memo INV, at 3 (Resolute Sub. Resp., Exh. 1), P.R. 28, C.R. 1.  That zero margin does not even take into account other company-specific dumping calculations challenged by Resolute.  Were Resolute not to prevail on those company-specific claims, the A-A rate would remain at zero.

2.    Recourse To "Extraordinary Circumstances" Is Not Limited To Full Sunset Reviews

The Coalition attempts to read a limitation into the "extraordinary circumstances" exception: "As an initial matter, because this is an expedited sunset review, Commerce will not consider a rate other than one calculated and published in a prior determination."  Coalition Br. at 25.  The Coalition asserts that under Commerce's regulations and practice, Commerce must "limit" consideration of "extraordinary circumstances" to "full reviews." *Id.* (citing 19 C.F.R. § 351.218(e)(2)(i)).

The Coalition's argument is built on a faulty interpretation of the law and Commerce's regulations.  The sunset review statute nowhere defines "extraordinary circumstances" nor limits the exception to full five-year reviews.  *See* 19 U.S.C. § 1675a(c)(3).  The SAA supports this interpretation, placing no limitations based on the distinction between types of sunset reviews.  *See* SAA, 1994 U.S.C.C.A.N. at 4214.

The regulation cited by the Coalition states that "{e}ven where the Department conducts a full sunset review," Commerce will resort to a non-record margin only in the "most extraordinary circumstances."  19 C.F.R. § 351.218(e)(2)(i). This wording implies that the exception is broadly available in any type of sunset review, including a full review where the mere existence of a more developed record does not obviate the requirement of showing "extraordinary circumstances."  That interpretation is the only one consistent with the statute and past practice underscores Commerce's own view that the exception is not limited to full reviews.  *See, e.g., Certain Preserved Mushrooms* IDM, June 30, 2015, at 13.

According to the Government, the Court in *Dillinger* has "{i}mportantly. . . distinguished full and expedited sunset reviews and confirmed that expedited reviews

are based on facts available." Govt. Br. at 19 (citing *AG der Dillinger Huttenwerke v. United States*, 193 F. Supp. 2d 1339, 1348 (Ct. Int'l Trade 2002)); *see also* 19 U.S.C. § 1675(c)(3)(B). The Coalition also reads *Dilinger* as limiting reliance on the "extraordinary circumstances" exception to full reviews. *See* Coalition Br. at 27. The Government and Coalition are making a distinction without any material difference.

The statute does not prohibit a party to an expedited sunset review from making a claim of "extraordinary circumstances," regardless what evidentiary standards apply or whether a substantive response to the notice of initiation was deemed "adequate" within the meaning of 19 C.F.R. § 351.218(e)(1)(ii)(A). Nor did the *Dillinger* Court impose such a limit on "extraordinary circumstances."

Whereas Commerce may be required "to issue a final determination based on the facts available," 19 U.S.C. § 1675(c)(3)(B), that term does not mean Commerce is to examine only the record from the investigation and administrative reviews of the AD order. The SAA is unambiguous that the term "facts available" includes "information submitted on the record by parties in response to the notice of initiation." SAA, 1994 U.S.C.C.A.N. at 4206. The regulations provide that a party responding to a notice of initiation may submit evidence of "good cause" or "any other relevant information or argument that the party would like the Secretary to consider." 19 C.F.R. § 351.218(d)(3)(iv)(A) & (B). Resolute, exercising its rights, has placed extensive evidence and argument on the record to support its claim to "extraordinary circumstances," and Commerce must take that information into account.

Resolute is asking this Court to decide the lawfulness of Commerce's Final Results in the expedited sunset review as to Resolute. Commerce erred in rejecting Resolute's showing of "extraordinary circumstances" and in resorting to margins

calculated using an unreasonable methodology, as demonstrated by binding CAFC jurisprudence and expert record evidence.  Commerce itself has exercised similar authority to revisit and redo dumping margins in sunset reviews and could have and should have done so here.

### III.    THE EQUITIES CALL FOR A DIFFERENT OUTCOME

Commerce's dumping finding in the investigation as to Resolute is not necessarily in accordance with law.  The sunset review provision recognizes that, after five years, companies subject to trade-restrictive orders may have those orders revisited.  That right is rendered meaningless when the law has changed – as in the case of the DPM and the Cohen's *d* test – yet Commerce refuses to consider how those changes in law may have affected its original treatment of a company.  In this particular case, Resolute is caught in between – the law is changing but is not yet definitively changed.  Because of that uncertainty, Resolute is being denied its right to a considered sunset review.   Resolute should not have to wait another five years for the possible exercise of that right.

Commerce should be required, in light of more recent jurisprudence, to revisit the rates it used to determine a likelihood of dumping, which is the foundation of its conclusion.  Commerce does not say that Resolute is likely to dump; it bypasses that argument through the passive voice, that dumping is likely to continue.  Because dumping may be likely to continue but not by Resolute, Resolute is being deprived of its rights.  The interests of fairness demand a different result.  *See, e.g., Koyo Seiko Co., Ltd. v. United States,* 764 F. Supp 1108, 1111 (Ct. Intl. Trade 1990) (remanding to Commerce on grounds of "fairness").

**IV.    CONCLUSION**

For the reasons set forth in this Reply Brief, and in the Memorandum of Points and Authorities to Accompany Resolute's Motion for Judgment on the Agency Record, Resolute respectfully requests that this Court find Commerce's Final Results to be arbitrary, capricious and otherwise not in accordance with law.  Resolute asks for a remand to Commerce with instructions to:

(i) find that there is no likelihood of the continuation or recurrence of dumping as to Plaintiff;

(ii) revoke the antidumping duty order on softwood lumber from Canada as to Plaintiff; and

(iii) grant Plaintiff such additional relief as the Court may deem just and proper.


Respectfully submitted,


Elliot J. Feldman
Michael S. Snarr
Ronald J. Baumgarten
Tung A. Nguyen

Baker Hostetler LLP
Counsel to Resolute FP Canada Inc.

Dated: May 2, 2024

**CERTIFICTE OF COMPLIANCE**

Pursuant to U.S. Court of International Trade Chamber Procedure 2(B)(1), the

undersigned certifies that this brief complies with the word limitation requirement. The

word count for Resolute FP Canada Inc.'s Rule 56.2 Reply Brief, as computed by Baker

Hostetler's word processing system (Microsoft Word for Microsoft 365, version 2402), is

6,896 words.


/s/ Elliot J. Feldman
Signature of Attorney


Elliot J. Feldman
Name of Attorney


Resolute FP Canada Inc.
Representative Of


May 2, 2024
Date